1  **KATTEN MUCHIN ROSENMAN LLP**
Stuart M. Richter (SBN 126231)
2  stuart.richter@kattenlaw.com
Yonaton Rosenzweig (SBN 248137)
3  yoni.rosenzweig@kattenlaw.com
Meegan Maczek (SBN 260609)
4  meegan.maczek@kattenlaw.com
2029 Century Park East, Suite 2600
5  Los Angeles, CA 90067-3012
Telephone:  310.788.4400
6  Facsimile:  310.788.4471

7  Attorneys For Plaintiff
GOTTEX FUND MANAGEMENT, LTD.

FILED
CLERK, U.S. DISTRICT COURT

JUN 1 8 2013

CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

8
## UNITED STATES DISTRICT COURT
9
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11 GOTTEX FUND MANAGEMENT, LTD., a Delaware corporation, | Case No. SACV13-922-CJC(RNBx) |
| 12  Plaintiff, | **COMPLAINT FOR:** |
| 13  vs. | |
| 14 MKA REAL ESTATE OPPORTUNITY FUND I, LLC, a California limited liability company; MKA CAPITAL GROUP ADVISORS, LLC, a California limited liability company; JASON SUGARMAN, an individual; MICHAEL ABRAHAM, an individual; ELIZABETH SUGARMAN, an individual; LAUSANNE, LLC, a California limited liability company; EQUIPMENT RENTAL & MANAGEMENT, LLC, a Nevada limited liability company; and DOES 1-10, | **(1)-(6) BREACH OF CONTRACT** |
| | **(7)    FRAUDULENT CONVEYANCE** |
| | **(8)    CONVERSION** |
| | **(9)    AIDING AND ABETTING CONVERSION** |
| | **(10)   BREACH OF FIDUCIARY DUTY** |
| | **(11)   AIDING AND ABETTING BREACH OF FIDUCIARY DUTY** |
| Defendants. | **(12)   CIVIL CONSPIRACY TO CONVERT PROPERTY AND BREACH FIDUCIARY DUTIES** |

24        Plaintiff Gottex Fund Management, Ltd. ("Gottex Agent") as assignee of and
25  administrative agent for Gottex ABI Master Fund, Limited ("Gottex ABI"), Gottex
26  ABL (Cayman) Limited ("Gottex Cayman"), Hudson ABL Fund Limited ("Hudson"),
27  GVA ABL Portfolio Limited ("Gottex ABL") ("Noteholders" and, collectively with
28  the Gottex Agent, the "Gottex Entities") alleges as follows:

**COMPLAINT**

**INTRODUCTION**

1.     The Gottex Agent, on behalf of the Noteholders, seeks damages and other relief to remedy misappropriations, diversions of funds, and other financial wrongdoing by Defendants MKA Real Estate Opportunity Fund I, LLC ("MKA Fund"), MKA Capital Group Advisors, LLC ("MKA Advisors"), Jason Sugarman, Michael Abraham, Elizabeth Sugarman, Lausanne, LLC ("Lausanne") and Equipment Rental & Management, LLC ("ERM").  Noteholders loaned $100 million to defendant MKA Fund for MKA Fund to make real-estate secured loans and other related investments.  In exchange, MKA Fund granted the Noteholders a first priority blanket security interest in all of its existing and future property and assets, including MKA Fund loans, proceeds from the sales of the property securing payment of those loans, and collections on judgments or settlements enforcing MKA Fund loans or guaranties. To protect the Noteholders' security interests, MKA Fund agreed that all proceeds from collateral collected by MKA Fund would be deposited into a "Control Account" (sometimes referred to as a "Custody Account") controlled by the Gottex Agent. MKA Fund and its manager—MKA Advisors—concede that they bypassed and diverted money from that Control Account into accounts owned by them and/or their attorneys acting for them, in defiance of contractual and equitable obligations as well as Gottex's express instructions.  Millions of dollars of diverted collateral proceeds were used to benefit Jason Sugarman and Michael Abraham—owners and insiders of MKA Fund and MKA Advisors—to settle personal judgments and other obligations. The other defendants—ERM, Lausanne, and Elizabeth Sugarman—are related to and controlled by Sugarman and Abraham and entities that were used as conduits for and/or benefitted from these improper transfers.

2.     The Gottex Entities seek damages for all sums fraudulently converted by Defendants, and orders restoring property and cash to the Gottex Entities.

**PARTIES AND RELATED ENTITIES**

3.      Plaintiff Gottex Agent is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in Boston, Massachusetts, and is qualified to do business in California.  It is the administrative agent for Noteholders, Gottex ABI, Gottex Cayman, Hudson, and Gottex ABL, with authority to assert the rights of the Noteholders regarding the debts and other obligations alleged in this case.  Noteholders assigned to the Gottex Agent all of their rights to bring the claims in this action and any claims arising from the contracts and relationships alleged herein by agreement dated as of July 4, 2012.

4.      Defendant MKA Fund is a limited liability company organized under the laws of the State of California and located in Orange County, California.  It is the debtor to the Noteholders and the signatory of all the contracts in this action.  MKA Fund previously sued the Gottex Entities in federal court on diversity grounds.  On information and belief, none of the members of MKA Fund is a resident of any state where any Gottex Entity is a citizen or resident.

5.      Defendant MKA Advisors is a limited liability company organized under the laws of the State of California and with its principal place of business in Orange County, California.  It is the manager of MKA Fund and the signatory of several of the contracts in this action.  On information and belief, none of the members of MKA Advisors is a resident of any state where any Gottex Entity is a citizen or resident.

6.      Defendant Jason Sugarman is a resident of Los Angeles County, California and a principal of MKA Advisors and one or more of its affiliates.

7.      Defendant Michael A. Abraham is a resident of Orange County, California and a principal of MKA Advisors and one or more of its affiliates.

8.      Defendant Elizabeth Sugarman is a resident of Los Angeles County, California.  She is married to Jason Sugarman, and a principal of Lausanne.

9.      Defendant Lausanne is a limited liability company organized under the laws of the State of California and with its principal place of business in Los Angeles

**COMPLAINT**

County, California.  On information and belief, none of the members of Lausanne is a resident of any state where any Gottex Entity is a citizen or resident.

10.  Lausanne is controlled by Elizabeth Sugarman and other agents and/or entities controlled by Jason Sugarman.

11.  Defendant ERM is or was a limited liability company organized under the laws of the State of Nevada and with its principal place of business in Las Vegas, Nevada.  On information and belief, none of the members of ERM has been a resident of any state where any Gottex Entity is a citizen or resident.  ERM may have dissolved after the conduct alleged herein and its owners or other parties responsible for its debts will be named when the same has been discovered.  ERM is controlled by Jason Sugarman and agents and/or entities controlled by Jason Sugarman.

12.  Daniel D. White is general counsel for MKA Advisors and MKA Fund and exercises control over MKA Fund, MKA Advisors, Lausanne and/or ERM.

13.  Mr. George Baker is the President of MKA Fund and Mr. Kenneth Lipinski is the Chief Financial Officer of MKA Fund.

14.  Mr. George Baker is the President of MKA Advisors and Mr. Kenneth Lipinski is the Chief Financial Officer of MKA Advisors.

15.  Does 1-10 are entities or individuals with liability for the conduct described herein including by direct conduct, agency, alter ego, or by other legal reason including, inter alia, by being the owner of one of the Defendants if any one of said Defendants dissolves or has dissolved.

## JURISDICTION AND VENUE

16.  This court has jurisdiction over this matter pursuant to Title 28 of the United States Code section 1332, as complete diversity exists between the parties and the matter in controversy exceeds $75,000.

17.  Venue is proper in this Court because the contracts at issue in this action were made and executed, and were to be performed, in whole or in part in Orange County, California.  Also, the Gottex Entities and Defendants agreed that any legal

1    action or proceeding with respect to the contracts at issue in this case may be brought
2    in any federal court sitting in Los Angeles County, California.

### FACTS COMMON TO ALL CAUSES OF ACTION

#### The Amended Notes

5    18.    In 2006, the Noteholders agreed to loan MKA Fund $60 million, as
6    originally reflected in six notes signed by MKA Fund for the benefit of the
7    Noteholders.  Shortly thereafter, a loan for an additional $40 million was agreed to.
8    The existing seven (7) notes were amended and restated in or around November 2007
9    providing for a maturity date of April 2008 (the "Amended Notes").

10    19.    MKA Fund used the proceeds of this $100 million financing transaction
11    to make real estate secured loans.  MKA Fund also pursued claims, settlements, and
12    judgments related to its assets.

#### The Security Agreement

14    20.    To secure MKA Fund's repayment obligations under the original 2006
15    notes, MKA Fund executed a security agreement.  At or around the time that the
16    Amended Notes were signed, the parties entered into an "Amended and Restated
17    Security Agreement" (herein, as amended, "Security Agreement") dated as of April
18    12, 2006.  Attached hereto as **Exhibit 1** is a true and correct copy of the **Security
19    Agreement**.

20    21.    The Security Agreement granted the Gottex Agent, as agent to the
21    Noteholders, certain powers over the assets of MKA Fund including (1) an assignment
22    of all collateral as well as first priority blanket security on any assets acquired or
23    owned by MKA Fund at any time as well as first priority liens on the proceeds from
24    any sale of those assets, and (2) attorney-in fact power over the collateral upon any
25    event of default.

26    22.    Paragraph 4 of the Security Agreement provided that:

> As security for the full and prompt payment, performance and
> discharge when due … of the Secured Obligations, Debtor
> [MKA Fund] hereby pledges and grants Administrative Agent,

as agent for the Secured Parties, a Lien on and security interest in and right of set-off against …, *and assigns to* Administrative Agent, as agent for the Secured Parties, all of Debtor's rights, interests, powers and privileges in and to the following assets of Debtor, wherever situated, now existing or hereafter arising (collectively, the "Collateral"):

    (i)    all Accounts;

    (ii)    all Investment Property;

    (iii)    all Contract Rights, Commercial Tort Claims, cash, Deposit Accounts (including, but not limited to, the Custody Account, and all assets therein), General Intangibles (including Payment Intangibles and Software), Instruments (including any Promissory Notes), Inventory, Letter-of-Credit Rights and all Supporting Obligations;

    (iv)    all Documents; and

    (v)    all Proceeds of any and all of the foregoing.

23.    The secured obligations included all amounts due to the Gottex Entities under the Amended Notes, as well as all interest, fees, expenses, and costs of administering and maintaining the Collateral. (Security Agreement ¶ 5.) As set forth in Exhibit 2, these terms make clear that the Gottex Agent has a right of possession and control of the Proceeds from the sale of any Collateral.

<u>Control Account Agreement</u>

24.    MKA Fund and the Gottex Agent also entered into that certain "General Terms for the Deposit Account Control Agreement" (herein, "Control Account Agreement") dated as of June 30, 2006, which created a "Control Account" into which all proceeds of any MKA Fund collateral would be deposited for the benefit of the Noteholders. Attached hereto as **Exhibit 2** is a true and correct copy of the **Control Account Agreement.**

25.    Paragraph 6(b) of the Security Agreement required that all proceeds from the sale of any asset that MKA Fund invested in or owned, directly or indirectly, must be deposited into a Control Account. Similarly, Paragraph 9(e) required MKA Fund to turn over all distributions it receives from the Collateral to the Gottex Agent.

**COMPLAINT**

26.    The Control Account was established first at Alliance Bank.  Later, the account was moved to another bank pursuant to an agreement signed by MKA Fund, the Gottex Agent, and Banco Popular entitled "Instruction Letter Agreement related to Custody Accounts" (herein "Control Account Letter Agreement").  Attached hereto as **Exhibit 3** is a true and correct copy of the Control Account Letter Agreement.  In the Control Account Letter Agreement, Mr. Baker and Mr. Lipinski reaffirmed, on behalf of MKA Fund, that "all Proceeds of the Collateral will be deposited into the Control Account."  As MKA Fund's senior secured creditor, Gottex had exclusive approval rights for distribution of funds from the Control Account.

<u>The Default Provisions of the Security Agreement</u>

27.    MKA Fund agreed that, upon the occurrence of any default under the Security Agreement, the Gottex Agent would become MKA Fund's "true and lawful attorney-in-fact, with full power of substitution and full power and authority to acknowledge, swear to, record, file for any purpose and vote or consent to actions in respect of the Collateral without any notice to, or consent of, Debtor being required."  (Security Agreement ¶ 9(h).)

28.    The Security Agreement defined the following events of default, *inter alia*:  (i) "the transfer, sale or encumbrance of all or any portion of the Collateral in violation of this Agreement …"  (ii) the occurrence of any default under any "Note."  (Security Agreement ¶ 10.)

29.    MKA Fund's obligations under the Security Agreement were "absolute and unconditional" and not subject to any defense other than actual repayment.  (Security Agreement ¶ 13.)

30.    The Security Agreement further provided that any property or distributions from the Collateral that went to MKA Fund after default were being held "in trust for the benefit of the Gottex Entities."  (Security Agreement ¶ 9(e).)

## The Current Notes

31.     On April 9, 2008, the Gottex Entities sent a Notice of Default to MKA Fund claiming several defaults.

32.     After service of the Notice of Default, MKA Fund, MKA Advisors, and the Gottex Entities entered into a "Waiver Agreement" dated as of April 1, 2008. Attached hereto as **Exhibit 4** is a true and correct copy of the **Waiver Agreement**.

33.     At or around the time they entered the Waiver Agreement, the Amended Notes were amended and restated by entering into the following operative notes:

    a.    That certain "**Amended and Restated Promissory Note**" made by MKA Fund in favor of Gottex ABI as of April 1, 2008 for $36,970,548 at a 15% interest rate, with monthly interest due on the 10th of each month and a maturity date of December 1, 2008.  Attached hereto as **Exhibit 5** is a true and correct copy of this note.

    b.    That certain "**Second Amended and Restated Promissory Note**" made by MKA Fund in favor of Gottex Cayman as of April 1, 2008 for $26,052,961 at a 15% interest rate, with monthly interest due on the 10th of each month and a maturity date of December 1, 2008.  Attached hereto as **Exhibit 6** is a true and correct copy of this note.

    c.    That certain "**Second Amended and Restated Promissory Note**" made by MKA Fund in favor of Hudson as of April 1, 2008 for $4,986,536 at a 15% interest rate, with monthly interest due on the 10th of each month and a maturity date of December 1, 2008.  Attached hereto as **Exhibit 7** is a true and correct copy of this note.

    d.    That certain "**Second Amended and Restated Promissory Note**" made by MKA Fund in favor of Gottex ABL as of April 1, 2008 for $1,061,659 at a 15% interest rate, with monthly interest due on the 10th of each month and a maturity date of December 1, 2008.  Attached hereto as

**Exhibit 8** is a true and correct copy of this note.  (Collectively herein, as amended, "Current Notes").

34.    The Current Notes required timely repayment; they contain a series of affirmative and negative covenants; and they define various events of default.

35.    The Security Agreement remained in full force and effect as to the Current Notes.

Modification Agreement

36.    As of December 2008, MKA Fund was in default on its interest payments due under the terms of the Current Notes and was in default on its obligation to provide auditing information.

37.    As of December 2008, MKA Fund, MKA Advisors, and the Gottex Entities entered into a "**Modification Agreement**," a true and correct copy of which is attached hereto as **Exhibit 9.**

38.    The Modification Agreement provided for a revised maturity date on the Current Notes to December 2009.  (Modification Agreement ¶ 4(d).)

39.    The Modification Agreement required MKA Fund to make three "Periodic Payments of Principal" from March 1, 2009 to September 1, 2009 totaling **$36,000,000**.  (Modification Agreement ¶ 4(a)-(c).)

40.    The Modification Agreement amended the Security Agreement to make clear that the definition of "Control Account" would include any replacement of the then-current account at Alliance Bank.  (Modification Agreement ¶ 3(a).)

41.    Under the Modification Agreement, MKA Fund and MKA Advisors reaffirmed the obligation to grant the Noteholders a first priority security interest in all real property owned by MKA Fund, directly or indirectly, including "REO" properties (*i.e.* properties that MKA Fund acquired by foreclosure or credit bid or by any other manner as a lender or investor) and including, but not limited to, a list of properties set forth in Exhibit A of that agreement.  MKA Fund and MKA Advisors promised to record first deeds of trust in Gottex's favor on all REO properties.

42.    The Modification Agreement required the Gottex Entities' prior written approval before MKA Advisors could be paid any fees or expenses.  (Modification Agreement ¶ 10.)

43.    Simultaneously with the Modification Agreement, MKA Fund, MKA Advisors, the Gottex Agent, and each of the Noteholders entered into a series of "**Second Amendments**" to the Current Notes, true and correct copies of which are attached hereto as **Exhibit 10.**  The Second Amendments confirmed the extension of the maturity date to December 2009.  Further, both MKA Fund and MKA Advisors acknowledged the outstanding debts of MKA Fund to the Gottex Entities at that time:

a.    $33,468,610 owed by MKA Fund to Gottex ABI;

b.    $23,585,176 owed by MKA Fund to Gottex Cayman;

c.    $4,514,200 owed by MKA Fund to Hudson;

d.    $961,067 owed by MKA Fund to Gottex ABL.

MKA Fund's Defaults

44.    In breach of its obligations under the Current Notes, Security Agreement, Control Account Agreement, Control Account Letter Agreement, and Modification Agreement, MKA Fund:

a.    Failed to make monthly interest payments (Current Notes ¶ 5(b));

b.    Failed to make the Periodic Payments of Principal (Modification Agreement ¶ 4);

c.    Failed to repay the amounts due upon the amended maturity date of December 1, 2009 (Current Notes ¶ 5(a), as amended by the Second Amendment);

d.    Made unauthorized payments to MKA Advisors, which funds were used to pay Defendants Jason Sugarman and Michael Abraham. (Modification Agreement ¶ 10);

e.   Made actual or effective distributions/dividend payments, whether open or disguised, on account of equity interests in the property, without consent from MKA Fund (Current Notes ¶ 5(n)(ii));

f.   Failed to record a first priority deed of trust or mortgage on certain REO assets (Modification Agreement ¶¶ 1-2);

g.   Made unauthorized payments as purported "expenses" incurred in the sale of property that were in fact expenses unrelated to the sale of the property (Waiver Agreement ¶ 4(b));

h.   Failed to maintain sufficient capitalization and thereby committed a Collateral Breach (Current Notes ¶ 5(j));

i.   Failed to provide Gottex with all of the required monthly reports including the "Loan List," the list of Impaired Loans, the statement of redemption requests, financial statements, Manager certification, and/or other items (Current Notes ¶ 8(i));

j.   Failed to deposit Proceeds of the Collateral into the Control Account.

45.   By letters dated on or about June 13, 2012 and July 9, 2012, counsel for the Gottex Entities notified counsel for MKA Fund about certain of these breaches. Gottex demanded a return of proceeds from the sale of certain collateral which proceeds should have been deposited to the Control Account.  MKA Fund did not comply with this demand.

## The Fraudulent Transfers

46.   While MKA Fund was in default on its obligations to the Gottex Entities and was not otherwise paying its debts as and when due, Defendants acted in concert with their attorneys and other agents to engage in fraudulent conveyances and to misappropriate monies that were owned directly and/or beneficially by the Gottex Entities.  Under the terms of the agreements discussed above, all property owned by MKA Fund—directly or indirectly—and the proceeds from the property (by sale or

otherwise) was assigned to the Gottex Agent and the Gottex Agent had rights as attorney-in-fact over said property. Defendants knowingly acted together, aided and abetted one another, and conspired to violate these property rights, for the benefit of MKA Advisors, Michael Abraham, and Jason Sugarman.

47. During this time, MKA Fund sold and liquidated several assets which produced millions of dollars in proceeds. Under the parties' agreements and practice, the Gottex Entities had a right of possession to said funds. In a deliberate and intentional effort to avoid the Gottex Entities' contractual right to sweep the funds or to control how costs were paid on those assets, Defendants, acting in concert with their attorneys and other individuals, diverted money required to be paid into the Control Account. They paid the money into accounts controlled by MKA Advisors, its attorney Mr. White, or other affiliated parties. Defendants then used that money to pay MKA Advisors, Jason Sugarman, and Michael Abraham—using Elizabeth Sugarman, Lausanne, and ERM as knowing conduits—and other individuals and/or entities who were not entitled to payments ahead of the Gottex Entities. Defendants undertook these actions intentionally to avoid detection from the Gottex Entities and to make preferential payments to themselves, their owners, and to their preferred creditors who were subordinate to the Gottex Entities.

48. Defendants undertook these actions at a time when MKA Fund was insolvent. Since at least January 2009 and potentially earlier MKA Fund has been insolvent. According to its December 2011 financial statements, it had liabilities of $335,783,028 and assets of $21,678,070 at that time. Prior financial statements shared with the Gottex Agent show insolvency as early as January 2009.

49. For example, in March 2012, MKA Fund sold a condominium building that it had foreclosed upon in July 2011 ("Belaflora" or "Indiana Holdings"), which generated over $1 million in proceeds. Under the parties' agreements, the Gottex Entities had a right of possession in those funds and a right to sweep those funds once deposited into the Control Account. In a deliberate and intentional effort to avoid the

Gottex Entities' contractual rights, MKA Fund, acting in concert with its attorneys, MKA Advisors, Jason Sugarman and Michael Abraham, diverted money required to be paid into the Control Account. MKA Fund paid $1,304,592.27 to MKA Advisors through two channels. First, MKA Fund directed escrow to pay $512,540.00 directly to MKA Advisors. Second, it directed escrow to pay the remaining $792,052.00 in proceeds to the attorney trust account of Defendants' attorney, Daniel White. Mr. White then paid this $792,052.00 to MKA Advisors.

50.    MKA Fund failed to deposit the proceeds of the sale of New England Rancho into the Control Account. Instead, MKA Fund directed $282,849.29 in proceeds from the sale of New England Rancho to MKA Advisors.

51.    In October 2010, MKA Fund entered into a loan modification agreement regarding a project known as "Mesquite 55." Pursuant to this loan modification agreement, which was part of Gottex's collateral, MKA Fund was entitled to over $2.5 million in proceeds. From November 5, 2010 to March 2011, MKA Fund directed loan payments to the Control Account. But, beginning on April 20, 2011, MKA Fund, acting in concert with its attorneys, MKA Advisors, Jason Sugarman and Michael Abraham, directed the debtor to make loan payments to the attorney trust account of Defendants' attorney, Daniel White, in an intentional effort to avoid the Control Account. The direction to this borrower resulted in a diversion of $2,146,832.00 in loan proceeds.

52.    On or around May 24, 2011, MKA Fund entered into a loan modification agreement with its borrowers BDC Monte Sereno, LLC and Bermant Homes, Inc. MKA Fund immediately received a $643,838.00 receivable, which MKA Fund was required to deposit into the Control Account. Instead, MKA Fund directed the borrower to pay $519,358.00 to the trust account of Defendants' attorney, Daniel White, and $124,480.00 to MKA Advisors.

<u>Defendants Used the Unauthorized Insider Transfers</u>

<u>During Insolvency to Settle Personal Obligations</u>

<u>of Insider Jason Sugarman</u>

53.  In September 2008, several junior secured MKA Fund creditors ("<u>Freestone</u>") sued Jason Sugarman and Michael Abraham in Washington ("<u>Washington Action</u>") for breach of personal guaranties of loans made by Freestone to MKA Fund by way of several promissory notes ("<u>Freestone Notes</u>"). (Freestone was barred from suing MKA Fund for damages because the collateral securing the Freestone Notes was and is subordinate to the Gottex Entities' collateral.) On October 26, 2010, the Washington court entered judgment against Jason Sugarman and Michael Abraham personally for $6,926,750.00 ("<u>Sugarman/Abraham Washington Judgment</u>"). The Washington court also entered judgment against Michael Abraham personally for $23,550,950.00 ("<u>Abraham Washington Judgment</u>").

54.  On or around October 3, 2011, Freestone, Jason Sugarman, Elizabeth Sugarman, Michael Abraham, ERM, Lausanne and other entities entered into a settlement agreement by way of a Note Purchase Agreement ("<u>Note Purchase Agreement</u>") relating to the Sugarman/Abraham Washington Judgment. Pursuant to the Note Purchase Agreement, ERM agreed to purchase the Freestone Notes from Freestone for $2.5 million in cash.

55.  Defendants and Mr. White structured the Note Purchase Agreement in order to create the appearance that the $2.5 million purchase price was not coming from money belonging to MKA Fund or any other source due or owing to Noteholders. But the source of the $2.5 million purchase price was MKA Fund and the money used was due and owing to the Noteholders. Through a series of sham assignments of the Freestone Notes by ERM to Lausanne and by ERM and Lausanne to MKA Advisors, MKA Advisors paid the $2.5 million, with money that MKA Fund transferred to MKA Advisors directly or through the trust account of Daniel White, all of which should have been deposited into the Control Account.

56.    The "Note Purchase Agreement" is an elaborate, but thinly veiled sham arrangement by which entities controlled by Mr. Sugarman and his wife could settle litigation against him using MKA Fund assets, without disclosure or consent of the senior secured creditor, Gottex.  This conclusion is obvious because the Freestone notes were worthless—reflecting subordinate debt from an insolvent entity.  The only value to ERM for paying $2.5 million was to obtain releases for Mr. Sugarman and to avoid judgment enforcement against him.  The buyer of the Note, ERM, promised not to enforce the notes until Gottex and the remaining Freestone notes were paid off (para 1.7).  Freestone agreed, as part of the settlement, to return money that Jason Sugarman had paid them ($1,434,693.06 on May 26, 2011 and $33,002.64 on June 8, 2011).  Those moneys, not coincidentally, were paid to Freestone shortly the after Mesquite 55 proceeds and Bermant proceeds were diverted from the Control Account.

57.    In order to induce Freestone to enter into this improper arrangement, Sugarman and ERM falsely represented and warranted to Freestone that "no portion of the Purchase Price shall be delivered direct from MKA or indirectly from assets of MKA existing on or after June 1, 2007."  (Section 1.3.)  That date was selected because it was close to the date Gottex sent a default notice to MKA Fund.

<u>Defendants Used The Unauthorized Insider Transfers</u>

<u>During Insolvency to Settle Personal Obligations</u>

<u>of Insiders Michael Abraham</u>

58.    On or about December 29, 2011, Freestone, Michael Abraham, MKA Fund, MKA Advisors,  and other individuals and entities entered into a forbearance and settlement agreement ("<u>Abraham Settlement Agreement</u>") relating to the Abraham Washington Judgment.  Under the Abraham Settlement Agreement, Michael Abraham made a payment of $878,485.40 to Freestone around late December 2011/early January 2012 and an additional $500,000.00 payment to Freestone shortly thereafter.  Mr. Abraham made a third payment to Freestone in the amount of around $1,000,000 to comply with a $3,000,000 payoff amount.

59.     To pay Freestone pursuant to the Note Purchase Agreement and Abraham Settlement Agreement, Defendants, in concert with their attorneys and others, directed that funds from the sale of MKA Fund assets be diverted in such a manner to evade the Gottex Entities' attention and to avoid the Control Account. MKA Fund made these transfers at a time when MKA Fund was insolvent.

60.     Identical to the ERM Note Purchase Agreement, Mr. Abraham and his wife falsely represented and warranted in the Abraham Settlement Agreement that "no portion of the fund received or to be paid to Freestone under this Agreement shall be derived directly from MKA or indirectly from assets of MKA existing on or after June 1, 2007." (Para. 1.7.) In fact, the settlement payments came from funds that should have been placed in the Control Account for the benefit of the Noteholders. Mr. and Mrs. Abraham are currently in litigation with Freestone over the source of these funds.

Defendants Used The Unauthorized Transfers

During Insolvency to Pay Other Preferred Obligations

Before Gottex

61.     Based on the information it has obtained through its rights as a secured creditor (and without the benefit of the MKA Advisors' general ledger), the Gottex Agent has conducted a preliminary analysis of the monies that MKA Fund paid to various sources without using the Control Account, after defaulting on the Modification Agreement December 1, 2009. A total of $ 12,204,263 in disbursements recorded in the general ledgers did not go through the Control Account. Among other things, approximately $6,666,329 was paid to MKA-related individuals and entities, including MKA Advisors (over $3,600,000), Mr. White (over $2.5 million), Mr. Abraham, Mr. Sugarman, and Mr. Sugarman's assistant. Approximately $2,972,000 was paid to legal firms (and, on information and belief, a substantial amount was reimbursed by insurance companies.)

62.     The general ledgers, however, do not tell the full story of the diversion of MKA Fund's property because, on many occasions, proceeds from an MKA-Fund-

asset escrow were never recorded in any MKA Fund general ledger, but would instead be paid directly to a vendor, or be paid immediately as a supposed "management fee" to MKA Advisors.

## FIRST CAUSE OF ACTION

### (Against MKA Fund for Breach of Contract as to Gottex ABI Note)

63. The Gottex Agent, on behalf of Gottex ABI, hereby incorporates by reference paragraphs 1 through 62 as if stated in full herein.

64. The "Amended and Restated Promissory Note" dated as of April 1, 2008, and made by MKA Fund in favor of Gottex ABI, the Modification Agreement, and other contracts alleged above are valid, binding, and enforceable contracts.

65. Gottex ABI has performed all of its obligations to MKA Fund under the terms of such contracts except for any obligation(s) the performance of which have been discharged by operation of law and/or waived by MKA Fund or its agents.

66. MKA Fund has breached its obligations under said promissory note and other contracts for the reasons set forth above.

67. Gottex ABI has been damaged by the breach in the amount of the unpaid principal, interest, expenses, and other costs and expenses to which Gottex ABI is entitled under its agreements with MKA Fund but in no event less than $33,844,173.00, the outstanding indebtedness as of the end of 2012.

68. Pursuant to the provisions of the Current Note ¶¶ 13, 24, the Security Agreement ¶¶ 5, 8(b), the Modification Agreement ¶ 7, and any other applicable agreement, the Gottex Agent hereby prays for recovery of all attorneys' fees incurred by the Gottex Agent by reason of this lawsuit and any other losses, claims, liabilities, costs, or expenses incurred in this action as well as prior actions filed by the Gottex Agent to enforce its contractual rights.

COMPLAINT

## SECOND CAUSE OF ACTION

### (Against MKA Fund for Breach of Contract as to Gottex Cayman Note)

69. The Gottex Agent, on behalf of Gottex Cayman, hereby incorporates by reference paragraphs 1 through 68 as if stated in full herein.

70. The "Second Amended and Restated Promissory Note" dated as of April 1, 2008, and made by MKA Fund in favor of Gottex Cayman, the Modification Agreement, and other contracts alleged above are valid, binding, and enforceable contracts.

71. Gottex Cayman has performed all of its obligations to MKA Fund under the terms of such contracts except for any obligation(s) the performance of which have been discharged by operation of law and/or waived by MKA Fund or its agents.

72. MKA Fund has breached its obligations under said promissory note and other contracts for the reasons set forth above.

73. Gottex Cayman has been damaged by the breach in the amount of the unpaid principal, interest, expenses, and other costs and expenses to which Gottex Cayman is entitled under its agreements with MKA Fund, but in no event less than $23,849,817.00, the outstanding indebtedness as of the end of 2012.

74. Pursuant to the provisions of the Current Note ¶¶ 13, 24, the Security Agreement ¶¶ 5, 8(b), the Modification Agreement ¶ 7, and any other applicable agreement, the Gottex Agent hereby prays for recovery of all attorneys' fees incurred by the Gottex Agent by reason of this lawsuit and any other losses, claims, liabilities, costs, or expenses incurred in this action as well as prior actions filed by the Gottex Agent to enforce its contractual rights.

## THIRD CAUSE OF ACTION

### (Against MKA Fund for Breach of Contract as to Hudson Note)

75. The Gottex Agent, on behalf of Hudson, hereby incorporates by reference paragraphs 1 through 74 as if stated in full herein.

76. The "Second Amended and Restated Promissory Note" dated as of April 1, 2008, and made by MKA Fund in favor of Hudson, the Modification Agreement, and other contracts alleged above are valid, binding, and enforceable contracts.

77. Hudson has performed all of its obligations to MKA Fund under the terms of such contracts except for any obligation(s) the performance of which have been discharged by operation of law and/or waived by MKA Fund or its agents.

78. MKA Fund has breached its obligations under said promissory note and other contracts for the reasons set forth above.

79. Hudson has been damaged by the breach in the amount of the unpaid principal, interest, expenses, and other costs and expenses to which Hudson is entitled under its agreements with MKA Fund, but in no event less than $4,564,854.00, the outstanding indebtedness as of the end of 2012.

80. Pursuant to the provisions of the Current Note ¶¶ 13, 24, the Security Agreement ¶¶ 5, 8(b), the Modification Agreement ¶ 7, and any other applicable agreement, the Gottex Agent hereby prays for recovery of all attorneys' fees incurred by the Gottex Agent by reason of this lawsuit and any other losses, claims, liabilities, costs, or expenses incurred in this action as well as prior actions filed by the Gottex Agent to enforce its contractual rights.

## FOURTH CAUSE OF ACTION

### (Against MKA Fund for Breach of Contract as to Gottex ABL Note)

81. The Gottex Agent, on behalf of Gottex ABL, hereby incorporates by reference paragraphs 1 through 80 as if stated in full herein.

82. The "Second Amended and Restated Promissory Note" dated as of April 1, 2008, and made by MKA Fund in favor of Gottex ABL, the Modification Agreement, and other contracts alleged above are valid, binding, and enforceable contracts.

83.     Gottex ABL has performed all of its obligations to MKA Fund under the terms of such contracts except for any obligation(s) the performance of which have been discharged by operation of law and/or waived by MKA Fund or its agents.

84.     MKA Fund has breached its obligations under said promissory note and other contracts for the reasons set forth above.

85.     Gottex ABL has been damaged by the breach in the amount of the unpaid principal, interest, expenses, and other costs and expenses to which Gottex ABL is entitled under its agreements with MKA Fund, but in no event less than $971,881.00, the outstanding indebtedness as of the end of 2012.

86.     Pursuant to the provisions of the Current Note ¶¶ 13, 24, the Security Agreement ¶¶ 5, 8(b), the Modification Agreement ¶ 7, and any other applicable agreement, the Gottex Agent hereby prays for recovery of all attorneys' fees incurred by the Gottex Agent by reason of this lawsuit and any other losses, claims, liabilities, costs, or expenses incurred in this action as well as prior actions filed by the Gottex Agent to enforce its contractual rights.

## FIFTH CAUSE OF ACTION

**(Against MKA Fund for Breach of Contracts regarding the Custody Account)**

87.     The Gottex Agent, on its own behalf and on behalf of the Noteholders, hereby incorporates by reference paragraphs 1 through 86 as if stated in full herein.

88.     The Control Account Letter Agreement is a valid contract.

89.     The Modification Agreement is a valid contract.

90.     The Current Notes are valid contracts.

91.     The Security Agreement is a valid contract.

92.     The Control Account Letter Agreement, Modification Agreement, Current Notes, and Security Agreement all require and affirm MKA Fund's obligation to deposit all proceeds from the sale or disposition of any part of the Collateral, as defined in the Security Agreement, into a Control Account, as defined between the

1 parties.  Said Control Account was controlled by the Gottex Agent and designated at
2 Banco Popular, previously it was at Alliance Bank.

3   93. The Gottex Entities have performed all of their obligations to MKA Fund
4 under said contracts except for any obligation(s) the performance of which have been
5 discharged by operation of law or waived by MKA Fund, MKA Advisors, or their
6 agents.

7   94. MKA Fund has breached its obligations to deposit proceeds from
8 collateral sale into the Control Account.

9   95. The Gottex Agent has suffered actual damages subject to proof that
10 include, but are not limited to, the amount of all monies paid or disbursed by MKA
11 Fund, or on its behalf, unilaterally including but not limited to payments to insiders,
12 including to settle the Washington Action, which Gottex would have rejected outright.

13   96. Pursuant to the provisions of the Current Notes ¶¶ 13, 24, the Security
14 Agreement ¶¶ 5, 8(b), the Modification Agreement ¶ 7, and any other applicable
15 agreement, the Gottex Agent hereby prays for recovery of all attorneys' fees incurred
16 by the Gottex Agent by reason of this lawsuit and any other losses, claims, liabilities,
17 costs, or expenses incurred in this action as well as prior actions filed by the Gottex
18 Agent to enforce its contractual rights.

19 **SIXTH CAUSE OF ACTION**

20 **(Against MKA Fund for Breach of Security Agreement)**

21   97. The Gottex Agent, on its own behalf and on behalf of the Noteholders,
22 hereby incorporates by reference paragraphs 1 through 96 as if stated in full herein.

23   98. The Security Agreement dated as of April 12, 2006 is a valid contract.

24   99. The Gottex Entities have performed all of their obligations to MKA Fund
25 under the Security Agreement except for any obligation(s) the performance of which
26 has or have been discharged by operation of law.

27   100. MKA Fund has breached its obligations under the Security Agreement
28 for the reasons set forth above.

101.   The Gottex Agent has suffered actual damages subject to proof that include, but are not limited to, the amount of all monies paid or disbursed by MKA Fund, or on its behalf, unilaterally including, but not limited to, payments to insiders, including to settle the Washington Action, which Gottex would have rejected outright.

102.   Pursuant to the provisions of the Current Notes ¶¶ 13, 24, the Security Agreement ¶¶ 5, 8(b), the Modification Agreement ¶ 7, and any other applicable agreement,  the Gottex Agent hereby prays for recovery of all attorneys' fees incurred by the Gottex Agent by reason of this lawsuit and any other losses, claims, liabilities, costs, or expenses incurred in this action as well as prior actions filed by the Gottex Agent to enforce its contractual rights

### SEVENTH CAUSE OF ACTION

**(Against MKA Advisors, Jason Sugarman, Michael Abraham, Elizabeth Sugarman, Lausanne, ERM and Does 1-5: Fraudulent Conveyances – Actual and Constructive)**

103.   The Gottex Agent, on its own behalf and on behalf of the Noteholders, hereby incorporates by reference paragraphs 1 through 102 as if stated in full herein.

104.   At all times relevant, the Gottex Entities had a first prior security interest in all MKA Fund property and a right of repayment from MKA Fund for over $80,000,000.00 as of December 1, 2013.

105.   At the direction of Jason Sugarman, Michael Abraham, Daniel D. White and their agents, property and money belonging to MKA Fund were improperly and illegally transferred, directly and indirectly, to MKA Advisors, Jason Sugarman, Michael Abraham, Elizabeth Sugarman, Lausanne and ERM.

106.   Defendants took foregoing actions with the actual intent of hindering, delaying and/or defrauding the Gottex Entities from recovering debts owed to them by MKA Fund.   Defendants knew they were required to deposit all Collateral and its proceeds into the Control Account for the benefit of the Gottex Entities.   Instead, Defendants bypassed the Control Account to avoid detection by the Gottex Entities

and paid Collateral directly to MKA Advisors or the Daniel D. White Trust Account and directly or indirectly to Jason Sugarman, Michael Abraham, Elizabeth Sugarman, Lausanne and ERM.

107.  Defendants took the foregoing actions while MKA Fund was insolvent.

108.  In addition, MKA Fund transferred some or all property or incurred obligations without receiving reasonably equivalent value from the transferees.

109.  The Gottex Entities' right to repayment arose before Defendants engaged in the forgoing conduct.

110.  By the forgoing conduct, Defendants were a substantial factor in causing harm to the Gottex Entities.

111.  The Gottex Entities have been damaged in an amount subject to proof at trial but in no event less than the $3,583,519 plead above and/or paid for the Washington Judgment, Note Purchase Agreement, and Abraham Settlement Agreement.

112.  Defendants engaged in and/or orchestrated and carried out the fraudulent conveyances alleged above through and with the intent to avoid payments to and convert funds owing to the Gottex Entities.  Defendants did so with the actual intent to injure and harm the Gottex Entities for their own benefit and advantage.  The actions were malicious, fraudulent, and oppressive within the meaning of section 3294 of the California Civil Code and justify an award of exemplary damages according to proof.

113.  The harm to plaintiff and the Noteholders from Defendants' fraudulent conveyances is continuing cannot be fully compensated with money damages alone. Defendants' conduct was inequitable because, among other things, it deliberately and in secret denied plaintiff its right to recover even the principal on a $100,000,000 loan and it was done to benefit Defendants and their relatives and insiders, with the intention to harm plaintiff.  Plaintiff is entitled to a temporary and permanent injunction under California Civil Code sections 527 and 3422, enjoining and restraining Defendants and their agents from transferring, conveying or hypothecating

1    any funds owed to plaintiff or any money, asset, account, property, rights, notes,

2    commercial paper, or proceeds thereof derived directly or indirectly from any

3    Collateral, as defined in the Security Agreement, including all assets, property, or

4    proceeds held by or in title to MKA Opportunity Fund, directly or through other

5    entities, legally or equitably.

6        114.  Plaintiff is also entitled to an order requiring that Defendants' property,

7    accounts, and assets be placed in a constructive trust in an amount including all sums

8    of money fraudulent conveyed from MKA Fund or in avoidance of the Control

9    Account, as well as all money, assets, accounts, property, contract rights, notes,

10   commercial paper, or proceeds thereof derived directly or indirectly from any

11   Collateral, as defined in the Security Agreement, including all proceeds of such assets,

12   property, or proceeds held at any time in title to MKA Opportunity Fund, directly or

13   through other entities, legally or equitably.

## EIGHTH CAUSE OF ACTION

### (Against all MKA Advisors, Sugarman, and Abraham and

### Does 8-10: Conversion)

17       115.  The Gottex Agent, on its own behalf and on behalf of the Noteholders,

18   hereby incorporates by reference paragraphs 1 through 114 as if stated in full herein.

19       116.  The Gottex Entities had a possessory interest in $512,540.00 from the

20   proceeds of the sale of Belaflora, which proceeds were paid to MKA Advisors without

21   authorization.

22       117.  The Gottex Entities had a possessory interest in $792,052.00 from the

23   proceeds of the sale of Belaflora, which proceeds were paid to the Daniel D. White

24   trust account and then to MKA Advisors without authorization.

25       118.  The Gottex Entities had a possessory interest in $282,849.29 from the

26   proceeds of the sale of New England Rancho, which proceeds were paid to MKA

27   Advisors without authorization.

28

119. The Gottex Entities had a possessory interest in $2,146,832.00 from the proceeds of the loan modification and settlement agreement regarding Mesquite 55, which proceeds were paid to the Daniel D. White trust account, starting on April 21, 2011.

120. The Gottex Entities had a possessory interest in $124,480.00 paid on or around May 25, 2011 from the proceeds of the loan modification and settlement agreement dated May 24, 2011 with BDC Monte Sereno, LLC and Bermant Homes, Inc., which proceeds were paid to MKA Advisors without authorization.

121. The Gottex Entities had a possessory interest in $519,358.00 paid on or around May 25, 2011 from the proceeds of the loan modification and settlement agreement dated May 24, 2010 with BDC Monte Sereno, LLC and Bermant Homes, Inc., which proceeds were paid to the Daniel D. White trust account without authorization.

122. The Gottex Entities had a possessory interest in $1,434,693.06 used to pay junior creditor Freestone pursuant to the Sugarman/Abraham Washington Judgment on or around May 26, 2011.

123. The Gottex Entities had a possessory interest in $33,022.64 used to pay junior creditor Freestone pursuant to the Sugarman/Abraham Washington Judgment on or around June 8, 2011.

124. The Gottex Entities had a possessory interest in $878,485.40 used to pay junior creditor Freestone in late December 2011/early January 2012 pursuant to the Abrahams Settlement Agreement.

125. The Gottex Entities had a possessory interest in $500,000.00 used to pay junior creditor Freestone before January 30, 3012 pursuant to the Abrahams Settlement Agreement.

126. The Gottex Entities had a possessory interest in $1,000,000 used to pay junior creditor Freestone before on or about March 31, 2012 pursuant to the Abrahams Settlement Agreement (page 5) derived from the sale of Belaflora.

**COMPLAINT**

127. Defendants MKA Advisors, Sugarman, and Abraham intentionally and substantially interfered with the Gottex Entities' property by taking possession of these funds, preventing the Gottex Entities from having access to the funds, dissipating the funds to insiders, and refusing to return the funds upon demand.

128. The intent to interfere is demonstrated by, among other things, internal communications among Defendants and their attorneys where the intent to avoid Gottex's security is expressed. This intent is also evidenced by the terms of the Abraham Settlement Agreement and the Note Purchase Agreement, where Sugarman, Abraham, and ERM misrepresent the source of funds for payoff. This intent is also evidenced by the decision not to disclose to the Gottex Agent or seek its approval for these payments. This intent is also shown by the fact that payments which were previously being made to the Control Account—such as the Mesquite 55 loan modification payments—stopped being paid there when funds were needed. The intent is evidenced by the fact that, **one day before** the largest Mesquite 55 fraudulent conveyance alleged above, the Gottex Agent sent an expressly reminding MKA Fund, MKA Advisors, Sugarman, and their agents not to make **any** expense payments without using the Control Account. The immediate defiance within 24 hours of that instruction demonstrates bad faith, intentional misconduct, and an intent to harm the Gottex Agent.

129. The Gottex Entities did not consent to this interference.

130. The Gottex Entities were harmed thereby in an amount to be proven at trial.

131. These defendants engaged in and/or orchestrated and carried out this conversion through and with the intent to avoid payments to and convert funds owing to the Gottex Entities. Defendants did so with the actual intent to injure and harm the Gottex Entities for their own benefit and advantage. The actions were malicious, fraudulent, and oppressive within the meaning of section 3294 of the California Civil Code and justify an award of exemplary damages according to proof.

1    132.   The harm to plaintiff and the Noteholders from Defendants' conversion is
2    continuing cannot be fully compensated with money damages alone.   Defendants'
3    conduct was inequitable because, among other things, it deliberately and in secret
4    denied plaintiff its right to recover even the principal on a $100,000,000 loan and it
5    was done to benefit Defendants and their relatives and insiders, with the intention to
6    harm plaintiff.   Plaintiff is entitled to a temporary and permanent injunction under
7    California Civil Code sections 527 and 3422, enjoining and restraining Defendants
8    and their agents from transferring, conveying or hypothecating any funds owed to
9    plaintiff or any money, asset, account, property, rights, notes, commercial paper, or
10   proceeds thereof derived directly or indirectly from any Collateral, as defined in the
11   Security Agreement, including all assets, property, or proceeds held by or in title to
12   MKA Opportunity Fund, directly or through other entities, legally or equitably.

13   133.   Plaintiff is also entitled to an order requiring that Defendants' property,
14   accounts, and assets be placed in a constructive trust in an amount including all sums
15   of money converted from the Gottex Entities or in avoidance of the Control Account,
16   as well as all money, assets, accounts, property, contract rights, notes, commercial
17   paper, or proceeds thereof derived directly or indirectly from any Collateral, as
18   defined in the Security Agreement, including all proceeds of such assets, property, or
19   proceeds held at any time in title to MKA Opportunity Fund, directly or through other
20   entities, legally or equitably.

21                          **NINTH CAUSE OF ACTION**
22      **(Against MKA Advisors, Jason Sugarman, Michael Abraham, Elizabeth**
23      **Sugarman, Lausanne, ERM and Does 1-5: Aiding and Abetting Conversion)**

24   134.   The Gottex Agent, on its own behalf and on behalf of the Noteholders,
25   hereby incorporates by reference paragraphs 1 through 133 as if stated in full herein.

26   135.   The Gottex Entities had a possessory interest in the monies described
27   above.

28

136.   Defendant MKA Fund intentionally and substantially interfered with the Gottex Entities' property by taking possession of these funds, preventing the Gottex Entities from having access to the funds, dissipating the funds to insiders, and refusing to return the funds upon demand.

137.   Defendants each received or knowingly served as a conduit of said funds with the intent to aid in diverting and hiding money from the Gottex Entities.

138.   Defendants MKA Advisors, Jason Sugarman, Michael Abraham, Elizabeth Sugarman, Lausanne and ERM, with knowledge of the forgoing facts, provided substantial assistance and aid to one or more of the other Defendants in converting these sums of money.

139.   The defendants each took actions, alleged above, in furtherance of the same goal to aid and abet the conversion.

140.   The Gottex Entities were harmed in an amount to be proven and each defendant is jointly and severally liable therefor.

141.   These defendants engaged in and/or orchestrated and carried out this conversion through and with the intent to avoid payments to and convert funds owing to the Gottex Entities.  Defendants did so with the actual intent to injure and harm the Gottex Entities for their own benefit and advantage.  The actions were malicious, fraudulent, and oppressive within the meaning of section 3294 of the California Civil Code and justify an award of exemplary damages according to proof.

142.   Plaintiff repeats its allegations that it is entitled to a temporary and a permanent injunction as well as a constructive trust for the reasons set forth above in paragraphs 132-133.

## TENTH CAUSE OF ACTION

### (Against MKA Advisors, Jason Sugarman, Michael Abraham and Does 5-7:
### Breach of Fiduciary Duty – Trust Fund Doctrine)

143.   The Gottex Agent, on its own behalf and on behalf of the Noteholders, hereby incorporates by reference paragraphs 1 through 142 as if stated in full herein.

144.   MKA Advisors, Jason Sugarman, and/or Michael Abraham are or were the managers or officers of MKA Fund, or its owners, or the owners of its owners, at all times relevant.  They had effective control of MKA Fund at the time of the matters described above.   MKA Fund was actually insolvent at the time of the transfers discussed above regarding Belaflora, New England Rancho, Mesquite 55, BDC Monte Sereno, LLC and Bermant Homes, as well as the payment of the Washington Judgment, the Abrahams Settlement, and the Note Purchase Agreement, as well as the other payments and transfers discussed above.  Under the trust fund doctrine and *Berg & Berg Enterprises, LLC v. Boyle*, 178 Cal. App. 4th 1020 (2009), all managers, officers, or controlling equity holders of MKA Fund had fiduciary duties to the Gottex Entities.    Under the trust fund doctrine, MKA Advisors, Jason Sugarman, and/or Michael Abraham had a fiduciary duty to "avoid[] actions that divert, dissipate, or unduly risk corporate assets that might otherwise be used to pay creditors claims.  This would include acts that involve self-dealing or the preferential treatment of creditors ..." *Id.* at 1041.

145.   MKA Advisors, Jason Sugarman and/or Michael Abraham breached this fiduciary duty by the conduct described above and thereby were a substantial factor in harming the Gottex Entities.

146.   These defendants engaged in and/or orchestrated and carried out this fiduciary breach through and with the intent to avoid payments to and convert funds owing to the Gottex Entities.  Defendants did so with the actual intent to injure and harm the Gottex Entities for their own benefit and advantage.   The actions were malicious, fraudulent, and oppressive within the meaning of section 3294 of the California Civil Code and justify an award of exemplary damages according to proof.

147.   The harm to plaintiff and the Noteholders from Defendants' breach of fiduciary duties is continuing cannot be fully compensated with money damages alone.   Defendants' conduct was inequitable because, among other things, it deliberately and in secret denied plaintiff its right to recover even the principal on a

$100,000,000 loan and it was done to benefit Defendants and their relatives and insiders, with the intention to harm plaintiff. Plaintiff is entitled to a temporary and permanent injunction under California Civil Code sections 527 and 3422, enjoining and restraining Defendants and their agents from transferring, conveying or hypothecating any funds owed to plaintiff or any money, asset, account, property, rights, notes, commercial paper, or proceeds thereof derived directly or indirectly from any Collateral, as defined in the Security Agreement, including all assets, property, or proceeds held by or in title to MKA Opportunity Fund, directly or through other entities, legally or equitably.

148.   Plaintiff is also entitled to an order requiring that Defendants' property, accounts, and assets be placed in a constructive trust in an amount including all sums of money diverted or dissipated from the Gottex Entities or in avoidance of the Control Account, as well as all money, assets, accounts, property, contract rights, notes, commercial paper, or proceeds thereof derived directly or indirectly from any Collateral, as defined in the Security Agreement, including all proceeds of such assets, property, or proceeds held at any time in title to MKA Opportunity Fund, directly or through other entities, legally or equitably.

**ELEVENTH CAUSE OF ACTION**

**(Against MKA Advisors, Jason Sugarman, Michael Abraham, Elizabeth Sugarman, Lausanne, ERM and Does 6-8: Aiding and Abetting Breach of Fiduciary Duty)**

149.   The Gottex Agent, on its own behalf and on behalf of the Noteholders, hereby incorporates by reference paragraphs 1 through 148 as if stated in full herein.

150.   Defendants MKA Advisors, Jason Sugarman, Michael Abraham, Elizabeth Sugarman, Lausanne and ERM, with knowledge of the forgoing facts, provided substantial assistance and aid in the foregoing acts and for breaching the fiduciary duties owed to the Gottex Entities.

29

**COMPLAINT**

151.  As a result of this conduct, the Gottex Entities suffered damages in an amount to be proven at trial.

152.  These defendants engaged in and/or orchestrated and carried out this fiduciary breach through and with the intent to avoid payments to and convert funds owing to the Gottex Entities.  Defendants did so with the actual intent to injure and harm the Gottex Entities for their own benefit and advantage.  The actions were malicious, fraudulent, and oppressive within the meaning of section 3294 of the California Civil Code and justify an award of exemplary damages according to proof.

153.  Plaintiff repeats its allegations that it is entitled to a temporary and a permanent injunction as well as a constructive trust for the reasons set forth above in paragraphs 147-48.

## TWELFTH CAUSE OF ACTION

### (Against all Defendants and Does 6-8: Conspiracy to Commit Breach of Fiduciary Duty and Conversion)

154.  The Gottex Agent, on its own behalf and on behalf of the Noteholders, hereby incorporates by reference paragraphs 1 through 147 as if stated in full herein.

155.  Defendants each knew that the foregoing conduct constituted wrongful and/or tortious conduct which would deprive Gottex of its legal rights and/or deprive Gottex of money that rightfully was owed to Gottex.

156.  Defendants, and each of them, provided substantial assistance or encouragement to, and were substantial factors in, one another committing the conversions and breaches of fiduciary duty described above.

157.  Plaintiff repeats its allegations that it is entitled to a temporary and a permanent injunction as well as a constructive trust for the reasons set forth above in paragraphs 132-33. 147-48.

.

## PRAYER FOR RELIEF

WHEREFORE, the Gottex Agent hereby prays for relief as follows:

1.    On the First, Second, Third, and Fourth Causes of Action as to MKA Fund:

       a.    For a judgment in favor of the Gottex Agent awarding all amounts due under the Current Notes as provided by the terms thereof but in no event less than $63,230,725.00—the outstanding indebtedness as of the end of 2012—plus accrued interest;

       b.    For attorneys' fees as provided by the notes and amendments.

2.    On the Fifth and Sixth Causes of Action as to MKA Fund:

       a.    For a judgment in favor of the Gottex Agent in an amount to be determined by the Court or at trial awarding all proceeds, receivables, net sums, distributions, property, or any payments of any kind received by Defendants or any agent or vendor of MKA Fund and that comprised a proceed of the Collateral, directly or indirectly, which should have been deposited into the Control Account;

       b.    For attorneys' fees as provided by the agreements.

3.    On the Seventh Cause of Action for fraudulent conveyances as to all Defendants:

       a.    For a judgment in favor of the Gottex Agent in an amount to be determined at trial;

       b.    For all damages proximately caused by the fraudulent conveyances;

       c.    For exemplary damages;

       d.    For a temporary and permanent injunction;

       e.    For a constructive trust.

4.    On the Eighth Cause of Action for conversion as to MKA Advisors, Jason Sugarman, Michael Abraham and Does:

1          a.    For a judgment in favor of the Gottex Agent in an amount to be

2                determined by the Court or at trial;

3          b.    For all damages proximately caused by the conversion;

4          c.    For exemplary damages;

5          d.    For a temporary and permanent injunction;

6          e.    For a constructive trust.

7     5.    On the Ninth Cause of Action for aiding and abetting conversion as to

8  MKA Advisors, Jason Sugarman, Michael Abraham, Elizabeth Sugarman, Lausanne,

9  ERM and Does:

10         a.    For a judgment in favor of the Gottex Agent in an amount to be

11               determined at trial;

12         b.    For all damages proximately caused by the conversion;

13         c.    For exemplary damages;

14         d.    For a temporary and permanent injunction;

15         e.    For a constructive trust.

16    6.    On the Tenth Cause of Action for breach of fiduciary duty as to MKA

17  Advisors, Jason Sugarman, Michael Abraham and Does:

18         a.    For a judgment in favor of the Gottex Agent in an amount to be

19               determined at trial;

20         b.    For all damages proximately caused by the breach of fiduciary

21               duty;

22         c.    For exemplary damages;

23         d.    For a temporary and permanent injunction;

24         e.    For a constructive trust.

25    7.    On the Eleventh Cause of Action for aiding and abetting breach of

26  fiduciary duty as to MKA Advisors, Jason Sugarman, Michael Abraham, Elizabeth

27  Sugarman, Lausanne, ERM and Does:

28

**COMPLAINT**

1       a.     For a judgment in favor of the Gottex Agent in an amount to be

2             determined by the Court or at trial;

3       b.     For all damages proximately caused by the breach of fiduciary

4             duty;

5       c.     For exemplary damages;

6       d.     For a temporary and permanent injunction;

7       e.     For a constructive trust.

8    8.    On the Twelfth Cause of Action for civil conspiracy as to all Defendants

9 and Does:

10       a.     For a judgment in favor of the Gottex Agent in an amount to be

11             determined by the Court or at trial;

12       b.     For all damages proximately caused by the breach of fiduciary

13             duty;

14       c.     For exemplary damages;

15       d.     For a temporary and permanent injunction;

16       e.     For a constructive trust.

17    9.    On all causes of action:

18       a.     For an accounting;

19       b.     For costs of suit incurred herein;

20       c.     For attorneys' fees as provided by contract or by statute;

21       d.     For all other relief the Court deems proper.

22

23 Dated: June 18, 2013             KATTEN MUCHIN ROSENMAN LLP

24                             Stuart M. Richter

25                             Yonaton Rosenzweig

                               Meegan Maczek

26

27              By: _____

28                      Meegan Maczek

                     Attorneys for Plaintiff GOTTEX FUND

                     MANAGEMENT, LTD.

# EXHIBIT 1

## AMENDED AND RESTATED SECURITY AGREEMENT

THIS AMENDED AND RESTATED SECURITY AGREEMENT (the "Agreement") is dated as of April 12, 2006, between MKA Real Estate Opportunity Fund I, LLC, a California limited liability company ("Debtor"), in favor of Gottex Fund Management Ltd. as administrative agent for the Secured Parties (as defined herein) (the "Administrative Agent").

WHEREAS, (i) pursuant to the Note Purchase Agreement dated April 12, 2006 between Debtor and the Administrative Agent (the "Original Note Purchase Agreement"), Debtor issued six (6) secured registered promissory notes in an aggregate principal amount of $60,000,000 (each as amended, supplemented or otherwise modified from time to time and collectively, the "Tranche B Notes") and (ii) as a condition precedent to the purchase of the Tranche B Notes, Debtor granted a security interest in all of its assets pursuant to the security agreement between the Administrative Agent and Debtor dated as of April 12, 2006 (the "Original Security Agreement");

WHEREAS, Debtor, the Administrative Agent to the Noteholders (as defined below), and the other parties thereto have entered into an Amended and Restated Note Purchase Agreement dated as of April 12, 2006 (the "Note Purchase Agreement") and in connection therewith, Debtor has requested that one or more of GVA ABL Portfolio Limited, Gottex ABL (Cayman) Limited and Gottex ABI Master Fund Limited (collectively, the "Noteholders") purchase one or more secured registered promissory notes (each, as amended, supplemented or otherwise modified from time to time, a "Tranche A Note" and collectively, the "Tranche A Notes");

WHEREAS, on the date hereof, Gottex ABI Master Fund Limited intends to purchase a Tranche A Note in an aggregate principal amount of $40,000,000; and

WHEREAS, a condition precedent to the purchase of the initial Tranche A Note is that Debtor, among other things, enter into this Agreement to secure all obligations of Debtor to the Secured Parties, whenever arising, under the Note Purchase Agreement, each Note and each other Note Agreement (as defined below);

WHEREAS, Debtor will derive benefit from the purchase of the Tranche A Notes by the Noteholders; and

WHEREAS, Debtor is willing to enter into this Agreement on the terms and conditions hereinafter provided.

NOW, THEREFORE, for value received, in consideration of the premises, and in order to induce the Secured Parties to purchase the Tranche A Notes under the Note Purchase Agreement, Debtor hereby agrees with the Secured Parties as follows:

1. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Note Purchase Agreement and the following terms shall have the following meanings:

(a) "Accounts" means all "accounts," as such term is defined in the UCC, including each and every right of Debtor to the payment of money, whether such right to

84192580_3

payment now exists or hereafter arises, whether such right to payment arises out of a sale, lease or other disposition of goods or other property, out of a rendering of services, out of a loan, out of the overpayment of taxes or other liabilities, or otherwise arises under any contract or agreement, whether such right to payment is created, generated or earned by Debtor or by some other Person who subsequently transfers such Person's interest to Debtor, whether such right to payment is or is not already earned by performance, and howsoever such right to payment may be evidenced, together with all other rights and interests (including all Liens) which Debtor may at any time have by law or agreement against any account debtor or other obligor obligated to make any such payment or against any property of such account debtor or other obligor; including but not limited to all present and future Accounts, Contract Rights, loans and obligations receivable, credit card receivables, bonds, notes and other debt instruments, tax refunds and rights to payment in the nature of general intangibles.

(b)    "Cash Collateral" means all cash and cash equivalents standing to the credit of the Custody Account.

(c)    "Collateral" has the meaning set forth in Section 4 of this Agreement.

(d)    "Collateral Breach" means (i) with respect to the Tranche A Notes, the meaning set forth therein and (ii) with respect to the Tranche B Notes, the meaning set forth therein.

(e)    "Collateral Equity" has the meaning set forth in the Notes.

(f)    "Commercial Tort Claims" has the meaning given that term in the UCC.

(g)    "Contract Rights" means "contract rights" as such term is defined in the UCC and also any right to payment under a contract not yet earned by performance and not evidenced by an Instrument.

(h)    "Control Agreement" means that certain control agreement dated June 20, 2006 among the Custodian, the Administrative Agent and Issuer, as amended, supplemented or otherwise modified from time to time.

(i)    "Custody Account" means the one or more custody accounts (including, without limitation, any bank account(s)) established and maintained by Custodian under and pursuant to the Custody Agreement dated as of the date hereof between Debtor and Custodian, as the same may be amended from time to time (the "Custody Agreement"), and all assets from time to time held in or standing to the credit of any such account (or any successor account), and all Proceeds of the foregoing held in any such account (or successor account).

(j)    "Default" has the meaning set forth in Section 10 of this Agreement.

(k)    "Deposit Accounts" means a demand, time, savings, passbook, or other similar account maintained by a bank.  The term does not include investment property or accounts evidenced by an instrument.

(l)    "Document" means each file, record, ledger sheet and document, whether now owned or hereafter acquired, covering or relating to any of the Collateral.

84192980_3

2

(m)   "General Intangibles" means all "general intangibles," as such term is defined in the UCC, whether now owned or hereafter acquired, including, without limitation, causes of action, judgments, and payments under any settlement or other agreement.

(n)   "Instruments" has the meaning given that term in the UCC.

(o)   "Intercreditor Agreement" means that certain intercreditor agreement dated as of the date hereof among the Senior Lender, Secured Parties and Debtor, as amended, supplemented or otherwise modified from time to time.

(p)   "Inventory" means all inventory, as such term is defined in the UCC, whether now owned or hereafter acquired.

(q)   "Investment Property" means all of Debtor's investment property, as such term is defined in the UCC, whether now owned or hereafter acquired, including but not limited to all securities, security entitlements, securities accounts, commodity contracts and commodity accounts.

(r)   "Letter-of-Credit Rights" means a right to payment or performance under a letter of credit, whether or not the beneficiary has demanded or is at the time entitled to demand payment or performance.

(s)   "Payment Intangibles" means a General Intangible under which the account debtor's principal obligation is a monetary obligation.

(t)   "NAV" means the net asset value of Debtor.

(u)   "Permitted Liens" means (i) with respect to the Tranche A Notes, the meaning set forth therein and (ii) with respect to the Tranche B Notes, the meaning set forth therein.

(v)   "Permitted Transfers" means any sale of Collateral for fair value so long as either (i) following such sale no Collateral Breach shall exist, (ii) the proceeds of such sale are applied to payment of the Notes or the Senior Indebtedness or (iii) the proceeds of such sale are delivered to the Senior Lender or deposited in the Custody Account as required by Section 6(b) of this Agreement.

(w)   "Proceeds" means whatever is received upon the sale, exchange, collection, or other disposition of all or any part of the Collateral and, in any event, shall include, without limitation, (i) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Debtor from time to time with respect to any of the Collateral, (ii) any and all payments (in any form whatsoever) made or due and payable to Debtor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental authority (or any person acting under color of governmental authority), and (iii) any and all other amounts from time to time paid or payable or delivered under or in connection with any of the Collateral, including, without limitation, distributions (whether of principal, interest or otherwise), dividends (in money, shares of stock, ownership interests or other property), return of capital, securities or other property issued pursuant to any recapitalization, reorganization, merger or other transaction or any property

received in substitution for the Collateral, and all proceeds of any sale, transfer, liquidation, redemption or reinvestment of the Collateral.

(x)     "Promissory Note" means an instrument that evidences a promise to pay a monetary obligation, does not evidence an order to pay, and does not contain an acknowledgment by a bank that the bank has received for deposit a sum of money or funds.

(y)     "Secured Obligations" has the meaning specified in Section 5 of this Agreement.

(z)     "Secured Parties" has the meaning specified in Section 5 of this Agreement.

(aa)    "Senior Indebtedness" means (i) with respect to the Tranche A Notes, the meaning set forth therein and (ii) with respect to the Tranche B Notes, the meaning set forth therein.

(bb)    "Senior Lender" means (i) with respect to the Tranche A Notes, the meaning set forth therein and (ii) with respect to the Tranche B Notes, the meaning set forth therein.

(cc)    "Software" means a computer program and any supporting information provided in connection with a transaction related to the program.

(dd)    "Supporting Obligations" means a Letter-of-Credit Right, or secondary obligation that supports the payment or performance of an Account, a Document (as defined in the UCC), a General Intangible, an Instrument or Investment Property.

(ee)    "UCC" means the Uniform Commercial Code as the same may, from time to time, be in effect in the State of California, provided, however, in any event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority (or terms of similar import in any applicable jurisdiction) of the Noteholders' security interest in any Collateral is governed by the Uniform Commercial Code (or other similar law) as in effect in a jurisdiction (whether within or outside the United States) other than the State of California, the term "UCC" shall mean the Uniform Commercial Code (or other similar law) as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority (or terms of similar import in such jurisdiction) and for purposes of definitions related to such provisions.

2.      Each Noteholder has appointed Gottex Fund Management Ltd. to act as Administrative Agent in accordance with the terms of this Agreement with respect to the assets of Debtor defined as Collateral in Section 4, and Gottex Fund Management Ltd. accepts such appointment. Debtor hereby acknowledges and agrees to such appointment.

3.      Debtor hereby irrevocably authorizes the Administrative Agent (or its designee) at any time and from time to time to file in any jurisdiction any financing or continuation statement and amendment thereto or any registration of charge, mortgage or otherwise, containing any information required under the UCC or the law of any other applicable jurisdiction (in each case, without the signature of Debtor to the extent permitted by applicable law), necessary or

84192980_3

4

appropriate in the judgment of the Administrative Agent to perfect or evidence its security interest in and Lien on the Collateral (subject only to the Lien in favor of the Senior Lender), as agent for the Secured Parties. Debtor hereby irrevocably ratifies and approves any such filing, registration or recordation in any jurisdiction by the Administrative Agent (or its designee) that has occurred prior to the date hereof, of any financing statement, registration of charge, mortgage or otherwise. Debtor agrees to provide to the Administrative Agent (or its designees) any and all information required under the UCC or the law of any other applicable jurisdiction for the effective filing of a financing statement and/or any amendment thereto or any registration of charge, mortgage or otherwise.

4.      As security for the full and prompt payment, performance and discharge when due (whether at stated maturity, by acceleration or otherwise) of the Secured Obligations, Debtor hereby pledges and grants Administrative Agent, as agent for the Secured Parties, a Lien on and security interest in and right of set-off against (subject only to the Lien in favor of the Senior Lender), and assigns to Administrative Agent, as agent for the Secured Parties, all of Debtor's rights, interests, powers and privileges in and to the following assets of Debtor, wherever situated, now existing or hereafter arising (collectively, the "Collateral"):

> (i)     all Accounts;
>
> (ii)    all Investment Property;
>
> (iii)   all Contract Rights, Commercial Tort Claims, cash, Deposit Accounts (including, but not limited to, the Custody Account, and all assets therein), General Intangibles (including Payment Intangibles and Software), Instruments (including any Promissory Notes), Inventory, Letter-of-Credit Rights and all Supporting Obligations;
>
> (iv)   all Documents; and
>
> (v)    all Proceeds of any and all of the foregoing.

5.      This Agreement shall secure the full and prompt payment, performance and discharge when due (whether at stated maturity, by acceleration or otherwise) of the indebtedness of Debtor owed to each Noteholder and the Administrative Agent (collectively, the "Secured Parties") under the Note Purchase Agreement, each Note (including, but not limited to, each Tranche A Note and Tranche B Note) and each other Note Document, and all other obligations of Debtor to the Secured Parties arising under this Agreement, the Notes, the Note Purchase Agreement, and each other Note Document, whether now or hereafter existing and whether for principal, interest (including interest that accrues after any bankruptcy, insolvency or similar proceeding), fees, expenses or otherwise, and all costs and expenses of administering or maintaining Collateral and of enforcing the rights of the Secured Parties hereunder and under each other Note Document (collectively, the "Secured Obligations").

6.      (a)     All Instruments and Chattel Paper constituting Collateral shall be held by the Administrative Agent or the Senior Lender. Instruments and Chattel Paper constituting Collateral that are not being held by Administrative Agent or the Senior Lender shall, for purposes of the Note Purchase Agreement and the Notes, not be deemed to be owned by Debtor

for purposes of calculating the NAV or the Collateral Equity, but shall nevertheless constitute Collateral. Without limiting the foregoing, Debtor shall cause Secured Parties' security interest in, and Lien on all assets constituting Collateral at all times to be reflected on the official books and records of Debtor.

(b)     All Proceeds (other than Proceeds of Permitted Transfers) arising from or relating to any Chattel Paper or Instrument constituting Collateral shall be delivered to the Senior Lender or deposited in the Custody Account and administered as Collateral hereunder.

(c)     Except for Liens in favor of the Senior Lender and Permitted Transfers, Debtor shall not effect, and shall not permit to occur, any assignment, sale, transfer, pledge, redemption or granting of any further security interest in, charge over or Lien or encumbrance upon the Collateral (whether through redemption, purchase or otherwise) without the prior consent of the Administrative Agent.

7.     Debtor acknowledges that neither the Noteholders nor the Administrative Agent has any fiduciary relationship with, or fiduciary duty to, Debtor arising out of or in connection with this Agreement. The Administrative Agent may, in its sole discretion, give or withhold its consent to any matter as to which its consent is required hereunder. This Agreement does not create a joint venture or partnership among the parties.

8.     (a)     Debtor shall promptly notify the Administrative Agent as soon as it has knowledge or reasonable belief that the value of any Collateral has or may be impaired.

(b)     Debtor shall pay when due or reimburse the Secured Parties on demand for all costs of collection of any of the Secured Obligations and all other out-of-pocket expenses (including in each case all reasonable attorneys' fees and expenses) incurred by the Administrative Agent, each Noteholder or their respective agents in connection with the creation, perfection, satisfaction, protection, defense or enforcement of the Lien, charge and security interest granted hereunder or the creation, continuance, protection, defense or enforcement of this Agreement or any or all of the Secured Obligations, including expenses incurred in any litigation or bankruptcy or insolvency proceedings.

9.     Debtor represents, warrants, covenants and agrees as follows:

(a)     Debtor is a limited liability company duly organized, validly existing and in good standing under the laws of the State of California, with the requisite power and authority to enter into this Agreement;

(b)     Debtor is and at all times shall be the sole beneficial owner and holder of the Collateral with the full power and authority to assign and grant the Lien on and security interest in the Collateral to the Administrative Agent, as agent for the Noteholders, and the Collateral at all times shall constitute Debtor's entire interest therein; the Administrative Agent, as agent for Secured Parties, is and at all times shall be the sole secured party with respect to all Collateral (except for the Senior Lender);

(c)     The Collateral is and at all times shall be free and clear of Liens (except the Lien in favor of the Administrative Agent, as agent for the Secured Parties and the Lien in favor of the Senior Lender);

84192980_3

6

(d)     Except for Permitted Transfers and in connection with Permitted Liens, Debtor shall not sell, encumber, grant or permit any further security interest or charge in or Lien or encumbrance upon the Collateral without the prior written consent of the Administrative Agent, and shall at all times keep or cause to be kept full and accurate transactional records relating to the Collateral (including, without limitation, a record of all payments received and all credits granted with respect to the Collateral and all other permitted dealings with the Collateral);

(e)     Except as expressly permitted hereunder, Debtor will not permit or consent to any revocation or amendment with respect to any asset constituting Collateral that could result in a material adverse effect on any asset constituting Collateral or on the Collateral, in the aggregate, without the prior written consent of the Administrative Agent, and should Debtor receive any distributions in respect of the Collateral after the occurrence of a Default, it will immediately turn the same over to the Senior Lender or to the Administrative Agent, as agent for the Secured Parties, to be held and administered as Collateral hereunder, and pending such turnover Debtor shall hold the same in trust for the benefit of the Administrative Agent, as agent for the Secured Parties;

(f)     No financing statement, register of mortgages, charges and other encumbrances or similar document covering the Collateral or any part thereof is or shall be maintained at the registered office of Debtor or on file in any public office (except in favor of the Administrative Agent, as agent for the Secured Parties and the Senior Lender), and Debtor will, at the request of the Administrative Agent join with the Administrative Agent, as agent for the Secured Parties in (A) executing one or more financing statements pursuant to the UCC naming the Administrative Agent, as agent for the Secured Parties as secured party, (B) executing control agreements with respect to the Collateral, in each case naming the Administrative Agent, as agent for the Secured Parties as secured party, and/or (C) executing such other filings required under the laws of all jurisdictions necessary or appropriate in the judgment of the Administrative Agent to perfect or evidence its first priority security interest in, and Lien on the Collateral. Debtor shall pay all document preparation costs (including legal fees) and shall pay any filing or registration fee in all public offices where filing or registration may be deemed necessary or appropriate by the Administrative Agent and any stamp tax, assessment or duty related to the Collateral;

(g)     Debtor agrees, upon the written request of the Administrative Agent, to cause any third party financial or securities intermediary holding Collateral to acknowledge in a signed writing that such third party holds such Collateral solely on behalf of, and for the sole benefit of the Senior Lender and Administrative Agent as agent for the Secured Parties;

(h)     Upon the occurrence of any Default hereunder, Debtor, by its execution hereof, hereby makes, constitutes and appoints the Administrative Agent as its true and lawful attorney-in-fact, with full power of substitution and full power and authority to acknowledge, swear to, record, file for any purpose and vote or consent to actions in respect of the Collateral without any notice to, or consent of, Debtor being required. Until such a Default occurs, the Administrative Agent, agrees to accept voting instructions from Debtor; provided, however, that Debtor agrees that it will not instruct there to be any vote that is in any manner inconsistent with the terms of this Agreement, the Note Purchase Agreement or any other Note Document and if, in its sole absolute discretion, the Administrative Agent reasonably determines that any such

84192980_3

7

instruction is inconsistent, as aforesaid, then the Administrative Agent shall not follow such instruction and may vote in any manner it deems appropriate;

        (i)     Debtor's jurisdiction of formation is the State of California and its principal place of business is in the State of California; the name of Debtor as set forth in the preamble is its full legal name which has not been changed since Debtor's organization; Debtor will not change its legal name or principal place of business, or change the location where any Collateral is held, or the custodian, bailee or depository holding any such Collateral, without obtaining the prior written consent of the Administrative Agent, which consent shall not be unreasonably withheld;

        (j)     This Agreement has been duly and validly executed and delivered by Debtor and constitutes the legal, valid and binding agreement of Debtor, enforceable against Debtor in accordance with its terms except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws generally affecting creditors' rights and by the application of a governmental authority or arbitrator of equitable principles (regardless of whether enforcement is sought in equity or at law); and

        (k)     Debtor agrees that, from time to time upon the written request of the Administrative Agent, Debtor will execute and deliver such further documents and diligently perform such other acts and things in any jurisdiction as the Administrative Agent may reasonably request to fully effect the purposes of this Agreement or to further assure the first priority status of the Lien granted pursuant hereto.

        10.     Debtor shall be in default under this Agreement upon the happening of any of the following events or conditions (each, a "Default"):

        (a)     The transfer, sale or encumbrance of all or any portion of the Collateral in violation of this Agreement or the making of any levy, seizure or attachment thereof or thereon;

        (b)     The failure of the Administrative Agent, as agent of the Secured Parties, at any time to have a continuously perfected Lien on and security interest in the Collateral, subject to no other Lien except for the Lien in favor of the Senior Lender; or

        (c)     The occurrence of any Event of Default under any Note.

        11.     (a)     Upon the occurrence and continuation of any Default hereunder, the Administrative Agent, as agent of the Secured Parties, may, at its option, declare all of the Secured Obligations or any of them, notwithstanding any provisions thereof, immediately due and payable without demand or notice of any kind (except as specified below) and the same thereupon shall immediately become due and payable without demand or notice. The Administrative Agent may thereupon exercise from time to time any and all rights and remedies of a secured party under any applicable UCC (or any other laws in effect in any jurisdiction where any rights and remedies may be asserted) and any and all rights and remedies available to it as a result of this Agreement or any other Note Document including, without limitation, the right, to the maximum extent permitted by law, to exercise all voting, consensual and other powers of ownership pertaining to the Collateral (including, without limitation, the right to sell, transfer, pledge or redeem any and all of the Collateral) as if the Administrative Agent, as agent

for the Secured Parties, was the sole and absolute owner thereof (and Debtor agrees to take all such action as may be appropriate to give effect to such right). Notwithstanding anything to the contrary contained herein or in any Note, upon the occurrence of any Event of Default under any Note or any Default under this Agreement, the rights of the Noteholders with respect to the enforcement of this Agreement and the Collateral shall rank pari passu.

(b)     Without limiting the generality of the foregoing, the Administrative Agent, as agent for the Secured Parties, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by applicable law referred to below) to or upon Debtor or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived to the fullest extent permitted by applicable law), may upon the occurrence and continuation of any Default hereunder, forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, redeem, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Administrative Agent or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk. The Administrative Agent shall have the right upon any such public sale or sales, and, to the extent permitted by applicable law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in Debtor, which right or equity is hereby waived or released to the fullest extent permitted by applicable law. To the fullest extent permitted by applicable law, Debtor waives all claims, damages and demands it may acquire against the Administrative Agent or the Secured Parties arising out of the exercise by the Administrative Agent or the Secured Parties of any of their rights hereunder. If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.

(c)     Debtor recognizes that, by reason of certain prohibitions contained in the U.S. Securities Act of 1933, as amended, and applicable state securities laws, or other laws, the Administrative Agent, in the exercise of its rights and remedies upon the occurrence of a Default hereunder may be compelled, with respect to any sale of all or any part of the Collateral, to limit purchasers to those who are not United States persons and/or who will agree, among other things, to acquire the Collateral for their own account, for investment and not with a view to the distribution or resale thereof. Debtor acknowledges that any such restricted or private sales may be at prices and on terms less favorable to Debtor than those obtainable through a public sale without such restrictions, but agrees that such sales are commercially reasonable. Debtor further acknowledges that any specific disclaimer of any warranty of title or the like by the Administrative Agent will not be considered to adversely affect the commercial reasonableness of any sale of Collateral.

(d)     The proceeds of any collection, sale, or other realization of all or any part of the Collateral pursuant hereto shall be applied, first, to the payment of the costs and expenses of such collection, sale or other realization, including fees and expenses of the agents and counsel of Administrative Agent and the Secured Parties, and, thereafter, to any remaining Secured Obligations in such order as the Administrative Agent, as agent for the Secured Parties, may otherwise elect. If the proceeds of sale, collection or other realization of all or any part of

84192980_3

9

the Collateral are insufficient to cover the costs and expenses of such realization and the payment in full of all of the Secured Obligations, Debtor shall remain liable for any deficiency.

(e)     For the purpose of carrying out the provisions of this Section 11, and taking any action and executing any instruments, endorsements or assignments which the Administrative Agent may deem necessary or advisable to accomplish the purposes hereof, Debtor hereby makes, constitutes and appoints the Administrative Agent (or its designee), its attorney-in-fact with full power of substitution, to act in its place and stead, from time to time and at all times, in order to carry out the foregoing.  Such appointment is irrevocable and coupled with an interest.

(f)     The powers conferred on the Administrative Agent hereunder are solely to protect the Secured Parties' interests in the Collateral and shall not impose any duty upon the Secured Parties or the Administrative Agent to exercise any such powers.  The Administrative Agent and the Secured Parties shall be accountable only for amounts that each actually receives as a result of the exercise of such powers, and neither it nor any of their respective officers, directors, employees or agents shall be responsible to Debtor for any act or failure to act hereunder.  The Administrative Agent's and each Secured Party's duty of care with respect to Collateral in its possession (as imposed by law) shall be deemed fulfilled if it exercises reasonable care in physically safekeeping such Collateral or, in the case of Collateral in the custody or possession of a bailee or other third Person, exercises reasonable care in the selection of the bailee or other third Person, and the Secured Parties and the Administrative Agent need not otherwise preserve, protect, insure or care for any Collateral.  The Administrative Agent shall not be obligated to preserve any rights Debtor may have against prior parties, to realize on the Collateral at all or in any particular manner or order, or to apply any cash proceeds of Collateral in any particular order of application.

12.     All rights of the Administrative Agent and each Secured Party hereunder shall inure to the benefit of its respective successors and assigns, and all obligations of Debtor hereunder shall bind the successors and assigns of Debtor.  Notwithstanding anything to the contrary that may be set forth in this Agreement, when all Secured Obligations shall have been indefeasibly paid in full and no Secured Party has any further commitment to lend under the Note Purchase Agreement, then this Agreement, and the rights, powers and appointment of Administrative Agent hereunder and the security interest created hereby shall terminate and the Administrative Agent shall, at Debtor's expense, forthwith cause to be assigned, transferred and delivered, against receipt but without any recourse, warranty or representation whatsoever, any remaining Collateral to or on the order of Debtor.

13.     All rights of the Administrative Agent and each Secured Party hereunder, the grant of a Lien and security interest in and to the Collateral and all obligations of Debtor hereunder, shall be absolute and unconditional irrespective of (i) any lack of validity or enforceability of any Note Document or any other agreement with respect to any of the Secured Obligations or any other agreement or instrument relating to any of the foregoing, (ii) any change in time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from any Note Document or any other agreement or instrument, (iii) any exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to or departure from any guarantee, for all or any of the Secured Obligations, or (iv) any other circumstance which

might otherwise constitute a defense available to (other than the defense of indefeasible payment), or a discharge of, Debtor in respect of the Secured Obligations or in respect of this Agreement.

14.     This Agreement shall be governed by and construed in accordance with the laws of the State of California, without giving effect to its conflict of laws provisions, except to the extent that the validity or perfection of the Lien and security interest granted hereunder, or remedies hereunder, in respect of any particular Collateral are governed by the laws of a jurisdiction other than the State of California.  Each of the parties hereto hereby submits to the nonexclusive jurisdiction of any state or federal court sitting in Los Angeles, California for the purposes of all legal proceedings arising out of or relating to this Agreement or the transactions contemplated hereby and agrees that service of process may be made by mail to the respective party at its address set forth in Section 15 hereof.  Each of the parties hereto irrevocably waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.  To the extent that Debtor has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, Debtor hereby irrevocably waives such immunity in respect of its obligations under this Agreement and the other Note Documents and, without limiting the generality of the foregoing, agrees that the waivers set forth herein shall have the fullest scope permitted under the Foreign Sovereign Immunities Act of 1976 of the United States and are intended to be irrevocable for the purposes of such Act.  EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

15.     (a)     No failure on the part of  the Administrative Agent to exercise, and no course of dealing with respect to, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise by the Administrative Agent of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All rights and remedies of the Administrative Agent and each Secured Party are cumulative and are not exclusive of any remedies provided by law.  All rights and remedies of the Administrative Agent and each Secured Party may be exercised singularly or concurrently, at the Administrative Agent's option, and the exercise or enforcement of any one such right or remedy shall neither be a condition to nor bar the exercise or enforcement of any other.  The terms of this Agreement may not be waived, altered or amended except by an instrument in writing duly executed by Debtor and the Administrative Agent.

(b)     No consent or authorization on the part of the Administrative Agent or any Secured Party with respect to the sale, redemption, purchase or other disposition of any asset constituting Collateral that is proposed by Debtor shall constitute the approval thereof by the Administrative Agent for any purpose other than in accordance with the Note Purchase Agreement and the other Note Documents and the transactions contemplated thereby, nor shall such consent or authorization constitute an opinion or endorsement of the Administrative Agent or any Secured Party with respect to such proposal.

84192980_3                                11

All notices and other communications provided for hereunder shall be in writing (including facsimile) and mailed or delivered by hand:

(i)     if to Debtor:

        MKA Real Estate Opportunity Fund I, LLC
        c/o MKA Capital Group Advisors LLC
        26 Corporate Plaza, Suite 250
        Newport Beach, CA 92660
        Telephone:     (949) 729 - 1660
        Facsimile:     (949) 729 - 1665


(ii)  .  if to Administrative Agent:

        Gottex Fund Management Ltd.
        One International Place
        14th Floor
        Boston, MA 02110
        Attention:     William H. Woolverton, General Counsel
        Telephone:     (617) 532 - 0202
        Facsimile:     (617) 532 - 0219


All such notices and communications shall be deemed to have been duly given or made (i) in the case of hand deliveries, when delivered by hand, (ii) in the case of mailed notices, 4 Business Days after being deposited in the mail, first class, postage prepaid, (iii) in the case of overnight courier, when confirmed to have been received, and (iv) in the case of facsimile notice, when transmitted and confirmed during normal business hours (or, if delivered after the close of normal business hours, at the beginning of business hours on the next Business Day).

(c)     If any provision hereof is invalid and unenforceable in any jurisdiction, then, to the fullest extent provided by law, (i) the other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in favor of the Administrative Agent, as agent of the Secured Parties, to carry out the intentions of the parties hereto as nearly as may be possible and (ii) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provision in any other jurisdiction.

(d)     This Agreement and the other Note Documents constitute the entire contract among the parties hereto relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, among the parties hereto relating to the subject matter hereof. This Agreement may be signed in counterparts each of which shall be an original and all of which, when taken together, shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page of this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement.

84192980_3                                    12

[END OF TEXT]

84192980_3

13

IN WITNESS WHEREOF, the parties have duly executed and delivered this Agreement by their respective officers thereunto duly authorized as of the day and year first above written.

**MKA REAL ESTATE OPPORTUNITY FUND I, LLC,** as Debtor

BY: MKA Capital Group Advisors LLC
ITS: Manager

By: _____
Name: _____
Title: _____

**GOTTEX FUND MANAGEMENT LTD.,** as administrative agent

By: _____
Name: _____
Title: _____

84192980_3

14

IN WITNESS WHEREOF, the parties have duly executed and delivered this Agreement by their respective officers thereunto duly authorized as of the day and year first above written.

MKA REAL ESTATE OPPORTUNITY FUND I, LLC, as Debtor

By: _____
    Name:
    Title:

GOTTEX FUND MANAGEMENT LTD., as administrative agent

By: _____
    Name: _William H. Woolverton_
    Title: _Managing Director_

84192980_3

14

# EXHIBIT 2

 

Defending Liberty
Pursuing Justice

GENERAL TERMS FOR THE DEPOSIT ACCOUNT CONTROL AGREEMENT

version 1 dated February 13, 2006

available from the American Bar Association's Section of Business Law at
http://www.abanet.org/dch/committee.cfm?com=CL710060[1]

---

[1] This document is a model form produced by the Joint Task Force on Deposit Account Control Agreements of the ABA Section of Business Law. The provisions of the form have not been approved by the House of Delegates or Board of Governors of the American Bar Association and, accordingly, should not be construed as representing the policy of the American Bar Association.

## GENERAL TERMS FOR THE DEPOSIT ACCOUNT CONTROL AGREEMENT

**1.    Definitions and Rules of Interpretation.** In this Agreement (a) terms defined in the UCC and not otherwise defined in this Agreement have the same meanings in this Agreement as in the UCC, (b) the rules of interpretation in Article 1 of the UCC apply to the interpretation of this Agreement and (c) the term "or" is not exclusive. Unless otherwise stated, section references are to sections of these General Terms. In addition, the following terms in this Agreement have the following meanings or interpretations:

This *"Agreement"* means the Deposit Account Control Agreement dated the Agreement Date among the Secured Party, the Debtor and the Bank. The Deposit Account Control Agreement includes these General Terms (incorporated by reference), the Specific Terms and the Exhibit read and construed together as a single agreement.

*"Agreement Date"* means the date set forth at the beginning of this Agreement as the date as of which this Agreement was executed and delivered by the parties.

An *"address"* includes the person or persons or department of the Bank on an "attention" line.

*"Bank"* means the organization signing this Agreement as the Bank.

*"Business Day"* means:

    (i) for communications to the Bank, a day other than a day (A) that is not a "business day" as defined in Federal Reserve Board Regulation CC, 12 CFR Part 229, (B) on which the office, branch or department of the Bank specified as the Bank's address in the Exhibit is closed, or (C) on which commercial banks are closed in the city or cities set forth in the Specific Terms; and

    (ii) for communications to any other party, a day, other than a Saturday or Sunday, on which the other party is open for business at the location to which the communication is sent.

*"Claim"* means a claim, loss, cost or expense, and includes out-of-pocket or allocable internal legal fees and expenses incurred in bringing or defending a claim.

A *"communication"* includes the Initial Instruction, a Disposition Instruction or a notice.

*"Debtor"* means the person signing this Agreement as the Debtor.

*"Deposit Account"* has the meaning set forth in the "Background" of this Agreement. The Deposit Account is identified in Section 1 of the Specific Terms.

*"Deposit-related Agreements"* means, collectively, the deposit account agreement and any other agreements between the Bank and the Debtor governing the Deposit Account and any cash management or similar services provided by the Bank to the Debtor in connection with the Deposit Account.

*"Disposition Instruction"* means an instruction to the Bank directing the disposition of the funds in the Deposit Account.

*"Exhibit"* means the Exhibit referred to in Part C of and attached to this Agreement as the form to be used as the Initial Instruction.

*"Initial Instruction"* means the first instruction to the Bank originated by the Secured Party directing that the Bank no longer comply with the Debtor's Disposition Instructions. The Initial Instruction may also contain a Disposition Instruction originated by the Secured Party.

*"Order or Process"* means an order, judgment, decree or injunction, or a garnishment, restraining notice or other legal process, directing, or prohibiting or otherwise restricting, the disposition of the funds in the Deposit Account.

*"Outside Time"* means, unless an earlier Outside Time is stated in the Specific Terms, the opening of business on the second Business Day after the Business Day on which the Initial Instruction in substantially the form of the Exhibit is actually received at the address for the Bank specified in the Exhibit. If the Initial Instruction is actually received at that address after 12:00 noon, local time, at that address, then in determining the Outside Time, the Initial Instruction will be considered to have been actually received on the following Business Day.

"*Secured Party*" means the person signing this Agreement as the Secured Party, whether the person is acting in a representative capacity or otherwise.

"*Specific Terms*" means the terms contained in Part B of this Agreement.

"*UCC*" means the Uniform Commercial Code of the jurisdiction whose law governs this Agreement or, if relevant to any matter other than the meaning of a defined term, the Uniform Commercial Code of the jurisdiction whose law applies to the matter under the choice of law rules of the jurisdiction whose law governs this Agreement.

A "*writing*" means a tangible writing, including a facsimile and, if the Specific Terms permit, an electronic record; "*written*" refers to a communication in the form of a writing.

2.      The Debtor's Dealings with the Deposit Account.

(a)      Except as provided in Section 2(b), the Bank may comply with the Debtor's Disposition Instructions in accordance with the Deposit-related Agreements.

(b)      The Bank will not comply with the Debtor's Disposition Instructions after the Outside Time. In its discretion the Bank may cease complying with the Debtor's Disposition Instructions at an earlier time as permitted by Section 4(a)(iv).

3.      The Secured Party's Right to Give Instructions as to the Deposit Account. The Bank will comply with the Initial Instruction, and with any Disposition Instructions originated by the Secured Party, in each case (i) without the Debtor's further consent, and (ii) even if following the instruction results in the dishonoring by the Bank of items presented for payment from the Deposit Account or the Bank otherwise not complying with the Debtor's Disposition Instructions. The Initial Instruction may not be rescinded or otherwise modified without the Bank's consent.

4.      Exculpation of the Bank.

(a)      Notwithstanding the Bank's agreements in Sections 2 and 3, the Bank will not be liable to any other party for:

(i)      either failing to follow an Initial Instruction that (A) is not in the form of the Exhibit, (B) does not specify the address to which the Initial Instruction was to have been sent, (C) is not otherwise completed, or (D) does not have attached to it a copy of this Agreement as fully executed or, as a result of any such defect in the Initial Instruction, continuing to comply with the Debtor's Disposition Instructions;

(ii)      failing to follow a Disposition Instruction originated by the Secured Party (A) before the Outside Time, (B) that requires the disposition of the funds in the Deposit Account by a method not available to the Debtor under the Deposit-related Agreements, (C) that the Bank determines would result in the Bank's failing to comply with a statute, rule or regulation, or an Order or Process, binding upon the Bank, (D) that requires the disposition of funds that are not immediately available in the Deposit Account, (E) that, unless otherwise set forth in the Specific Terms, directs the disposition of less than all the funds in the Deposit Account or directs that the funds be sent to more than one recipient, or (F) for which the Bank has not received evidence reasonably required by the Bank as to the authority of the person giving the Disposition Instruction to act for the Secured Party;

(iii)      complying with the Debtor's Disposition Instructions, or otherwise completing a transaction involving the Deposit Account, that the Bank or an affiliate has started to process before the Outside Time; or

(iv)      after the Bank becomes aware that the Secured Party has sent the Initial Instruction, but before the Outside Time, complying with the Initial Instruction or a Disposition Instruction originated by the Secured Party, notwithstanding any fact or circumstance and even if the Initial Instruction (A) has not been actually received at the address specified in the Exhibit, (B) fails to have attached to it a copy of this Agreement as fully executed, or (C) is not completed or otherwise fails to be in the form of Initial Instruction set forth on the Exhibit.

(b)      The Bank will not be liable to any other party for:

(i)      wrongful dishonor of any item as a result of the Bank following the Initial Instruction or any Disposition Instruction originated by the Secured Party,

(ii)     failing to comply or delaying in complying with the Initial Instruction, any Disposition Instruction or any provision of this Agreement due to a computer malfunction, interruption of communication facilities, labor difficulties, act of God, war, terrorist attack, or other cause, in each case beyond the Bank's reasonable control,

(iii)    any other Claim, except to the extent directly caused by the Bank's gross negligence or willful misconduct, or

(iv)     any indirect, special, consequential or punitive damages.

(c)      The Bank will have no fiduciary duties under this Agreement to any other party, whether as trustee, agent, bailee or otherwise. The Bank will have no duties to the Secured Party except as expressly set forth in this Agreement. The Bank will have no duty to inquire into or determine the existence or enforceability of the Debtor's obligations to the Secured Party or whether, under any separate agreement between the Debtor and the Secured Party, the Debtor's obligations to the Secured Party are in default, the Debtor may originate a Disposition Instruction or the Secured Party may originate the Initial Instruction or any Disposition Instruction.

5.       The Bank's Recourse to the Deposit Account.

(a)      Except for amounts referred to in Section 5(b), the Bank (i) subordinates any security interest, lien or other encumbrance against the Deposit Account to the Secured Party's security interest and (ii) will not exercise any right of recoupment, setoff or debit against the Deposit Account. This subordination will not apply to any security interest that the Bank has in an item under UCC Article 4 as a collecting bank.

(b)      Notwithstanding Section 5(a), and regardless of any agreement of the Debtor to compensate the Bank by means of balances in the Deposit Account, the Bank may charge the Deposit Account, to the extent permitted by any

of the Deposit-related Agreements or applicable law, for:

(i) the face amount of a check, draft, money order, instrument, wire transfer of funds, automated clearing house entry, credit from a merchant card transaction, other electronic transfer of funds or other item (A) deposited in or credited to the Deposit Account, whether before or after the Agreement Date, and returned unpaid or otherwise uncollected or subject to an adjustment entry, whether for insufficient funds or for any other reason and without regard to the timeliness of the return or adjustment or the occurrence or timeliness of any other person's notice of nonpayment or adjustment, (B) subject to a claim against the Bank for breach of transfer, presentment, encoding, retention or other warranty under Federal Reserve Regulations or Operating Circulars, clearing house rules, the UCC or other applicable law, or (C) for a merchant card transaction, against which a contractual demand for chargeback has been made;

(ii) normal service charges or fees payable to the Bank in connection with the Deposit Account or any related services;

(iii) any adjustments or corrections of any posting or encoding errors; and

(iv) reimbursements for out-of-pocket or allocable internal legal fees and expenses in connection with the negotiation, administration or enforcement of this Agreement by the Bank.

6.       Indemnification and Reimbursement.

(a)      The Debtor indemnifies the Bank against all Claims incurred, sustained or payable by the Bank arising out of this Agreement except to the extent directly caused by the Bank's gross negligence or willful misconduct.

(b)      The Secured Party agrees to reimburse the Bank for any charge against the Deposit Account under Section 5(b) for which there were insufficient funds in the Deposit Account to satisfy the charge. Such reimbursement will be limited to the aggregate amount transferred from the Deposit Account as a result of the Bank's acting upon Disposition Instructions originated by the Secured Party or pursuant to Section 9(b). Any demand by the Bank for reimbursement

must be made within the number of days after the termination of this Agreement set forth in the Specific Terms. The Bank may not make a Claim for reimbursement under this subsection unless (i) the Debtor fails to satisfy the Claim within 15 days after the Bank makes a demand on the Debtor under Section 6(a) or (ii) the Bank is enjoined, stayed or prohibited by operation of law from making the demand on the Debtor.

(c)     The Secured Party's reimbursement obligations under Section 6(b) will not apply to (i) a charge for reimbursement of or indemnification for any out-of-pocket or allocable internal legal fees and expenses incurred by the Bank in connection with any claim or defense by the Bank against the Secured Party relating to this Agreement or (ii) the amount of any loss incurred by the Bank to the extent directly caused by the Bank's gross negligence or willful misconduct. If the Bank satisfies any Claim against the Debtor referred to in the foregoing clause (i) by charging the Deposit Account, the amount of the Secured Party's maximum liability for reimbursement obligations under Section 6(b) will be reduced by the amount of the Claim so satisfied.

(d)     If the Secured Party fails to reimburse the Bank for any amount under Section 6(b), the Secured Party will pay the Bank's out-of-pocket or allocable internal legal fees and expenses in collecting from the Secured Party the amount payable.

(e)     The Secured Party indemnifies the Bank against all other Claims incurred, sustained or payable by the Bank arising from the Bank following an Initial Instruction or a Disposition Instruction originated by the Secured Party, or from the Bank's remittance of funds pursuant to Section 9(b), except to the extent directly caused by the Bank's gross negligence or willful misconduct.

7.     Representations    and    Warranties; Agreements with Other Persons. The Bank represents and warrants to the Secured Party that the Bank (i) is an organization engaged in the business of banking, (ii) maintains the Deposit Account as a demand deposit account or accounts in the ordinary course of the Bank's business and (iii) has not entered into any currently effective agreement with any person under which the Bank

may be obligated to comply with Disposition Instructions originated by a person other than the Debtor or the Secured Party. The Bank will not enter into any agreement with any person under which the Bank may be obligated to comply with Disposition Instructions originated by a person other than the Debtor or the Secured Party.

8.     Deposit Account Information. If the Secured Party so requests, to the extent that the Bank has the operational ability to do so, the Bank will provide to the Secured Party, whether by Internet access or otherwise, a copy of each periodic account statement relating to the Deposit Account ordinarily furnished by the Bank to the Debtor. The Bank's liability for failing to provide the account statement will not exceed the Bank's cost of providing the statement. The Debtor authorizes the Bank to provide to the Secured Party, whether by Internet access or otherwise, any other information concerning the Deposit Account that the Bank may agree to provide to the Secured Party at the Secured Party's request.

9.     Termination; Closure of the Deposit Account.

(a)     Neither the Debtor nor the Bank will close the Deposit Account prior to termination of this Agreement. This Agreement may not be terminated by the Debtor except by a notice to the Bank given jointly by the other parties. This Agreement may be terminated (i) by the Secured Party at any time by notice to the other parties and (ii) by the Bank (A) immediately upon notice to the other parties if the Bank becomes obligated to terminate this Agreement or to close the Deposit Account under any statute, rule or regulation, or any Order or Process, binding upon the Bank, (B) upon five Business Days' notice to the other parties if any other party is in material breach of any of the Deposit-related Agreements or this Agreement, and (C) otherwise upon 30 days' notice to the other parties.

(b)     If the Bank terminates this Agreement pursuant to clause (A) of Section 9(a)(ii), the Bank will remit any funds in the Deposit Account on the date of termination (i) at the direction of the Secured Party if the direction is received by the Bank prior to the date of termination of this Agreement or (ii) if no such direction is received by the Bank prior to such date, by check mailed to

the address of the Secured Party for receiving communications under this Agreement. If the Bank terminates this Agreement pursuant to clause (B) or (C) of Section 9(a)(ii), the Bank will remit any funds in the Deposit Account on the date of termination at the direction of the Secured Party only if the direction is received by the Bank prior to the date of termination of this Agreement. Any obligation of the Bank to remit any funds to or at the direction of the Secured Party under this subsection is subject to clauses (B) through (F) of Section 4(a)(ii).

(c)        Except as provided in Section 9(b) and in any event if the Secured Party has communicated to the Bank that the Secured Party does not wish to receive or direct the disposition of the funds, the Secured Party will not receive from the Bank any remittance of funds from the Deposit Account upon termination of this Agreement by the Bank.

(d)        The termination of this Agreement will not affect any rights created or obligations incurred under this Agreement before the termination. Sections 4 and 6 will survive the termination of this Agreement for actions taken or omitted before the termination. Sections 9(b) and (c) will survive the termination of this Agreement, and Section 5 will survive the termination of this Agreement solely for any funds to be remitted to or at the direction of the Secured Party pursuant to Section 9(b).

10.        Communications.

(a)        All communications under this Agreement must be in writing and must be delivered by hand or overnight courier service, mailed by certified or registered mail, or sent by facsimile to the party addressee. If the Specific Terms permit a writing to include an electronic record, a communication, other than the Initial Instruction, may be sent by email.

(b)        For a communication under this Agreement to be effective, it must be received (i) for the Initial Instruction, at the Bank's address specified on the Exhibit and (ii) in all other cases, at the party's address indicated below the party's signature to this Agreement, in each case subject to any change in address provided in Section 10(c). Receipt of the Initial Instruction does not

occur until it is received by the person or persons or department specified on the "attention" line on the Exhibit. If more than one person is specified, receipt occurs when the Initial Instruction is received by one of the persons.

(c)        The Bank may communicate to the Secured Party changes in the address for the Initial Instruction, and any party may communicate to the other parties changes in its address for communications under this Agreement.

11.        Successors and Transferees.

(a)        This Agreement will inure to the benefit of, and be binding upon, the parties and their respective successors and other transferees permitted under this Section. Except as provided in this Section, a voluntary transfer of a party's rights or duties under this Agreement without the written consent of the other parties will be void.

(b)        The Bank may transfer its rights and duties under this Agreement to a transferee to which, by contract or operation of law, the Bank transfers substantially all of its rights and duties under the Deposit-related Agreements.

(c)        The Secured Party may transfer its rights and duties under this Agreement to (i) a transferee to which, by contract or operation of law, the Secured Party transfers substantially all of its rights and duties under the financing or other arrangements between the Secured Party and the Debtor for which the Deposit Account acts as collateral security or (ii) if the Secured Party is acting as a trustee, indenture trustee, agent, collateral agent, or other representative in whose favor a security interest is created or provided for, a transferee that is a successor trustee, indenture trustee, agent, collateral agent, or other representative.

(d)        No transfer under this Section will be binding upon a non-transferring party until the transferring party or the transferee notifies the non-transferring parties of the transfer in a writing signed by the transferee that identifies the transferee, gives the transferee's address for communications under this Agreement, and states that the transferee is a successor of the transferor or other transferee permitted under this Section and is entitled to the benefit of the

transferring party's rights and has assumed all of the transferring party's duties under this Agreement.

(e)     A non-transferring party need not request proof of any transfer or that the transferee is a successor of the transferor or other transferee permitted by this Section. If requested by a non-transferring party, however, the transferring party or the transferee will provide reasonable proof thereof. If the Bank or the Secured Party, as a non-transferring party, requests such proof, then the effectiveness of the notification of transfer as to the non-transferring party will be suspended until the proof is provided.

(f)     When a transfer becomes binding on the non-transferring parties, the transferring party will not be entitled to exercise any rights, and will be relieved of its obligations, accruing under this Agreement from and after that time. Those rights may be exercised and those obligations will be incurred by the transferee.

(g)     The provisions of subsections (d) and (e) requiring notification for a transfer to be binding on the non-transferring parties and suspending the effectiveness of the notification of transfer until reasonable proof of the transfer has been provided do not apply to the Bank as the transferring party if the transfer is by operation of law and by operation of the law (i) the transferee succeeds to all or substantially all of the rights and becomes generally bound by all of the duties of the Bank, including the Bank's duties under this Agreement, and (ii) the Bank ceases to exist.

12.     Entire Agreement; Relation to Other Agreements.

(a)     This Agreement constitutes the entire agreement of the parties, and supersedes all previous and contemporaneous negotiations, understandings and agreements, with respect to its subject matter, all of which have become merged and finally integrated into this Agreement.

(b)     If a term in the Specific Terms conflicts with a term of this Agreement not in the Specific Terms, the term in the Specific Terms controls.

(c)     If this Agreement conflicts with any of the Deposit-related Agreements, this Agreement will control. However, this Agreement will not (i)

derogate from any Claim or defense that the Bank may have against the Debtor under any of the Deposit-related Agreements or (ii) create any third party beneficiary rights under any of the Deposit-related Agreements in favor of the Secured Party.

(d)     This Agreement does not amend or otherwise modify any of the agreements between the Debtor and the Secured Party or provide any rights for the Debtor to originate a Disposition Instruction in contravention of any agreement between the Debtor and the Secured Party.

13.     Governing Law, Depositary Bank's Jurisdiction and Waiver of Jury Trial.

(a)     Except as otherwise required by Article 9 of the UCC, this Agreement will be governed by the law of that jurisdiction set forth in the Specific Terms without giving effect to any choice of law rule that would require the application of the law of another jurisdiction.

(b)     If the Specific Terms are completed expressly to designate the Bank's jurisdiction for purposes of part 3 of Article 9 of the UCC, then the Deposit-related Agreements are amended to provide that for those purposes that jurisdiction is the Bank's jurisdiction so designated.

(c)     To the extent permitted by applicable law, each party waives all rights to trial by jury in any action, claim or proceeding (including any counterclaim) of any type arising out of or directly or indirectly relating to this Agreement.

14.     Miscellaneous.

(a)     No amendment to this Agreement will be binding on any party unless it is in writing and signed by all of the parties. Any provision of this Agreement benefiting a party may be waived only by a writing signed by that party.

(b)     If a provision of this Agreement is held invalid or unenforceable in any respect, the validity or enforceability of the remaining provisions will not in any way be affected, it being understood that the invalidity or unenforceability of an affected provision in a particular jurisdiction will not in and of itself affect the validity or enforceability of the provision in any other jurisdiction.

DEPOSIT ACCOUNT CONTROL AGREEMENT

version 1 dated February 13, 2006

available from the American Bar Association's Business Law Section at
http://www.abanet.org/dch/committee.cfm?com=CL710060

Executed and Delivered as of June 30, 2006

## PARTIES

This Agreement is among the persons signing this Agreement as the *"Secured Party"*, the *"Debtor"* and the *"Bank"*.

## BACKGROUND

The Debtor is the Bank's customer with respect to one or more demand deposit accounts identified by the account numbers specified below (individually and collectively, as re-numbered and including any funds in the account or accounts, the *"Deposit Account"*). The Debtor has granted the Secured Party a security interest in the Deposit Account. The Debtor is requesting that the Bank enter into this Agreement. The Bank is willing to do so upon the terms contained in this Agreement.

This Agreement includes the General Terms, the Specific Terms and the Exhibit, each as defined or referred to below.

## AGREEMENTS

A.    GENERAL TERMS.   This Agreement is subject to the General Terms for Deposit Account Control Agreement version 1 dated February 13, 2006, developed by a special task force of the American Bar Association's Business Law Section and available from the Business Law Section at http://www.abanet.org/dch/committee.cfm?com=CL710060 (the *"General Terms"*). The General Terms are incorporated in this Agreement by reference and without modification except as may be provided in Section 10 of the Specific Terms.

B.    SPECIFIC TERMS.   The following terms (the *"Specific Terms"*) complete, supplement or modify the General Terms:

1.    Deposit Account *(see "Background" above)*.   The following account or accounts comprise the Deposit Account [*list by account number*]: 01052217; 01219979; 02200740

2. _Business Day (see definition of "Business Day" in Section 1 of the General Terms)_:

A day will not be considered as a "Business Day" if commercial banks in the following city or cities are closed on that day: Los Angeles, California or New York, New York.  If the preceding sentence is not completed, no additional days are excluded from the definition of "Business Day".

3. _Outside Time (see definition of "Outside Time" in Section 1 of the General Terms)_:

If the Outside Time is to be based on a period of less than two Business Days, the following is the earlier period:_____.  If an earlier period is not inserted in the preceding sentence, then the Outside Time will be based on two Business Days.

4. _Disposition of less than all or multi-disposition of funds (see Section 4(a)(ii)(E) of the General Terms)_:

The following is any computation or formula by which a Disposition Instruction originated by the Secured Party may provide for a disposition of less than all of the funds in the Deposit Account and whether there may be multiple recipients of the funds:  A Disposition Instruction originated by Secured Party may provide for a disposition of all or any part of the funds in the Deposit Account and there may be multiple recipients.

If the preceding paragraph is not completed to permit a disposition of less than all of the funds in the Deposit Account, then a Disposition Instruction originated by the Secured Party must be for a disposition of all of the funds.  If the preceding paragraph is not completed to permit a disposition of the funds in the Deposit Account to multiple recipients, then a Disposition Instruction originated by the Secured Party must require that the funds be sent to a single recipient.

5. _Reimbursement Claim Period (see Section 6(b) of the General Terms)_:

The number of days following the termination of the Agreement in which a reimbursement claim must be made against the Secured Party under Section 6(b) of the General Terms is  30 Days_____.  If a number is not inserted in the preceding sentence, the number is 90.

6. _Electronic Records (see definition of "writing" in Section 1 of the General Terms)_:

Checking this line __X_ means that the parties permit a writing to include an electronic record and permit communications by email.  Otherwise, the parties do not permit a writing to include an electronic record and do not permit communications by email.

7.    Governing Law *(see Section 13(a) of the General Terms)*:

The  jurisdiction  whose  law  governs  this  Agreement  is _____California_____.  If a jurisdiction is not inserted in the preceding sentence, the jurisdiction will be determined by applicable law.

8.    Bank's Jurisdiction for UCC Purposes *(see Section 13(b) of the General Terms)*:

The Bank's jurisdiction for purposes of part 3 of UCC Article 9 is _____California_____.  If the Bank's jurisdiction for such purposes is not inserted in the preceding sentence, the Bank's jurisdiction for such purposes will be determined by applicable law.

9.    Delivery of Executed Copy *(see Part D)*:

Checking this line _X_ means that the delivery of an executed copy of this Agreement may be made by electronic transmission in addition to a transmission by facsimile.  Otherwise, delivery of an executed copy of this Agreement may not be made by a form of electronic transmission other than facsimile.

10.    Additional Provisions *(see Section 12(b) of the General Terms)*:

The following provisions modify or supplement the General Terms:

If no provisions are inserted above in this Section 10, then there are no modifications to or supplements of the General Terms.

C.    EXHIBIT.  The parties have completed and attach hereto the Exhibit to be used as the form of the Initial Instruction.

D.    SINGLE AGREEMENT; COUNTERPARTS.  The General Terms, the Specific Terms and the Exhibit shall be read and construed together with the other provisions of this Agreement as a single agreement.  Delivery of executed copies of this Agreement may be made by facsimile or, if so permitted in Section 9 of Part B, by another form of electronic transmission.  This Agreement may be executed in counterparts, each of which shall constitute an original and all of which collectively shall constitute a single agreement.

[remainder of page intentionally left blank]

# SIGNATURES

Debtor:

MKA REAL ESTATE OPPORTUNITY FUND I, LLC

By: _____
Name: *JASON SUGARMAN*
Title: *PRESIDENT / MANAGING MEMBERS*
Address:   26 Corporate Plaza Dr. #250
           Newport Beach, CA 92660
Attention: MKA Capital Group Advisors Inc.
Attention: Jason Sugarman
Telephone Number (for information only):(949) 729 - 1660
Facsimile Number:(949) 729 - 1665
Electronic mail address (if Section 6 of Part B permits): jsugarman@mkacap.com


Secured Party:

GOTTEX FUND MANAGEMENT, LTD.

By: _____
Name:
Title:
Address:

Attention: William H. Woolverton, General Counsel
Telephone Number (for information only):(617) 532 - 0202
Facsimile Number:(617) 532 - 0219
Electronic mail address (if Section 6 of Part B
permits):William.Woolverton@gottexfunds.com

Ex. 02, p. 57

SIGNATURES

Debtor:


MKA REAL ESTATE OPPORTUNITY FUND I, LLC



By:_____
Name:
Title:
Address:

Attention: MKA Capital Group Advisors Inc.
Attention: Jason Sugarman
Telephone Number (for information only):(949) 729 - 1660
Facsimile Number:(949) 729 - 1665
Electronic mail address (if Section 6 of Part B permits): jsugarman@mkacap.com



Secured Party:


GOTTEX FUND MANAGEMENT, LTD.

By: _William Woolverton_
Name: _William H. Woolverton_
Title: VICE PRESIDENT
Address: BOSTON, MA

Attention: William H. Woolverton, General Counsel
Telephone Number (for information only):(617) 532 - 0202
Facsimile Number:(617) 532 - 0219
Electronic mail address (if Section 6 of Part B
permits):William.Woolverton@gottexfunds.com

Bank:

ALLIANCE BANK

By: _____

Name:  Cristina Toranzo-Hellems
Title: SVP/Operations/Cash Management
Address: 100 Corporate Pointe Culver City, CA. 90230
E-Mail:lmoorhouse@allbank.com

Exhibit

GOTTEX FUND MANAGEMENT, LTD.

DEPOSIT ACCOUNT CONTROL AGREEMENT

INITIAL INSTRUCTION

[6/22/06]

Alliance Bank
100 Corporate Pointe
Culver City, CA. 90230
Attention: Lynn Moorhouse VP/Operations

Ladies and Gentlemen:

This is the Initial Instruction as defined in the Deposit Account Control Agreement dated as of June 30, 2006, among you, us and MKA REAL ESTATE OPPORTUNITY FUND I, LLC (the *"Debtor"*) (as currently in effect , the *"Control Agreement"*). A copy of the Control Agreement as fully executed is attached. Capitalized terms used in this Initial Instruction have the meanings given them in the Control Agreement

This Initial Instruction directs the Bank no longer to comply with the Debtor's Disposition Instructions.

As an included Disposition Instruction, we direct you to send the funds in the Deposit Account to us by the method and at the address indicated below. We recognize that, as a condition to your complying with this Disposition Instruction and to the extent that we have not already done so, we must provide to you evidence reasonably required by you as to the authority of the person giving this Disposition Instruction to act for us. We also recognize that your obligation to comply with this Disposition Instruction is subject to the other provisions of Section 4(a)(ii) of the General Terms.

Funds transfer instructions:

Receiving bank:
ABA routing number for domestic wire:122237997
ABA  routing number for ACH transaction:122237997

Ex. 02, p. 60

International: Swift Code No. _____Not Applicable_.

Reference details:.

Very truly yours,

GOTTEX FUND MANAGEMENT, LTD.

By:_____

Title:_____

BUSDOCS/1535848.1
Specific Terms and Conditions - Control Agreement

8

# EXHIBIT 3



Banco Popula North America
888 S. Disneyland Drive #500
Anaheim, CA 92802
Attention: Claudia E. Bustos, AVP


Date: July 22, 2010

Ladies and Gentlemen:

Re:  (i) Those certain second amended and restated secured registered promissory notes, dated as of April 1, 2008 and issued by MKA Real Estate Opportunity Fund I, LLC ("**MKA**") to GVA ABL Portfolio Limited, Gottex ABL (Cayman) Limited and Hudson ABL Fund Limited and that certain amended and restated secured registered promissory note, dated as of April 1, 2008 and issued by MKA to (each note, as amended, supplemented or otherwise modified from time to time and collectively, the "**Notes**") and (ii) that certain Waiver Agreement dated as of April 1, 2008 (as amend supplemented or otherwise modified from time to time, the "**Waiver Agreement**") among Gottex ABI Master Fund Limited, GVA ABL Portfolio Limited, Gottex ABL (Cayman) Limited and Hudson ABL Fund Limited, MKA and Gottex Fund Management Ltd. ("**Gottex**").  All capitalized terms not otherwise defined herein are used as defined in the Notes.

By countersigning below, you hereby agree as follows:

1.  MKA will open two accounts with Banco Popular, a "**Control Account**" (account number 680-7777898) and a "**Disbursement Account**" (account number 680-7777906).  Each of the Control Account and the Disbursement Account is a "**Custody Account**", as defined in the Notes.  The agreements related to the establishment of the Disbursement Account and the Control Account are "**Custody Agreements**", as defined in the Notes.  Banco Popular is a "**Bank**" as defined in the Notes.

2.  MKA acknowledges and agrees that the signatories on the Control Account will be composed solely of employees of Gottex or its affiliates.

3.  MKA acknowledges and agrees that all Proceeds of the Collateral will be deposited into the Control Account.

4.  MKA acknowledges and agrees that the signatories on the Disbursement Account will be composed of employees of Gottex or its affiliates and employees of MKA or its affiliates.

5.  MKA agrees that, immediately upon receipt by MKA and Banco Popular of notification from Gottex of a breach by MKA of the Notes or the Waiver Agreement, (a) Gottex shall have sole power and authority to direct transactions with respect to both the Control Account and the Disbursement Account, and (b) no disbursements shall be made out of either the Disbursement Account or the Control Account without the prior written consent of Gottex.

This Agreement shall be governed by, and shall be construed in accordance with, the internal laws of the State of California, without regard to conflict of law principles.  To the extent there is any



84292886_1_Instruction Letter Agreement related to Custody Accounts

conflict between the terms of this letter agreement and any Custody Agreement or the Notes with respect to the subject matter hereof, the terms hereof shall govern.

[Signature page follows]



Very truly yours,

GOTTEX FUND MANAGEMENT LTD.

By:
Name: Joachim Gottschalk
Title:  CEO

[Additional signature page to follow]

ACKNOWLEDGED AND AGREED TO:

MKA REAL ESTATE OPPORTUNITY FUND I, LLC

By: _____                By: _____
Name: GEORGE BAKER                            Name: KENNETH LIPINSKI
Title: PRESIDENT                              Title: CFO


ACKNOWLEDGED AND AGREED TO:

BANCO POPULA NORTH AMERICA

By: _____
Name: Claudia Russo
Title: Business Deposit Services

# EXHIBIT 4

EXECUTION COPY

## WAIVER AGREEMENT

This Waiver Agreement ("Agreement") is made and entered into as of April 1, 2008, by and among MKA Real Estate Opportunity Fund I, LLC, a California limited liability company (the "Issuer"), and MKA Capital Group Advisors, LLC, a California limited liability company (the "Manager"), on the one hand, and Gottex ABI Master Fund Limited, a Cayman Islands exempted company, Gottex ABL (Cayman) Limited, a Cayman Islands exempted company, GVA ABL Portfolio Limited, a British Virgin Islands company, Hudson ABL Fund Limited, a Cayman Islands exempted company (collectively, the "Noteholders") and Gottex Fund Management, Ltd. ("Administrative Agent" and, collectively with the Noteholders, "Gottex"), on the other.

## RECITALS

**WHEREAS**, on April 9, 2008, the Administrative Agent, on behalf of the Noteholders, provided a written notice to the Issuer (the "Default Notice") stating that it had determined the Issuer to be in default under the Old Notes (as defined below);

**WHEREAS**, the Issuer disputed that any defaults existed and filed a complaint against Gottex (the "Complaint") in the United States District Court, Central District of California;

**WHEREAS**, the Issuer has agreed to withdraw its Complaint on the terms and conditions set forth herein;

**WHEREAS**, the Administrative Agent, on behalf of the Noteholders, has agreed to rescind the Default Notice on the terms and conditions set forth herein;

**WHEREAS**, there are currently 7 secured registered promissory notes outstanding to the Noteholders, each of which is referenced in Exhibit A hereto (each as amended from time to time, including pursuant to the First Amendment, and, collectively, the "Old Notes"); "First Amendment" means that certain Global Amendment and Agreement entered into among the parties hereto dated as of November 6, 2007;

**WHEREAS**, except as set forth in Section 5 below, the parties hereto desire to amend and restate each of the Old Notes with new promissory notes, each substantially in the form attached hereto as Exhibit B (collectively, the "New Notes"), and to amend the security agreement applicable to the Old Notes (the "Security Agreement") as set forth in section 4 below and deem the Security Agreement modified such that any references to the Old Notes in the Security Agreement shall be deemed to refer to the New Notes.

**WHEREAS**, the parties hereto desire to resolve any and all disputes between them (except as set forth in Section 5 below), including, without limitation, any and all claims of default to date under the Old Notes or the First Amendment, on the terms set forth herein; and

WHEREAS, capitalized terms referred to herein without definition have the meanings given to them in the New Notes.

NOW, THEREFORE, for and in consideration of the covenant and agreements hereinafter set forth, the receipt of which is hereby acknowledged, and other good and valuable consideration, the parties hereto agree as follows:

1.    Default Notice.  The Default Notice shall be rescinded and the mutual releases set forth in Section 15 hereof (entitled "Mutual Releases") shall be effective on the date (the "Effective Date") that the Administrative Agent or its counsel, by Katten Muchin Rosenman LLP, has received the following:

    (a)    a fully executed copy of this Agreement;

    (b)    executed copies of the New Notes;

    (c)    a repayment plan, in a form and substance reasonably satisfactory to the Administrative Agent, describing the Issuer's assets and outlining the Issuer's plan to pay its obligations under the New Notes in accordance with the terms thereof;

    (d)    an incumbency certificate, certified by the Manager, certifying the names and true signatures of the Person authorized to sign this Agreement and the New Notes; and

    (e)    a fully executed and acknowledged joint instruction letter, substantially in the form of Exhibit C hereto (the "Instruction Letter").

2.    Valuation Agent.  The Issuer may continue to employ FMV Opinions, Inc. as its independent valuation agent.  If the Issuer has not paid fifty percent (50%) of the outstanding principal balance due on the New Notes as of August 31, 2008, Gottex may require that the Issuer appoint a new valuation agent that is referenced on the list of valuation agents set forth on Exhibit D hereto on thirty (30) days written notice to the Issuer and such new valuation agent shall be retained by the Issuer.

3.    Withdrawal of Complaint.  The Issuer hereby agrees that no later than two (2) Business Days following the Effective Date, it shall withdraw the Complaint. Gottex shall stipulate to withdrawal of the Complaint to the extent necessary to effect such withdrawal under the Federal Rules of Civil Procedure and any other applicable rules.

4.    New Notes; Modification of Security Agreement.  The parties hereby agree that (a) the New Notes shall amend, restate, supersede, and replace the Old Notes and (b) upon the Effective Date, the Security Agreement shall be (i) deemed modified such that any references to the Old Notes in the Security Agreement shall be deemed to refer to the New Notes, and (ii) amended as set forth below.  On the Effective Date, the parties agree to execute and deliver counterparts to the New Notes. For the avoidance of doubt, the Note Agreements set forth the entirety of the Issuer's obligations to Gottex and other than as set forth in the Note Agreements, the Issuer shall not have any obligations whatsoever to Gottex.  Except as expressly provided below, nothing herein shall be deemed nor construed to impair Gottex's

existing liens on the Collateral under the Security Agreement and the terms of the Security Agreement shall remain in full force and effect.  On the Effective Date, the Old Notes shall be deemed cancelled and will be of no further force and effect, and the Security Agreement shall be deemed (x) modified to refer to the New Notes as described above in this section and (y) amended as set forth below.

Notwithstanding anything to the contrary in the Security Agreement, the New Notes, or any other agreement, Issuer shall not be required to grant a lien in, continue the perfection of a lien in proceeds in, or otherwise execute and deliver a deed of trust encumbering REO in favor of the Lenders, except as set forth below:

     (a)     if, at any time, the quotient (expressed as a percentage) of (A) all REO properties in the MKA portfolio, in the aggregate (as valued by sum of the credit bid at the foreclosure sale or the outstanding balance on the loan secured by the individual REO property, whichever is greater) and (B) the Value, in the aggregate, of each Acceptable Loan and each Acceptable Property plus the amount of cash in the Custody Account, exceeds 30%, the Issuer shall grant Gottex a deed of trust in such REO as necessary to bring such REO within the definition of Acceptable Property in order to reduce such quotient to or below 30% and shall execute and deliver such a deed of trust, in a form provided by Gottex that is reasonably acceptable to the Issuer for such purpose;

     (b)     if REO is sold, the Issuer agrees that the net proceeds of such REO shall be deposited in the Custody Account, following payment to any expenses of sale, and shall remain subject to the liens in favor of Gottex; and

     (c)     any security interest provided pursuant to this provision shall be solely to further secure repayment of the New Notes and shall not, under any circumstances, increase any liability of the Issuer to Gottex under the New Notes.

5.     <u>Surviving Clause of the Old Notes</u>.  Clause (a) of the "Events of Default" section of each Old Note shall remain in full force and effect, notwithstanding the amendment and restatement of the Old Notes.  Notwithstanding anything to the contrary contained herein or in any New Note, the parties hereto hereby agree that Gottex shall be deemed to be (and shall be deemed to have been), forbearing from exercising its rights against the Issuer arising under clause (a) of the "Events of Default" section of each Old Note.  Gottex hereby agrees to continue to forbear from exercising its rights with respect to clause (a) of the "Events of Default" section of each Old Note.

6.     <u>Representations and Warranties</u>.  Each of the parties to this Agreement represents and warrants to, and agrees with, each other party hereto, as follows:

(a)     Such party has received independent legal advice from its attorneys with respect to the advisability of making the settlement provided for herein, the advisability of executing this Agreement, and the existence and meaning of section 1542 of the California Civil Code.

(b)     Such party has carefully read, and knows and understands the contents of, this Agreement. Each party executes this Agreement without fraud, duress, mistake, or undue influence on the part of anyone, including any other party to this Agreement. No party shall be entitled to set aside or rescind this Agreement on the basis of any claim of fraud, duress, mistake, or undue influence.

(c)     Such party (or any officer, agent, employee, representative, or attorney of or for such party) has not made any statement or representation to any other party regarding any fact relied upon in entering into this Agreement, and such party does not rely upon any statement, representation, or promise of any other party (or of any officer, agent, employee, representative or attorney for any other party) in making and executing this Agreement, except as expressly stated herein.

(d)     Such party has made such investigation of the facts pertaining to the Agreement, and of all the matters pertaining thereto, as it deems necessary.

(e)     The terms of this Agreement are contractual and are the result of arm's-length negotiations on the part of such party.

(f)     Each individual signing this Agreement expressly warrants that he or she is fully authorized to sign this Agreement and bind the party on whose behalf he or she signs to all the terms of this Agreement.

7.    <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. No waiver or modification of the terms hereof shall be valid unless in a writing signed by the parties hereto.

8.    <u>Governing Law</u>. This Agreement shall be governed by, and shall be construed in accordance with, the internal laws of the State of California, without regard to conflict of law principles.

9.    <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NEW NOTES, THE SECURITY AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

10.    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute a single agreement.

11.     Entire Agreement. The recitals to this Agreement are hereby incorporated into and made a part of this Agreement, and shall constitute covenants and representations of the parties hereto and shall be binding upon and enforceable against each of the parties. This Agreement, including the New Notes, constitutes the complete and entire agreement between the parties regarding the subject matter hereof, and shall supersede all prior and contemporaneous oral or written negotiations, representations, agreements, and understandings with respect to such subject matter.

12.     Gottex Expenses. The Issuer agrees to reimburse Gottex (pursuant to Section 3 of the New Notes) costs and expenses (including, but not limited to, reasonable attorneys' fees) incurred by Gottex of up to $37,000 in the aggregate. Gottex hereby agrees that upon the making of such reimbursement, the amount of costs and expenses owing by the Issuer with respect to the Note Agreement as of the date hereof, after giving effect to such reimbursement, shall be $0.

13.     Additional Agreement. The execution, delivery, and effectiveness of this Agreement shall not be deemed to establish any course of dealing between the parties hereto or create any obligation or agreement of Gottex with respect to any future restructuring, modification, amendment, waiver, or forbearance with respect to the New Notes.

14.     Severability. In case any provision in this Agreement shall be held to be invalid, illegal or unenforceable, such provision shall be severable from the rest of this Agreement and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

15.     Mutual Releases.

        (a)     Certain Defined Terms.

                (i)     "Gottex Parties" means the Noteholders and the Administrative Agent, in all capacities, and each of their respective past or present affiliates, subsidiaries, parents, successors and predecessors, officers, directors, agents, employees, attorneys, advisors, insurers, investment advisors, auditors, accountants, representatives, and any person, firm, trust, corporation, officer, director, or other individual or entity in which any of them has a controlling interest or which is related to or affiliated with the Noteholder or the Administrative Agent, and the legal representatives, heirs, successors in interest, or assigns of the Noteholder and the Administrative Agent.

                (ii)    "MKA Parties" means the Issuer and the Manager, in all capacities, and each of their respective past or present affiliates, subsidiaries, parents, successors and predecessors, officers, directors, agents, employees, attorneys, advisors, insurers, investment advisors, auditors, accountants, representatives, and any person, firm, trust, corporation, officer, director, or other individual or entity in which any of them has a controlling interest or which is related to or affiliated with the Issuer or the Manager, and the legal

representatives, heirs, successors in interest, or assigns of the Issuer and the Manager.

(iii)   "Released Claims" means any and all demands, defaults, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages, and any and all claims, defenses, rights of setoff or recoupment, liabilities, liens, security interests, interests, or rights of any nature whatsoever (including claims for losses, damages including consequential damages, unjust enrichment, breach of fiduciary duty, breach of contract, attorneys' fees, disgorgement of fees, litigation costs, injunction, declaration, contribution, indemnification or any other type or nature of legal or equitable relief), whether accrued or not, whether already acquired or acquired in the future, whether known or unknown, in law or equity, brought by way of demand, complaint, answer, defense, cross-claim, claim, third-party claim, or otherwise, arising from, related to, or concerning the First Amendment, the Old Notes, the Security Agreement as applicable to the Old Notes prior to the modifications thereto that become effective on the Effective Date, or any agreements or documents relating thereto.

(b)   Releases by the Gottex Parties. From and after the Effective Date, each of the Gottex Parties hereby absolutely, unconditionally, and irrevocably releases and forever discharges each of the MKA Parties of and from the Released Claims that any of the Gottex Parties, directly, indirectly, or in any other capacity, ever had, now has, or hereafter may have; provided, however, that the foregoing release shall not affect or impair the enforceability of this Agreement (including, without limitation, the covenants and representations and warranties herein) or the rights of the parties hereunder. **Each of the Gottex Parties understands and agrees that, subject to the foregoing limitation, the releases given pursuant to this Agreement shall include any Released Claims that are not known or suspected to exist as of the date hereof and that no fact or circumstance, evidence, or transaction which now could be asserted or which may hereafter be discovered shall affect in any way the final, irrevocable, and unconditional nature of the releases set forth above.** From and after the Effective Date, this Agreement may be pleaded by any of the MKA Parties as a full and complete defense to any proceeding instituted with respect to any Released Claims.

(c)   Releases by the MKA Parties. From and after the Effective Date, each of the MKA Parties hereby absolutely, unconditionally, and irrevocably releases and forever discharges each of the Gottex Parties of and from the Released Claims that any of the MKA Parties, directly, indirectly, or in any other capacity, ever had, now has, or hereafter may have; provided, however, that the foregoing release shall not affect or impair the enforceability of this Agreement (including, without limitation, the covenants and representations and warranties herein) or the rights of the parties hereunder. **Each of the**

**MKA Parties understands and agrees that, subject to the foregoing limitation, the releases given pursuant to this Agreement shall include any Released Claims that are not known or suspected to exist as of the date hereof and that no fact or circumstance, evidence, or transaction which now could be asserted or which may hereafter be discovered shall affect in any way the final, irrevocable, and unconditional nature of the releases set forth above.** From and after the Effective Date, this Agreement may be pleaded by any of the Gottex Parties as a full and complete defense to any proceeding instituted with respect to any Released Claims.

(d)    Waiver under California Civil Code § 1542.  Within the scope of the releases provided herein, the releases constitute waivers by the parties hereto of any and all rights under section 1542 of the Civil Code of California (or any similar, comparable, or equivalent law of any state or territory of the United States, or principle of common law), which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

16.    Covenant Not to Sue.  Each party to this Agreement covenants and agrees not to bring, or to consent to its counsel bringing, any action, claim, suit, or proceeding against any other party as to any of the matters that have been released in this Agreement.

17.    No Admissions.  This Agreement constitutes a compromise of disputed claims and does not constitute, and shall not be construed as, an acknowledgement by any party of the validity of any claims or an admission of any liability with respect thereto.

18.    Survival of Representations and Warranties.  The representations and warranties contained in this Agreement shall survive the execution, delivery, and performance of this Agreement.

19.    Neutral Construction.  Each party has cooperated, by and through its counsel, in the drafting and preparation of this Agreement.  Hence, this Agreement will be construed neutrally, and will not be applied more strictly against one party than another.

20.    Headings.  Paragraph headings in this Agreement are for convenience and shall not be considered for any purpose in construing this Agreement.

21.    Appointment of Administrative Agent. Each Noteholder hereby irrevocably appoints Gottex Fund Management Ltd. to act on its behalf as administrative agent with respect to the New Notes and each other Note Agreement and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  All calculations with respect to the payment of any amounts due under

Waiver Agreement                                    7

any Note Agreement shall be made by the Administrative Agent.  Gottex Fund Management Ltd. hereby accepts such appointment.  The Issuer hereby acknowledges and agrees to such appointment.  Any and all actions (including, without limitation, waivers, consents and/or approvals) that may be or are required to be taken by the Noteholder under any Note Agreement may be carried out by the Administrative Agent on behalf of the Noteholders.  The provisions of this Section are solely for the benefit of the Administrative Agent and the Noteholders and Issuer shall not have rights as a third party beneficiary of any of such provisions.

[Signature pages to follow]

IN WITNESS WHEREOF, the undersigned executed or caused this Agreement to be executed as of the day and year first above written.

The Issuer:    MKA REAL ESTATE OPPORTUNITY FUND I, LLC,
        a California limited liability company

        By:  MKA Capital Group Advisors, LLC
           a California limited liability company

        By: _____
        ~~Gregory Contillo, Its President~~ Chairman of the Board
        Michael Abraham

Manager:    MKA Capital Group Advisors, LLC,
        a California limited liability company

        By: _____
        ~~Gregory Contillo, Its President~~ Chairman of The Board
        Michael Abraham

        [additional signature pages follow]

Waiver Agreement

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _Orange_

On _May 9 2008_ before me, _Mabel Wan, Notary Public_,
Date _____ Here Insert Name and Title of the Officer

personally appeared _Michael A. Abraham_
Name(s) of Signer(s)

---

MABEL WAN
COMM. #1613078
Notary Public-California
ORANGE COUNTY
My Comm. Exp. Oct 15, 2009

Place Notary Seal Above

who proved to me on the basis of satisfactory evidence to
be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the
instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws
of the State of California that the foregoing paragraph is
true and correct.

WITNESS my hand and official seal.

Signature _____
Signature of Notary Public

———————————————— **OPTIONAL** ————————————————

*Though the information below is not required by law, it may prove valuable to persons relying on the document
and could prevent fraudulent removal and reattachment of this form to another document.*

### Description of Attached Document

Title or Type of Document: _Waiver Agreement_

Document Date: _April 1, 2008_ Number of Pages: _16_

Signer(s) Other Than Named Above: _____

### Capacity(ies) Claimed by Signer(s)

Signer's Name: _Michael A. Abraham_

☑ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

Signer Is Representing: _____

Signer's Name: _____

☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

Signer Is Representing: _____

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5907   Reorder: Call Toll-Free 1-800-876-6827

Ex. 04, p. 75

Noteholders:                    GOTTEX ABI MASTER FUND LIMITED,
                                a Cayman Islands exempted company

                                By: Gottex Fund Management Sarl,
                                    Its Investment Manager

                                Name: Tim Roniger
                                Title: CFO

                                Name: Bert Janssen
                                Title: Managing Director


                                GOTTEX ABL (CAYMAN) LIMITED,
                                a Cayman Islands exempted company

                                By: Gottex Fund Management Sarl,
                                    Its Investment Manager

                                Name: Tim Roniger
                                Title: CFO

                                Name: Bert Janssen
                                Title: Managing Director


                       [additional signature pages follow]


Waiver Agreement

GVA ABL PORTFOLIO LIMITED,
a British Virgin Islands company

By: Gottex Fund Management Sarl,
    Its Investment Manager

Name: Tim Roniger
Title: CFO

Name: Bart Janssen
Title: Managing Directors


HUDSON ABL FUND LIMITED,
a Cayman Islands exempted company

By: Gottex Fund Management Sarl,
    Its Investment Manager

Name:
Title:

Name: Bert Janssen
Title: Managing Director


[additional signature page follows]

Waiver Agreement

Administrative Agent:    GOTTEX FUND MANAGEMENT, LTD.
a Cayman Islands exempted company

By: _____

Its  General Counsel

Waiver Agreement

## EXHIBIT A

**Old Notes (Amended and Restated by the New Notes)**

1. That certain secured registered promissory note made by MKA Real Estate Opportunity Fund I, LLC in favor of Gottex ABI Master Fund Limited dated February 15, 2007 for $40,000,000.

2. That certain amended and restated secured registered promissory note made by MKA Real Estate Opportunity Fund I, LLC in favor of GVA ABL Portfolio Limited dated as of April 12, 2006 for $8,000,000.

3. That certain amended and restated secured registered promissory note made by MKA Real Estate Opportunity Fund I, LLC in favor of Hudson ABL Fund Limited dated as of June 6, 2006 for $5,000,000.

4. That certain amended and restated secured registered promissory note made by MKA Real Estate Opportunity Fund I, LLC in favor of GVA ABL Portfolio Limited dated as of June 30, 2006 for $21,000,000.

5. That certain amended and restated secured registered promissory note made by MKA Real Estate Opportunity Fund I, LLC in favor of Gottex ABL (Cayman) Limited dated as of April 12, 2006 for $12,000,000.

6. That certain amended and restated secured registered promissory note made by MKA Real Estate Opportunity Fund I, LLC in favor of Gottex ABL (Cayman) Limited dated as of June 6, 2006 for $5,000,000.

7. That certain amended and restated secured registered promissory note made by MKA Real Estate Opportunity Fund I, LLC in favor of Gottex ABL (Cayman) Limited dated as of June 30, 2006 for $9,000,000.

**EXHIBIT B**

The New Note

[to be attached]

## EXHIBIT C

### The Instruction Letter

**[to be attached]**

## EXHIBIT D

### Valuation Agents

Houlihan Smith & Company Inc.

Duff & Phelps

Hilco

Navigant

Sterling

# EXHIBIT 5

EXECUTION COPY

PURSUANT TO THE WAIVER AGREEMENT DATED AS OF APRIL 1, 2008 (THE "WAIVER AGREEMENT"), BY AND AMONG MKA REAL ESTATE OPPORTUNITY FUND I, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY (THE "ISSUER"), AND MKA CAPITAL GROUP ADVISORS, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY (THE "MANAGER"), ON THE ONE HAND, AND GOTTEX ABI MASTER FUND LIMITED, A CAYMAN ISLANDS EXEMPTED COMPANY, GOTTEX ABL (CAYMAN) LIMITED, A CAYMAN ISLANDS EXEMPTED COMPANY, GVA ABL PORTFOLIO LIMITED, A BRITISH VIRGIN ISLANDS COMPANY, HUDSON ABL FUND LIMITED, A CAYMAN ISLANDS EXEMPTED COMPANY (COLLECTIVELY, "GOTTEX"), AND GOTTEX FUND MANAGEMENT, LTD. ("ADMINISTRATIVE AGENT"), ON THE OTHER, EXCEPT AS SET FORTH IN SECTION 5 OF THE WAIVER AGREEMENT, THIS PROMISSORY NOTE AMENDS AND RESTATES THAT CERTAIN PROMISSORY NOTE MADE BY THE ISSUER IN FAVOR OF GOTTEX ABI MASTER FUND LIMITED (THE "NOTEHOLDER") DATED FEBRUARY 15, 2007 FOR $40,000,000.

## AMENDED AND RESTATED PROMISSORY NOTE

$36,970,548                                                      Dated as of April 1, 2008

For value received, the Issuer promises to pay to the Noteholder the principal amount of Thirty Six Million Nine Hundred Seventy Thousand Five Hundred Forty Eight Dollars ($36,970,548) at an interest rate equal to fifteen percent (15%) per annum (the "Base Rate") from April 1, 2008 until paid in full.

1.     **Definitions**. Capitalized terms not defined herein shall have the meanings ascribed to them in that certain Amended and Restated Security Agreement dated April 12, 2006 by and between the Issuer and the Administrative Agent (as amended, supplemented or otherwise modified from time to time, the "Security Agreement") and the following terms shall have the following meanings.

"Acceptable Loan" means Loan in respect of which the Administrative Agent shall have received a complete Loan Package.

"Acceptable Property" means real property owned by the Issuer as of the date hereof that satisfies the following criteria:  (i) the Administrative Agent shall have received a complete Property Package with respect thereto and (ii) the Administrative Agent shall have determined (in its sole discretion) that it has a first priority perfected security interest in such real property. For the avoidance of doubt, "Acceptable Property" excludes REO.

"Bank" means Alliance Bank or such other bank as the parties may agree upon.

"Business Day" means any day on which banking institutions in California are open for the transaction of banking business.

A&R Note - ABI/ MKA

"Collateral Breach" means, as of any date of determination, the quotient (expressed as a percentage) of (i) the Total Loan Amount and (ii) the Value, in the aggregate, of each Acceptable Loan and each Acceptable Property plus the amount of cash in the Custody Account, exceeds 50%.

"Custody Account" means the one or more custody accounts (including, without limitation, any bank account(s)) established and maintained by the Bank under and pursuant to the Custody Agreement dated as of the date hereof between the Issuer and the Bank (the "Custody Agreement"), and all assets from time to time held in or standing to the credit of any such account (or any successor account), and all Proceeds of the foregoing held in any such account (or successor account).

"Debt" means at any date without duplication (i) indebtedness for borrowed money, (ii) obligations evidenced by bonds, debentures, notes or other similar instruments, (iii) obligations to pay the deferred purchase price of property or services (excluding trade payables and other accounts payable incurred in the ordinary course of business), (iv) capital lease obligations, (v) indebtedness of others secured by a Lien on the Issuer's property, (vi) the maximum amount available to be drawn under all letters of credit and all unpaid drawings in respect of such letters of credit, (vii) all obligations to pay a specified purchase price for goods or services, whether or not delivered or accepted, i.e., take-or-pay and similar obligations, (viii) all obligations created or arising under any conditional sale or other title retention agreement or incurred as financing, (ix) the net obligations under Derivatives and (x) obligations under a guaranty of debt of others of the kinds referred to in clauses (i) through (ix) above.

"Derivatives" means derivative transactions, including, without limitation, swap agreements or commodity transactions.

"Impaired Loan" means any Loan referenced on the Loan List in respect of which the obligor thereunder (i) has failed to make a payment of principal or interest and such failure shall not have been cured for more than two (2) months or (ii) has failed to comply with any material term, covenant or agreement in the relevant loan documents or is otherwise in default thereunder, in each case, regardless of whether the relevant failure has been waived.

"Lender Commitments" means, with respect to any Loan, advances required or permitted to be made by the Issuer under such Loan to the relevant borrower, whether such advance is paid to such borrower or to one or more of such borrower's senior lenders.

"Lien" means any lien, pledge, security interest or other charge or encumbrance of any kind, or any other type of preferential arrangement.

"Loan" means each loan (i) in respect of which, as of the date hereof, the Issuer is the lender of record or an assignee thereof or in which the Issuer owns a participation and (ii) that is secured by a security interest in a mortgage, deed of trust or similar collateral agreement.

"Loan Package" has the meaning set forth in Schedule I hereto.

"Material Adverse Effect" means a material adverse effect on (1) the ability of the Issuer to perform any of its obligations under any of the Note Agreements, (2) the legality, validity or

2

A&R Note - ABl/ MKA

enforceability of any provision of this Note or any other Note Agreement, (3) the business, condition (financial or otherwise), assets, prospects or results of operations of the Issuer or (4) the value of, or the priority of the Administrative Agent's security interest, in the Collateral securing the obligations of the Issuer under any Note, in each case, as determined by the Administrative Agent in its reasonable discretion; provided, however, that any material adverse effect that is being suffered on an industry-wide basis in the industry in which the Issuer is a participant shall not constitute a "Material Adverse Effect."

"Maturity Date" means December 1, 2008.

"NAV" means the net asset value of the Issuer as determined in accordance with U.S. generally accepted accounting principles ("U.S. GAAP").

"NAV Calculation" means a written statement by the Issuer certifying as to the NAV and each Loan and piece of real property owned by the Issuer as of the date hereof, as of the end of the applicable quarter or the date of such notice, as applicable, together with (in reasonable detail) a schedule of the computations used by the Issuer or its designee in determining the applicable NAV.

"Note Agreements" means, collectively, all of the Notes, the Subordination Agreement, the Security Agreement, the Control Agreement, any other document securing the Notes and each other document executed in connection therewith or pursuant thereto, each as amended, supplemented or otherwise modified from time to time. "Note Agreements" does not include the Note Purchase Agreement.

"Notes" means the new promissory notes (including this Note) that, pursuant to the terms of the Waiver Agreement, amend and restate each of the seven (7) secured registered promissory notes identified in Exhibit A to the Waiver Agreement.

"Permitted Expenses" means (i) legal and auditing expenses, not to exceed $300,000 per month and (ii) any other payments the Administrative Agent permits the Issuer to pay.

"Permitted Liens" means liens imposed by applicable law for taxes that are not yet due or are being contested in good faith by appropriate proceedings.

"Person" means a firm, unincorporated organization, corporation, partnership or any other entity.

"Property Package" has the meaning set forth in Schedule I hereto.

"Protective Advances" means, with respect to any Loan, an advance or payment the Issuer desires to make in order to protect or preserve the relevant asset constituting Collateral.

"REO" means an Acceptable Loan that has been converted into real property owned by Issuer as a result of foreclosure, deed in lieu of foreclosure or other enforcement of the Acceptable Loan.

3

"Subordination Agreement" means that certain subordination agreement among the Administrative Agent, the Issuer, Freestone Capital Partners L.P., Freestone Capital Qualified Partners L.P., Freestone Low Volatility Partners LP, Freestone Low Volatility Qualified Partners LP, GVA ABL Portfolio Limited, Gottex ABL (Cayman) Limited and Gottex ABI Master Fund Limited dated as of February 20, 2007 (as amended, supplemented or otherwise modified from time to time).

"Substantive Information" means any information required to be delivered pursuant to Section 8(f) through Section 8(i) of this Note.

"Total Loan Amount" means the unpaid principal amount outstanding under the Notes, together with all accrued and unpaid interest thereon.

"Unallocated Disbursements" means, with respect to any month for which interest is due, the amount by which the Disbursements during such month exceeds the amount of interest payable and any expenses and indemnities payable for such month.

"Value" means, as of any date of determination, (i) with respect to each Loan, (A) an amount determined by the Issuer equal to the lesser of the then outstanding principal amount thereunder and the fair market value thereof or (B) if the Valuation Agent has determined the value of the Loan, the value thereof as determined by the Valuation Agent and as set forth on a statement provided by the Valuation Agent to the Administrative Agent, as applicable; and (ii) with respect to each piece of real property owned by the Issuer, (A) an amount determined by the Issuer equal to the fair market value thereof or (B) if the Valuation Agent has determined the value thereof, the value thereof as determined by the Valuation Agent and as set forth on a statement provided by the Valuation Agent to the Administrative Agent, as applicable.

"Valuation Agent" means (i) FMV Opinions, Inc. as its independent valuation agent or (ii) any successor thereto appointed in accordance with the Waiver Agreement, as the context requires.

## 2.  **Repayment.**

The principal amount of this Note, together with all accrued and unpaid interest and all other amounts payable to the Noteholder hereunder, shall be paid no later than the Maturity Date.

Principal, interest and all other sums due under this Note are payable in lawful money of the United States. The Issuer may prepay any or all amounts due under this Note, in its sole discretion, without premium or penalty, at any time. Any such prepayment shall be applied first, to outstanding expenses and indemnities payable to the Noteholder or the Administrative Agent hereunder or under any other Note Agreement, if any, then to accrued and unpaid accrued interest, if any, and, thereafter, to the principal amount outstanding hereunder.

## 3.  **Interest**.

Interest shall be payable on this Note on the tenth (10th) day of the month following the month for which interest is due (each, an "Interest Payment Date") and shall accrue from the first day of each month through (and including) the last day of the month; provided, that the first

4

A&R Note - ABI/ MKA

Interest Payment Date shall be May 10, 2008 for interest due for the month of April 2008 and that on such date Issuer shall also pay to Gottex $37,000 representing costs and expenses payable by Issuer pursuant to Section 12 of the Waiver Agreement.  The applicable interest shall be calculated at the interest rate applicable to this Note (15% per annum) based on the actual number of days in the applicable month divided by 360.

With respect to any date on which any payment or disbursement is to be made or is due hereunder or under the Waiver Agreement (a "Due Date"), (1) Due Dates shall be determined based on then-current Pacific Time in the United States and (2) if the Due Date falls on a weekend or a bank holiday, such Due Date shall be extended to the first Business Day thereafter

If any interest payment or other charge or fee payable hereunder exceeds the maximum amount then permitted by applicable law, then the Issuer shall pay the maximum amount then permitted by applicable law.

4.   **Distributions and Disbursements from the Custody Account**.

(a)   No disbursements or other distributions shall be made (or instructed to be made) from the Custody Account without the prior written consent of the Administrative Agent; provided, that:

(x)   with respect to one request per week (which request shall be submitted to the Administrative Agent on Wednesday of each week) to authorize the disbursement of funds from the Custody Account (a "Requested Disbursement") related to a Lender Commitment and/or a Permitted Expense, the Administrative Agent shall approve such Requested Disbursement if:

(i)   the disbursed funds are being used by the Issuer to fund a Lender Commitment and/or a Permitted Expense;

(ii)   the Administrative Agent receives a request substantially in the form of the specimen attached hereto as Annex A, which request shall be provided three (3) calendar days prior to the date the Issuer desires the relevant funds to be disbursed; and

(iii)   no Event of Default shall have occurred or would be reasonably likely to occur with the passage of time after giving effect to such Requested Disbursement; and

(y)   with respect to any Requested Disbursement related to a Protective Advance, the Administrative Agent shall not unreasonably withhold its consent with respect to authorizing the relevant disbursement and the satisfaction of the requirements set forth in clauses (i) through (iii) below shall be a condition precedent to any such authorization:

5

A&R Note - ABI/ MKA

(i)     the disbursed funds are being used by the Issuer to fund a Protective Advance;

(ii)    the Administrative Agent receives a request substantially in the form of the specimen attached hereto as Annex A, which request shall be provided three (3) calendar days prior to the date the Issuer desires the relevant funds to be disbursed; and

(iii)   no Event of Default shall have occurred or would be reasonably likely to occur with the passage of time after giving effect to such Requested Disbursement.

For the avoidance of doubt, (A) with respect to Requested Disbursements related to Lender Commitments and/or Permitted Expenses, the Administrative Agent shall not be required to authorize a disbursement from the Custody Account with respect to any Requested Disbursement unless all three (3) conditions set forth in clauses (i) through (iii) above shall have been satisfied and (B) with respect to Requested Disbursements related to Protective Advances, the Administrative Agent shall have no obligation to authorize a disbursement from the Custody Account.

With respect to clauses (x)(ii) and (y)(ii), in exigent circumstances outside of the Issuer's reasonable control, the relevant request may be provided with less time in advance of the date the Issuer desires for the funds to be disbursed and the Administrative Agent shall not unreasonably withhold its consent with respect to authorizing the relevant disbursement of funds.

(b)     The Issuer acknowledges and agrees that the Administrative Agent is authorized to instruct the Bank to make the following disbursement of funds (the "Disbursements") to an account designated by the Administrative Agent (the "Gottex Account"), on the tenth (10th) day of each month: all amounts credited to the Custody Account in excess of the sum of (i) $750,000 and (ii) any amounts authorized to be disbursed pursuant to a Requested Disbursement and not yet disbursed, as of such tenth (10th) day.

(c)     The Disbursements shall be applied to the amounts outstanding under the Notes in the following order:

(1)     to any outstanding expenses and indemnities payable by the Issuer under the Notes or any other Note Agreement; and

(2)     then, to any accrued but unpaid interest under the Notes.

(d)     To the extent that there are any Unallocated Disbursements, the Unallocated Disbursements shall be reserved by the Administrative Agent for application in accordance with clauses (c)(1) and (c)(2) above (the "Reserved Unallocated Disbursements"), except that any portion of such Reserved Unallocated Disbursements

6

that has been reserved for more than sixty-one (61) days (the "Unreserved Unallocated Disbursements") will be applied toward the principal due under the Notes.

For illustration purposes only, assume that:

(1)     all interest required to paid through April 2008 was paid on or prior to the applicable Interest Payment Date;

(2)     monthly interest is always $750,000;

(3)     during the month of May 2008, a total of $1,400,000 in Disbursements has been paid, and $0 in indemnities and expenses were incurred, leaving $650,000 in Reserved Unallocated Disbursements from May 2008 (which becomes Unreserved Unallocated Disbursements applicable toward principal in August 2008);

(4)     during the month of June 2008, a total of $850,000 in Disbursements has been paid, and $0 in indemnities and expenses were incurred, leaving $100,000 in Reserved Unallocated Disbursements from June 2008 (which becomes Unreserved Unallocated Disbursements applicable toward principal in September 2008);

(5)     during the month of July 2008, a total of $550,000 in Disbursements has been paid, and $20,000 of indemnities and expenses has been incurred, resulting in a shortfall of $220,000 with respect to the $750,000 in interest due for July 2008; and

(6)     during the month of August 2008, a total of $450,000 in Disbursements has been paid and $0 in indemnities and expenses has been incurred, resulting in a shortfall of $300,000 with respect to the $750,000 in interest due for August 2008.

Under this example:

(A)     the $650,000 in Reserved Unallocated Disbursements from May 2008 is applied against the $220,000 shortfall for July 2008, leaving $430,000 of Reserved Unallocated Disbursements from May 2008;

(B)     in August 2008, the $430,000 in Reserved Unallocated Disbursements from May 2008 becomes $430,000 in Unreserved Unallocated Disbursements and is applied toward the principal due under the Notes;

(C)     the $430,000 in now Unreserved Unallocated Disbursements from May is not available to cover the $300,000 shortfall in August 2008;

(D)     the $100,000 in Reserved Unallocated Disbursements from June 2008 is applied to the $300,000 shortfall in August 2008, leaving $200,000 outstanding for August 2008; and

7

(E)     the Issuer must make a cash payment of $200,000 to cover the shortfall for August 2008 on the applicable Interest Payment Date.

(e)     Whenever any payment under any Note would be due or is otherwise payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day, and such extension of time shall in such case be included in the computation of the payment of interest.

(f)     Within five (5) Business Days following each payment or Disbursement, the Administrative Agent shall provide to the Issuer a written statement (the "Disbursement Report") reflecting the application of such payments by the Administrative Agent in accordance with this Section 4.  In addition to information regarding application of such payments, the Disbursement Report shall include the amount of Unallocated Distributions and an aging report for such Unallocated Distributions.

5.     **Events of Default**.

If any of the following events ("Events of Default") shall occur and be continuing:

(a)     the failure by the Issuer to pay this Note on or before December 1, 2008;

(b)     subject to the Disbursement Procedures, the failure to pay interest hereunder when due and such failure remains unremedied for five (5) Business Days following the date notice of such failure shall have been provided by the Administrative Agent to the Issuer;

(c)     the failure by the Administrative Agent to receive any Substantive Information when required to be delivered and such failure remains unremedied for ten (10) Business Days following the date notice of such failure shall have been provided by the Administrative Agent to the Issuer;

(d)     the failure by the Issuer to comply with Section 2 or Section 3 of the Waiver Agreement;

(e)     the incurrence by the Issuer of any Debt that is ranked senior to or pari passu with the Debt incurred pursuant to this Note without the prior written consent of the Administrative Agent;

(f)     subject to section 4 of the Waiver Agreement, the failure by the Administrative Agent, as agent for the Noteholder, at any time to have a continuously

8

A&R Note - ABI/ MKA

perfected first priority Lien on and security interest in the Collateral subject to no other Lien;

(g)     the Issuer shall grant or permit any further security interest or Lien or encumbrance of any kind upon all or any portion of the Collateral except for (a) the Bank's contractual right of set-off and Lien as set out in the Custody Agreement appointing Alliance Bank as Bank of the Issuer, which right shall be capped at 5% of the net asset value of the Issuer and (b) Liens imposed by applicable law for taxes that are not yet due or are being contested in good faith by appropriate proceedings;

(h)     the Issuer shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against the Issuer seeking to adjudicate it bankrupt or insolvent, or seeking liquidation, dissolution, winding-up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property and assets and, in the case of any such proceeding instituted against the Issuer, such proceeding shall remain undismissed or unstayed for a period of 30 days; or the Issuer shall take any limited liability company action to authorize any of the actions set forth above in this clause (i);

(i)     any judgment or order for the payment of money in excess of $7,000,000 shall be rendered against the Issuer and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order which shall not have been stayed or dismissed within 30 days after the commencement of such proceedings or (ii) there shall be any period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(j)     a Collateral Breach shall occur and such breach remains unremedied for ten (10) Business Days following the date notice of such breach shall have been provided by the Administrative Agent to the Issuer;

(k)     the Issuer shall fail to provide to the Administrative Agent the 2006 audit by July 15, 2008;

(l) the Issuer shall fail to provide to the Administrative Agent the 2007 audit by August 15, 2008;

(m)     any representation or warranty by the Issuer herein shall be incorrect in any material respect when made or deemed made;

9

A&R Note - ABI/ MKA

(n)      (i) except with respect to Section 9(c), the Issuer shall fail to perform or observe any term, covenant or agreement herein or under any other Note Agreement, and in each case such failure remains unremedied for ten (10) Business Days following the date notice of such failure shall have been provided by the Administrative Agent to the Issuer or (ii) the Issuer shall fail to comply with Section 9(c);

(o)      the Issuer shall fail to receive on or prior to the date that is thirty (30) days from the date hereof, a report prepared by the Valuation Agent setting forth the Value of each Loan and each piece of real property owned by the Issuer as of December 31, 2007;

(p)      the Issuer shall fail to receive on or prior to the date that is thirty (30) days from September 30, 2008, a report prepared by the Valuation Agent setting forth the Value of each Loan and each piece of real property owned by the Issuer as of June 30, 2008;

then, and in any such event, the Administrative Agent may, by written notice to the Issuer declare the principal amount outstanding hereunder, all accrued interest thereon, all fees and all other accrued amounts payable under this Note and the other Note Agreements to be forthwith due and payable, whereupon the principal amount outstanding hereunder, all such interest and fees and all such other amounts hereunder and under the other Note Agreements shall be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Issuer provided, however, that upon the occurrence of any event in clauses (h) or (i) above, the principal amount outstanding hereunder, all accrued interest and all accrued other amounts payable, including fees, under this Agreement and under the other Note Agreements shall automatically become and be due and payable, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Issuer.

No failure on the part of the Noteholder or the Administrative to exercise, and no delay in exercising, any right hereunder, under this Note shall operate as a waiver thereof nor shall the single or partial exercise, of any such right preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.  No notice to or demand on the Issuer in any case shall entitle the Issuer to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Noteholder or the Administrative Agent to any other or further action in any circumstance without notice or demand.

6.      **Representations and Warranties of the Issuer**.

As of the date hereof, the Issuer represents and warrants to the Noteholder as follows:

10

(a)     The Issuer (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation and (ii) is duly qualified as a foreign limited liability company in each other jurisdiction in which it owns or leases property or in which the conduct of its business requires it to so qualify or be licensed and where, in each case, failure to so qualify and be in good standing could have a Material Adverse Effect.

(b)     The execution, delivery and performance by the Issuer of this Note is within its limited liability company powers, has been duly authorized by all necessary limited liability company action, and does not (i) contravene the Issuer's organizational documents, (ii) contravene any contractual restriction binding on it, (iii) require any consent under any agreement or instrument to which it is a party or by which any of its properties or assets is bound, (iv) result in or require the creation or imposition of Lien upon any property or assets of the Issuer other than Liens permitted hereunder or (v) violate any law, writ, judgment, injunction, decree, determination or award.  The Issuer is not in violation of any such law, writ, judgment, injunction, decree, determination or award or in breach of any contractual restriction binding upon it, except for such violation or breach which would not have a Material Adverse Effect.

(c)     No order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption or waiver by, any governmental authority or any other third party (except as have been obtained or made and are in full force and effect), is required to authorize, or is required in connection with, (i) the execution, delivery and performance by the Issuer of this Note or (ii) the legality, validity, binding effect or enforceability of this Note.

(d)     This Note when delivered for value hereunder will be legal, valid and binding obligations of the Issuer enforceable against the Issuer in accordance with its respective terms in all respects.

(e)     The Issuer is not required to register as an "investment company," and is not a person "controlled by" an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended.

(f)     All information with respect to the Issuer (i) provided by or on behalf of the Issuer, to the Noteholder or the Administrative Agent in connection with the negotiation, execution and delivery of this Note, including, without limitation, any financial statements of the Issuer provided to the Noteholder, or (ii) provided or to be provided by the Issuer in any offering document of the Issuer (except as to information about the Noteholder furnished by it specifically for inclusion therein) was or will be, on or as of the applicable date of provision thereof complete and correct in all material respects and did not (or will not) contain any untrue statement of a material fact or omit

11

to state a fact necessary to make the statements contained therein not misleading in light of the time and circumstances under which such statements were made.

(g)     All licenses, permits, approvals, concessions or other authorizations necessary to the conduct of the business of the Issuer have been duly obtained and are in full force and effect other than those where the failure to obtain and maintain any of the foregoing would not have a Material Adverse Effect.   There are no restrictions or requirements which limit the Issuer's ability to lawfully conduct its business or perform its obligations under this Note.

(h)     With respect to each Loan owned by the Issuer as of the date hereof, the Issuer shall have delivered to the Administrative Agent a complete Loan Package.

(i)     With respect to any real property owned by the Issuer as of the date hereof, the Administrative Agent shall have received a complete Property Package.

7.     **Security Interest**.

This Note shall constitute a secured obligation of the Issuer in accordance with the Security Agreement.

8.     **Affirmative Covenants.**

So long as any amounts hereunder remain unpaid, the Issuer covenants and agrees that:

(a)     The Issuer shall maintain its limited liability company existence.   The Issuer shall comply with all applicable laws.

(b)     All Proceeds of the Collateral will be deposited into the Custody Account.

(c)     The Issuer shall keep proper books of record and accounts as are necessary to prepare financial statements in accordance with U.S. GAAP.

(d)     The Issuer shall notify the Administrative Agent, as soon as reasonably practicable, if an event occurs that results in the revocation, suspension or termination of any license, permit or approval held by any other fund managed by the Manager.

(e)     The Issuer shall remain principally engaged in its business as conducted by it as of the date hereof.

(f)     The Issuer shall furnish, or shall cause same to be furnished, to the Noteholder and the Administrative Agent: (i) as soon as available and in any event within ninety (90) days after the end of each fiscal year of the Issuer, its unaudited annual consolidated financial statements, including all notes thereto, which statements shall

12

include a consolidated statement of financial position as of the end of the relevant fiscal year and statement of operations and a statement of cash flows for such fiscal year, all setting forth in comparative form the corresponding figures from the previous fiscal year, all prepared in conformity with U.S. GAAP, accompanied by a certificate of the chief financial officer of the Issuer which shall state that said consolidated financial statements fairly present the consolidated financial condition and results of operations of the Issuer as of the end of, and for, such period, and a report setting forth each asset of the Issuer and the applicable NAV (as defined below) thereof; (ii) as soon as available and in any event within 30 days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Issuer, its unaudited quarterly consolidated financial statements, which statements shall include the consolidated statement of financial position as of the end of the relevant quarterly fiscal period and statement of operations and statement of cash flows for such quarterly fiscal period, all setting forth in comparative form the corresponding figures from the corresponding quarterly fiscal period in the previous fiscal year, all prepared in conformity with U.S. GAAP, accompanied by a certificate of the chief financial officer of the Issuer which shall state that said quarterly consolidated financial statements fairly present the consolidated financial condition and results of operations of the Issuer as of the end of, and for, such period (subject to footnotes and ordinary year-end adjustments), and a report setting forth each asset of the Issuer and the applicable NAV thereof; and (iii) any and all documents, instruments, filings or agreements received in connection with any Loan or piece of real property owned by the Issuer (including, but not limited to, all amendments, supplements or other modifications made to any document or agreement in a Loan Package or a Property Package).   The Issuer shall furnish to the Noteholder and the Administrative Agent, at the time it furnishes its financial statements, a certificate of an authorized officer of the Issuer that no Event of Default (as defined below) has occurred and no event has occurred and is continuing which with the lapse of time or the giving of notice or both would constitute an Event of Default.

(g)     The Issuer shall furnish, or shall cause the same to be furnished, to the Noteholder and the Administrative Agent:

(i) not later than 60 days after the end of each calendar quarter, the NAV Calculation; and

(ii) within 5 calendar days of the end of each month, a statement setting forth the principal amount of all Notes outstanding and all accrued and unpaid interest thereon as of such date.

(h)     The Issuer shall furnish to the Noteholder and the Administrative Agent promptly after request therefor, such other business and financial information respecting the condition or operations, financial or otherwise, of the Issuer as the Noteholder or the Administrative Agent may from time to time reasonably request.

13

(i)      No later than the last Business Day of each month, the Issuer shall provide to the Administrative Agent the following reports with respect to the last Business Day of the immediately preceding month:

(i)      a list (the "Loan List") of all Loans;

(ii)     with respect to each Loan, a statement setting forth (a) the outstanding principal amount thereunder, (b) the accrued and unpaid interest thereunder, (c) the amount of any undrawn commitment made by the Issuer with respect to such Loan and (d) an estimated reserve for uncollectible amounts with respect to such Loan, if any;

(iii)    a list of all Impaired Loans;

(iv)     a statement of all redemption requests submitted to the Issuer and MKA Real Estate Opportunity Fund, Ltd.; provided, that such statement shall not include the identities of the relevant member or shareholder or any other confidential information with respect to the relevant member or shareholder, as applicable;

(v)      a statement setting forth all Debts of the Issuer and MKA Real Estate Opportunity Fund, Ltd., the scheduled payment dates for such Debts and the maturity dates for such Debts;

(vi)     monthly unaudited financial statements, including a balance sheet, income statement and cash flow statement for the Issuer and MKA Real Estate Opportunity Fund, Ltd.;

(vii)    a certification from the Manager of the Issuer that all representations and warranties in the Notes are true and correct and that the Issuer is in compliance with each covenant in the Notes; and

(viii)   as soon as possible and in any event within two (2) days after the Issuer obtains actual knowledge of the occurrence of any actual litigation against the Issuer, the Manager or MKA Real Estate Opportunity Fund, Ltd., a statement of the Manager setting forth the details thereof and the action which the Issuer, the Manager or MKA Real Estate Opportunity Fund, Ltd., as applicable, has taken and proposes to take with respect thereto.

14

(j)      The Issuer shall cause the Bank to provide to the Administrative Agent (via e-mail to amy.lai@gottexfunds.com and Gustavo.Dominguez@gottexfunds.com) a daily account statement with respect to the Custody Account.

(k)      If after the date hereof the Issuer appoints an auditor other than Rothstein Kass, the Issuer shall, within three (3) Business Days' of such appointment, deliver a copy of an executed engagement letter between the Issuer and such auditor evidencing that such auditor has been retained as auditor to the Issuer together with (if such information is not in the engagement letter) documentation setting forth the scope of the duties of such auditor with respect to its engagement with respect to the Issuer.

9.      **Negative Covenants**.

So long as any amounts hereunder remain unpaid, the Issuer covenants and agrees that:

(a)      The Issuer shall not change its fiscal year or its method of accounting as in effect on the date hereof.

(b)      (i) The Issuer shall not appoint a custodian other than Alliance Bank without the prior written consent of the Administrative Agent and (ii) the Issuer shall not appoint an auditor other than Rothstein Kass, PricewaterhouseCoopers; Deloitte; Ernst & Young; or KPMG without the prior written consent of the Administrative Agent, such consent not to be unreasonable withheld.

(c)      The Issuer shall not (i) declare or make any dividend payment or other distribution of assets, property, cash, rights, obligations or securities on account of any equity interests in the Issuer, or purchase, redeem, retire or otherwise acquire for value any equity interests in the Issuer unless the Issuer shall have received the prior written consent of the Administrative Agent or (ii) without duplication, make (or authorize or otherwise permit the making of) any distribution, payment, disbursement or dividend of any kind, from cash in the Custody Account or otherwise, to any Person other than the Administrative Agent without the prior written consent of the Administrative Agent.

(d)      The Issuer shall not merge or consolidate with or into, or convey, transfer, lease or otherwise dispose of, whether in one transaction or in a series of transactions, all or substantially all of the property and assets (whether now owned or hereafter acquired) of the Issuer to, any Person.

10.      **Amendments**.

Neither this Note nor any provision hereof may be waived, amended or modified, except pursuant to an agreement or agreements in writing entered into by the Issuer and the Noteholder.

15

A&R Note - ABI/ MKA

11.  **Notices**

All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, sent by facsimile or sent by electronic mail as follows:

If the notice is to the Issuer, such address is:

Gregory Contillo, President
MKA Real Estate Opportunity Fund I, LLC
c/o MKA Capital Group Advisors LLC
26 Corporate Plaza, Suite 250
Newport Beach, CA 92660
Telephone:  (949) 729 - 1660
Facsimile:  (949) 729 – 1665
E-mail: gcontillo@mkacap.com

with a copy to:

Van C. Durrer, II, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071
Telephone: (213) 687-5200
Facsimile: (213) 621-5200
E-mail: van.durrer@skadden.com

With a copy to:

Daniel D. White
26 Corporate Plaza Drive, Suite 260
Newport Beach, CA 92660
Telephone: (949) 729-9119
E-mail: dan@ddwlaw.com

If the notice is to the Noteholder, such address is:

Gottex ABI Master Fund Limited
Gottex Fund Management Sarl
Avenue de Rhodanie 48
Lausanne 1007
Switzerland
Attention: William H. Woolverton, General Counsel
Telephone:  (617) 532 - 0202
Facsimile:  (617) 532 - 0219
E-mail: william.woolverton@gottexfunds.com

16

with a copy to the Administrative Agent at:

Gottex Fund Management Ltd.
One International Place
14th Floor
Boston, MA 02110
Attention:  William H. Woolverton, General Counsel
Telephone:  (617) 532 - 0202
Facsimile:  (617) 532 - 0219
E-mail: william.woolverton@gottexfunds.com


with a copy to:

Stuart Richter, Esq.
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone:  (310) 788-4582
Facsimile:  (310) 712-8434
E-mail: stuart.richter@kattenlaw.com


Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile or electronic mail shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, such notice shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  The Issuer, the Noteholder and the Administrative Agent may change its address, e-mail address or facsimile number for notices and other communications hereunder by notice to the other in the same manner as described herein.

12.    **Enforcement.**

In the case any one or more of the Events of Default specified herein shall have occurred and be continuing, the Noteholder may proceed to protect and enforce its rights either by suit in equity and/or by action at law, whether for the specific performance of any covenant or agreement contained herein or may proceed to enforce the payment of all sums then due (whether by acceleration or otherwise) hereunder or to enforce any other legal or equitable right of the Noteholder.  If an Event of Default shall have occurred and is continuing and the Noteholder shall (or the Administrative Agent on its behalf shall), in the exercise of its rights hereunder, retain attorneys, or incur other costs and expenses for the collection of payments due or to become due, or for the enforcement or performance or observance of any obligation or agreement of the Issuer hereunder, the Issuer shall pay to the Noteholder or the Administrative Agent, as applicable, on demand the reasonable fees of such attorneys together with all other costs and expenses incurred by the Noteholder and the Administrative Agent.

13.    **Governing Law.**

17

A&R Note - ABI/ MKA

This Agreement shall be governed by, and construed in accordance with, the laws of the State of California, without giving effect to its conflict of laws provisions other than Section 1646.5 of the California Civil Code.

14.   **Submission to Jurisdiction.**

THE ISSUER AND THE NOTEHOLDER CONSENT TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE OF CALIFORNIA. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS NOTE MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT SITTING IN LOS ANGELES, CALIFORNIA, AND EACH OF THE ISSUER AND THE NOTEHOLDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE NON-EXCLUSIVE JURISDICTION OF THOSE COURTS.

15.   **Waiver of Venue.**

The Issuer and the Noteholder irrevocably and unconditionally waive, to the fullest extent permitted by applicable law, any objection that they may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Note in any court referred to in the Section 14. The Issuer and the Noteholder hereby irrevocably waive, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such Court.

16.   **Service of Process.**

The Issuer and the Noteholder irrevocably consent to service of process in the manner provided for in Section 11. Nothing in this Agreement will affect the right of the Noteholder or the Issuer to serve process in any other manner permitted by applicable law.

17.   **Waiver of Jury Trial.**

THE ISSUER AND THE NOTEHOLDER HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY, ARISING OUT OF OR RELATING TO THIS NOTE (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). THE ISSUER AND THE NOTEHOLDER (A) CERTIFY THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OR ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGE THAT THEY HAVE BEEN INDUCED TO ISSUE  THIS NOTE BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED HEREIN.

18.   **Right of Set-off.**

If an Event of Default shall have occurred and be continuing, the Noteholder is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set-off and apply any and all amounts held by a Noteholder at any time owing by the Noteholder to or for the credit or the account of the Issuer against any and all of the obligations of the Issuer

18

now or hereafter existing under this Note to the Noteholder, irrespective of whether or not the Noteholder shall have made any demand under this Note and although such obligations of the Issuer may be contingent or unmatured. The rights of the Noteholder under this Section are in addition to other rights and remedies (including other rights of setoff) that the Noteholder may have. The Noteholder agrees to notify the Issuer in writing prior to the application of any such set-off, provided that the failure to give such notice shall not affect the validity of such set-off and application.

### 19. Assignment.

This Note and the obligations of the Issuer hereunder may not be assigned or delegated by the Issuer without the prior written consent of the Noteholder. This Note and the Noteholder's rights hereunder may be assigned without the Issuer's consent in accordance with Section 23. Whenever in this Note reference is made to the Noteholder or the Issuer, such reference shall be deemed to include, as applicable, a reference to their respective successors and permitted assigns. The provisions of this Note shall be binding upon and shall inure to the benefit of such successors and assigns. The Issuer's successors and assigns shall include, without limitation, a receiver, trustee, or debtor in possession of or for the Issuer.

Subject to Section 23, if in connection with any purchase by a third party of the Note, Noteholder receives the unpaid principal amount outstanding hereunder, together with all accrued and unpaid interest thereon and all other amounts payable to the Noteholder hereunder and under the other Note Agreements, Noteholder shall, at no cost to Noteholder, take any and all steps reasonably necessary to assign this Note to such third party purchaser, including, without limitation, delivering such documents as are reasonably necessary or appropriate to effect such assignment of the Note, provided however, that such assignment shall be on an as is, where is basis and without recourse to Noteholder, and Noteholder shall not incur any liability in connection with such assignment, or be required to make any representations or warranties (other than customary warranties of due authorization and no encumbrance of title to such note) to any assignee, Issuer, or any other third party in connection with such assignment.

### 20. Severability.

In case any provision in this Note shall be held to be invalid, illegal or unenforceable, such provision shall be severable from the rest of this Note, as the case may be, and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

### 21. Counterparts; Integration.

This Note may be executed in counterparts, each of which shall constitute an original, and all of which when taken together shall constitute a single contract. This Note (together with the Waiver Agreement and the Security Agreement) constitutes the entire contract among the parties relating to the subject matter hereof. Except as expressly set forth in Section 5 of the Waiver Agreement, this Note completely restates, amends and supersedes that certain Promissory Note made by Issuer in favor of Noteholder dated February 15, 2007, and all other previous agreements and understandings, oral or written, relating to the subject matter hereof.

19

A&R Note - ABI/ MKA

22.    **Registered Instrument.**

This Note is a registered instrument and is not a bearer instrument.  This Note is registered as to both principal and interest with the Issuer and all payments hereunder shall be made to the named Noteholder or, in the event of a transfer pursuant to Section 23, to the transferee identified in the record of ownership of this Note maintained by the Noteholder on behalf of the Issuer. Transfer of this Note may not be effected except in accordance with the provisions of Section 23.

23.    **Transfer.**

(a)    If this Note is held by or assigned or transferred to a noteholder that is not a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended from time to time (the "Code"), then (x) all interest accrued and paid on this Note will qualify for exemption from United States withholding tax as "portfolio interest" because this Note is an obligation which is in "registered form" within the meaning of Sections 871(h)(2)(B) and 881(c)(2)(B) of the Code, and the applicable Treasury Regulations promulgated thereunder, and (y) as such, all interest accrued and paid on this Note will be exempt from United States information reporting under Sections 6041 and 6049 of the Code and United States backup withholding under Section 3406 of the Code.  In furtherance of the foregoing, the Issuer shall require that any such transferee or assignee noteholder that is not a United States person shall represent, warrant and covenant to the Issuer that (i) such noteholder is not, and will not be as long as any amounts due under this Note have not been paid in full, a "United States person," within the meaning of Section 7701(a)(30) of the Code; (ii) such noteholder is not, and will not be as long as any amounts due under this Note have not been paid in full, a person described in Section 881(c)(3) of the Code; (iii) on or prior to the date of transfer or assignment and on or prior to each anniversary of such date until all amounts due under this Note have been paid in full, such noteholder shall provide the Issuer with a properly executed U.S. Internal Revenue Service ("IRS") Form W-8BEN, Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding (or any successor form prescribed by the IRS), certifying as to such noteholder's status for purposes of determining exemption from United States withholding tax, information reporting and backup withholding with respect to all payments to be made to such noteholder hereunder; (iv) if an event occurs that would require a change in the exempt status of such noteholder or any of the other information provided on the most recent IRS Form W-8BEN (or successor form) previously submitted by such noteholder to the Issuer hereunder, such noteholder will so inform the Issuer in writing (or by submitting to the Issuer a new IRS Form W-8BEN or successor form) within 30 days after the occurrence of such event; and (v) such noteholder will not assign or otherwise transfer this Note or any of its rights hereunder except in accordance with the provisions of the paragraph below.

(b)    Transfer of this Note may be effected only by (i) surrender of this Note to the Issuer and the re-issuance of this Note to the transferee, or the Issuer's issuance to the Noteholder of a new note in the same form as this Note but with the transferee denoted as the Noteholder, or (ii) the recording by the Administrative Agent of the identity of the transferee in a record of ownership of this Note maintained by the Administrative Agent on behalf of, and as agent to, the Issuer.  The terms and conditions of this Note shall be binding upon and inure to the benefit of the Issuer and the Noteholder and their permitted assigns; provided, however, that if

20

any such assignment (whether by operation of law, by way of transfer or participation, or otherwise) is to any noteholder that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code, then such noteholder shall submit to the Issuer on or before the date of such assignment an IRS Form W-8BEN (or any successor form) certifying as to such noteholder's status for purposes of determining exemption from United States withholding tax, information reporting and backup withholding with respect to all payments to be made to such noteholder under the new note (or other instrument). Any attempted transfer in violation of this Section 23 shall be void and of no force and effect. Until there has been a valid transfer of this Note and of all of the rights hereunder by the Noteholder (or the Administrative Agent on its behalf) in accordance with this Section 23, the Issuer shall deem and treat the Noteholder as the absolute beneficial owner and holder of this Note and of all of the rights hereunder for all purposes (including, without limitation, for the purpose of receiving all payments to be made under this Note).

24.    **Indemnification**.

The Issuer hereby agrees to indemnify the Administrative Agent, the Noteholder, their respective affiliates and their respective partners, directors, officers, employees, agents and advisors (each such person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable fees, charges and disbursements of any counsel for any Indemnitee whether incurred in any action or proceeding between the parties or otherwise) incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Issuer or any affiliate, partner, director, officer, employee, agent or advisor of the Issuer arising out of, in connection with, or as a result of (a) the execution or delivery of this Note, any other Note Agreement or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (b) any purchase or issuance of a Note or the use or proposed use of the proceeds therefrom, or (c) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Issuer or any affiliate, partner, director, officer, employee, agent or advisor of the Issuer, and regardless of whether any Indemnitee is a party thereto, provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) result from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by the Issuer or any affiliate, partner, director, officer, employee, agent or advisor of the Issuer against an Indemnitee for any material breach of such Indemnitee's obligations hereunder or under any Note. The provisions of this Section 24 shall survive the repayment of the amounts owed to the Noteholder hereunder and the termination of the other Note Agreements.

*[Remainder of page intentionally left blank; signature page to follow]*

21

IN WITNESS WHEREOF, the undersigned has executed this Note as of the date first set forth above.

MAKER:

MKA REAL ESTATE OPPORTUNITY FUND I, LLC, a California limited liability company

By:     Its Manager, MKA Capital Advisors, LLC, a California limited liability company

By:     _Michael A. Abraham_

Gregory-Contillo    Michael A. Abraham
President    Chairman of the Board

22

**Ex. 05, p. 104**

**Annex A**

See Attached

Ex. 05, p. 105

MKA RE Opportunity Fund I, LLC
Cash Account analysis
Effective Date

| | | | | |
|---|---|---|---|---|
| Checking Balance | $ | - | Effective Date | |
| MM Balance | $ | - | Effective Date | |
| Escrow Balance | $ | - | Effective Date | |
| Less Open pre-approved balance | $ | - | Effective Date | From Alliance Bank |
| Other | $ | - | | |
| Available Cash | $ | - | | |

| | | | |
|---|---|---|---|
| Proposed Wire to Gottex | $ | - | * |
| Builder Draws (Detail Below) | $ | - | * |
| Builder Loan Fees (Detail Below) | $ | - | * |
| Open A/P (Detail Below) | $ | - | * |
| Other | $ | - | * |
| Remaining | $ | - | $750,000  Sweep over this amount |
| *Net requested cash release | $ | - | |

**Builder Draws**

**Builder Loan/Management Fees**

**Open A/P**

| Monthly<br>Legal/Audit Recap | |
|---|---|
| | |
| Max | $ 300,000 |
| Available | $ 300,000 |

**Other**

Ex. 05, p. 106

## Schedule I

"Loan Package" means, with respect to each Loan, (i) all negotiable promissory notes, if any (ii) copies of the relevant (1) loan agreement, if any, (2) security agreement and all documents executed or filed in connection therewith, (3) deed of trust or mortgage, (4) fully executed Assignment of deed of trust or mortgage substantially in the form of Exhibit A hereto (each, an "Assignment"), (5) title insurance policy on the relevant deed of trust or mortgage, and (6) all amendments, modifications, and extensions of the foregoing and such other documents and agreements as the Administrative Agent may reasonably request, (iii) evidence that the lien granted to the Administrative Agent on the mortgage or deed of trust, as the case may be, has been recorded in the relevant county title office and (iv) copies of all assignment of leases and rents, guaranties and indemnities (completion guaranties, guaranties of principal and/or interest and/or other financial issues, environmental indemnities, so-called bad-boy or non-recourse carveout guaranties), relevant opinions (including non-consolidation, single purpose entity opinions and enforceability opinions), cash management agreements, rate cap agreements and pledges thereof, UCC financing statements, closing statements and certificates, any other documents, certificates or other agreements executed in connection with the foregoing, if any

"Property Package" means, with respect to each piece of real property owned by the Issuer, (i) copies of the relevant (1) grant deed, (2) title insurance policy on the relevant grant deed, and (3) all amendments, modifications, and extensions of the foregoing and such other documents and agreements as the Administrative Agent may reasonably request, (ii) evidence that the grant deed has been recorded in the relevant county title office and (iii) copies of all ground leases, leases, contracts, construction contracts, architects contracts and other related documents, closing statements and certificates, and any other documents, certificates or other agreements executed in connection with the foregoing, if any.

A&R Note - ABI/MKA

Exhibit A

RECORDING REQUESTED BY:

WHEN RECORDED MAIL TO:

_____
_____
_____
Attention: _____

_____

*SPACE ABOVE LINE FOR RECORDER'S USE*

ASSIGNMENT OF DEED OF TRUST

FOR VALUE RECEIVED, the undersigned MKA Real Estate Opportunity Fund I, LLC ("Assignor") hereby grants, transfers and assigns to Gottex Fund Management Ltd. ("Assignee"), as agent for each of GVA ABL PORTFOLIO LIMITED, GOTTEX ABL (CAYMAN) LIMITED and GOTTEX ABI MASTER FUND LIMITED, all beneficial interest under that certain [Deed of Trust and Assignment of Rents, Security Agreement and Fixture Filing] (the "Deed of Trust"), dated _____, 2006, executed by _____, as Trustor ("Trustor"), in favor of _____, as Trustee, and _____, as Beneficiary, covering the land described in Annex "A" attached hereto and incorporated herein by this reference, and recorded on _____, 2008, as Instrument No. _____ in the Official Records of the County Recorder's office of _____ County, California, TOGETHER WITH the note or notes described or referred to in the Deed of Trust and all other obligations secured thereby, all money due and to become due thereon with interest, and all rights accrued or to accrue under the Deed of Trust.

Assignor represents and warrants to Assignee as follows:

ARTICLE I.   Assignor has the right, power and authority, and has taken all action necessary, to assign the Deed of Trust to Assignee pursuant to this Assignment;

ARTICLE II.   The Deed of Trust has not been supplemented, amended, modified, terminated, released or cancelled nor has Assignor waived any of its rights thereunder;

ARTICLE III.   Except with respect to the assignment by Assignor in favor of Alliance Bank, Assignor owns the entire interest of the beneficiary under the Deed of Trust free

1-25

and clear of any claim or interest of any kind whatsoever (whether present or contingent, conditional or unconditional, choate or inchoate) by any other party, whether by encumbrance, pledge, assignment, participation, option or otherwise;

ARTICLE IV.  Assignor is not in default of any of its obligations under the Deed of Trust; and

ARTICLE V.  To the best knowledge of Assignor, Trustor is not in default of any of its obligations under the Deed of Trust and does not have any defense, claim, offset or counterclaim to the enforcement of its obligations thereunder.

This Assignment (i) shall be binding on Assignor and its successors and assigns and shall inure to the benefit of Assignee and its successors and assigns, (ii) shall be governed by the law of the State of California and (iii) may not be modified orally, but only by a writing executed by Assignor and Assignee.

Dated: _____, 200[ ]

By: _____
     Title: _____

By: _____
     Title: _____

1-26

Ex. 05, p. 109

Annex "A" to
Assignment of Deed of Trust

LEGAL DESCRIPTION OF LAND

A&R Note - ABI/ MKA

**[Confirm with Title Company]**

STATE OF _____                          }
                                              }ss.
COUNTY OF _____                         }

On _____, before me, _____ personally appeared, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.           *This area for official notarial seal*

Signature_____

My Commission Expires: _____

A&R Note – ABI/ MKA                                    **Ex. 05, p. 111**

# EXHIBIT 6

EXECUTION COPY

PURSUANT TO THE WAIVER AGREEMENT DATED AS OF APRIL 1, 2008 (THE "WAIVER AGREEMENT"), BY AND AMONG MKA REAL ESTATE OPPORTUNITY FUND I, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY (THE "ISSUER"), AND MKA CAPITAL GROUP ADVISORS, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY (THE "MANAGER"), ON THE ONE HAND, AND GOTTEX ABL MASTER FUND LIMITED, A CAYMAN ISLANDS EXEMPTED COMPANY, GOTTEX ABL (CAYMAN) LIMITED, A CAYMAN ISLANDS EXEMPTED COMPANY, GVA ABL PORTFOLIO LIMITED, A BRITISH VIRGIN ISLANDS COMPANY, HUDSON ABL FUND LIMITED, A CAYMAN ISLANDS EXEMPTED COMPANY (COLLECTIVELY, "GOTTEX"), AND GOTTEX FUND MANAGEMENT, LTD. ("ADMINISTRATIVE AGENT"), ON THE OTHER, EXCEPT AS SET FORTH IN SECTION 5 OF THE WAIVER AGREEMENT, THIS PROMISSORY NOTE AMENDS AND RESTATES THOSE CERTAIN AMENDED AND RESTATED PROMISSORY NOTES MADE BY THE ISSUER IN FAVOR OF GOTTEX ABL (CAYMAN) LIMITED (THE "NOTEHOLDER") DATED APRIL 12, 2006, JUNE 6, 2006 AND JUNE 30, 2006 FOR $12,000,000, $5,000,000 AND $9,000,000, RESPECTIVELY.

## SECOND AMENDED AND RESTATED PROMISSORY NOTE

$26,052,961                                                  Dated as of April 1, 2008

 For value received, the Issuer promises to pay to the Noteholder the principal amount of Twenty Six Million Fifty Two Thousand Nine Hundred Sixty One Dollars ($26,052,961) at an interest rate equal to fifteen percent (15%) per annum (the "Base Rate") from April 1, 2008 until paid in full.

 1. **Definitions**. Capitalized terms not defined herein shall have the meanings ascribed to them in that certain Amended and Restated Security Agreement dated April 12, 2006 by and between the Issuer and the Administrative Agent (as amended, supplemented or otherwise modified from time to time, the "Security Agreement") and the following terms shall have the following meanings.

 "Acceptable Loan" means Loan in respect of which the Administrative Agent shall have received a complete Loan Package.

 "Acceptable Property" means real property owned by the Issuer as of the date hereof that satisfies the following criteria:  (i) the Administrative Agent shall have received a complete Property Package with respect thereto and (ii) the Administrative Agent shall have determined (in its sole discretion) that it has a first priority perfected security interest in such real property. For the avoidance of doubt, "Acceptable Property" excludes REO.

 "Bank" means Alliance Bank or such other bank as the parties may agree upon.

A&R Note - Gottex ABL/ MKA

"Business Day" means any day on which banking institutions in California are open for the transaction of banking business.

"Collateral Breach" means, as of any date of determination, the quotient (expressed as a percentage) of (i) the Total Loan Amount and (ii) the Value, in the aggregate, of each Acceptable Loan and each Acceptable Property plus the amount of cash in the Custody Account, exceeds 50%.

"Custody Account" means the one or more custody accounts (including, without limitation, any bank account(s)) established and maintained by the Bank under and pursuant to the Custody Agreement dated as of the date hereof between the Issuer and the Bank (the "Custody Agreement"), and all assets from time to time held in or standing to the credit of any such account (or any successor account), and all Proceeds of the foregoing held in any such account (or successor account).

"Debt" means at any date without duplication (i) indebtedness for borrowed money, (ii) obligations evidenced by bonds, debentures, notes or other similar instruments, (iii) obligations to pay the deferred purchase price of property or services (excluding trade payables and other accounts payable incurred in the ordinary course of business), (iv) capital lease obligations, (v) indebtedness of others secured by a Lien on the Issuer's property, (vi) the maximum amount available to be drawn under all letters of credit and all unpaid drawings in respect of such letters of credit, (vii) all obligations to pay a specified purchase price for goods or services, whether or not delivered or accepted, i.e., take-or-pay and similar obligations, (viii) all obligations created or arising under any conditional sale or other title retention agreement or incurred as financing, (ix) the net obligations under Derivatives and (x) obligations under a guaranty of debt of others of the kinds referred to in clauses (i) through (ix) above.

"Derivatives" means derivative transactions, including, without limitation, swap agreements or commodity transactions.

"Impaired Loan" means any Loan referenced on the Loan List in respect of which the obligor thereunder (i) has failed to make a payment of principal or interest and such failure shall not have been cured for more than two (2) months or (ii) has failed to comply with any material term, covenant or agreement in the relevant loan documents or is otherwise in default thereunder, in each case, regardless of whether the relevant failure has been waived.

"Lender Commitments" means, with respect to any Loan, advances required or permitted to be made by the Issuer under such Loan to the relevant borrower, whether such advance is paid to such borrower or to one or more of such borrower's senior lenders.

"Lien" means any lien, pledge, security interest or other charge or encumbrance of any kind, or any other type of preferential arrangement.

"Loan" means each loan (i) in respect of which, as of the date hereof, the Issuer is the lender of record or an assignee thereof or in which the Issuer owns a participation and (ii) that is secured by a security interest in a mortgage, deed of trust or similar collateral agreement.

"Loan Package" has the meaning set forth in Schedule I hereto.

2

"Material Adverse Effect" means a material adverse effect on (1) the ability of the Issuer to perform any of its obligations under any of the Note Agreements, (2) the legality, validity or enforceability of any provision of this Note or any other Note Agreement, (3) the business, condition (financial or otherwise), assets, prospects or results of operations of the Issuer or (4) the value of, or the priority of the Administrative Agent's security interest, in the Collateral securing the obligations of the Issuer under any Note, in each case, as determined by the Administrative Agent in its reasonable discretion; provided, however, that any material adverse effect that is being suffered on an industry-wide basis in the industry in which the Issuer is a participant shall not constitute a "Material Adverse Effect."

"Maturity Date" means December 1, 2008.

"NAV" means the net asset value of the Issuer as determined in accordance with U.S. generally accepted accounting principles ("U.S. GAAP").

"NAV Calculation" means a written statement by the Issuer certifying as to the NAV and each Loan and piece of real property owned by the Issuer as of the date hereof, as of the end of the applicable quarter or the date of such notice, as applicable, together with (in reasonable detail) a schedule of the computations used by the Issuer or its designee in determining the applicable NAV.

"Note Agreements" means, collectively, all of the Notes, the Subordination Agreement, the Security Agreement, the Control Agreement, any other document securing the Notes and each other document executed in connection therewith or pursuant thereto, each as amended, supplemented or otherwise modified from time to time. "Note Agreements" does not include the Note Purchase Agreement.

"Notes" means the new promissory notes (including this Note) that, pursuant to the terms of the Waiver Agreement, amend and restate each of the seven (7) secured registered promissory notes identified in Exhibit A to the Waiver Agreement.

"Permitted Expenses" means (i) legal and auditing expenses, not to exceed $300,000 per month and (ii) any other payments the Administrative Agent permits the Issuer to pay.

"Permitted Liens" means liens imposed by applicable law for taxes that are not yet due or are being contested in good faith by appropriate proceedings.

"Person" means a firm, unincorporated organization, corporation, partnership or any other entity.

"Property Package" has the meaning set forth in Schedule I hereto.

"Protective Advances" means, with respect to any Loan, an advance or payment the Issuer desires to make in order to protect or preserve the relevant asset constituting Collateral.

"REO" means an Acceptable Loan that has been converted into real property owned by Issuer as a result of foreclosure, deed in lieu of foreclosure or other enforcement of the Acceptable Loan.

3

A&R Note - Gottex ABL/ MKA

"Subordination Agreement" means that certain subordination agreement among the Administrative Agent, the Issuer, Freestone Capital Partners L.P., Freestone Capital Qualified Partners L.P., Freestone Low Volatility Partners LP, Freestone Low Volatility Qualified Partners LP, GVA ABL Portfolio Limited, Gottex ABL (Cayman) Limited and Gottex ABl Master Fund Limited dated as of February 20, 2007 (as amended, supplemented or otherwise modified from time to time).

"Substantive Information" means any information required to be delivered pursuant to Section 8(f) through Section 8(i) of this Note.

"Total Loan Amount" means the unpaid principal amount outstanding under the Notes, together with all accrued and unpaid interest thereon.

"Unallocated Disbursements" means, with respect to any month for which interest is due, the amount by which the Disbursements during such month exceeds the amount of interest payable and any expenses and indemnities payable for such month.

"Value" means, as of any date of determination, (i) with respect to each Loan, (A) an amount determined by the Issuer equal to the lesser of the then outstanding principal amount thereunder and the fair market value thereof or (B) if the Valuation Agent has determined the value of the Loan, the value thereof as determined by the Valuation Agent and as set forth on a statement provided by the Valuation Agent to the Administrative Agent, as applicable; and (ii) with respect to each piece of real property owned by the Issuer, (A) an amount determined by the Issuer equal to the fair market value thereof or (B) if the Valuation Agent has determined the value thereof, the value thereof as determined by the Valuation Agent and as set forth on a statement provided by the Valuation Agent to the Administrative Agent, as applicable.

"Valuation Agent" means (i) FMV Opinions, Inc. as its independent valuation agent or (ii) any successor thereto appointed in accordance with the Waiver Agreement, as the context requires.

## 2.    Repayment.

The principal amount of this Note, together with all accrued and unpaid interest and all other amounts payable to the Noteholder hereunder, shall be paid no later than the Maturity Date.

Principal, interest and all other sums due under this Note are payable in lawful money of the United States.  The Issuer may prepay any or all amounts due under this Note, in its sole discretion, without premium or penalty, at any time.  Any such prepayment shall be applied first, to outstanding expenses and indemnities payable to the Noteholder or the Administrative Agent hereunder or under any other Note Agreement, if any, then to accrued and unpaid accrued interest, if any, and, thereafter, to the principal amount outstanding hereunder.

## 3.    Interest.

Interest shall be payable on this Note on the tenth (10th) day of the month following the month for which interest is due (each, an "Interest Payment Date") and shall accrue from the first day of each month through (and including) the last day of the month; provided, that the first

4

Ex. 06, p. 115

Interest Payment Date shall be May 10, 2008 for interest due for the month of April 2008 and that on such date Issuer shall also pay to Gottex $37,000 representing costs and expenses payable by Issuer pursuant to Section 12 of the Waiver Agreement. The applicable interest shall be calculated at the interest rate applicable to this Note (15% per annum) based on the actual number of days in the applicable month divided by 360.

With respect to any date on which any payment or disbursement is to be made or is due hereunder or under the Waiver Agreement (a "Due Date"), (1) Due Dates shall be determined based on then-current Pacific Time in the United States and (2) if the Due Date falls on a weekend or a bank holiday, such Due Date shall be extended to the first Business Day thereafter.

If any interest payment or other charge or fee payable hereunder exceeds the maximum amount then permitted by applicable law, then the Issuer shall pay the maximum amount then permitted by applicable law.

4.      **Distributions and Disbursements from the Custody Account**.

(a)      No disbursements or other distributions shall be made (or instructed to be made) from the Custody Account without the prior written consent of the Administrative Agent; provided, that:

(x)      with respect to one request per week (which request shall be submitted to the Administrative Agent on Wednesday of each week) to authorize the disbursement of funds from the Custody Account (a "Requested Disbursement") related to a Lender Commitment and/or a Permitted Expense, the Administrative Agent shall approve such Requested Disbursement if:

(i)      the disbursed funds are being used by the Issuer to fund a Lender Commitment and/or a Permitted Expense;

(ii)      the Administrative Agent receives a request substantially in the form of the specimen attached hereto as Annex A, which request shall be provided three (3) calendar days prior to the date the Issuer desires the relevant funds to be disbursed; and

(iii)      no Event of Default shall have occurred or would be reasonably likely to occur with the passage of time after giving effect to such Requested Disbursement; and

(y)      with respect to any Requested Disbursement related to a Protective Advance, the Administrative Agent shall not unreasonably withhold its consent with respect to authorizing the relevant disbursement and the satisfaction of the requirements set forth in clauses (i) through (iii) below shall be a condition precedent to any such authorization:

5

(i)     the disbursed funds are being used by the Issuer to fund a Protective Advance;

(ii)    the Administrative Agent receives a request substantially in the form of the specimen attached hereto as Annex A, which request shall be provided three (3) calendar days prior to the date the Issuer desires the relevant funds to be disbursed; and

(iii)   no Event of Default shall have occurred or would be reasonably likely to occur with the passage of time after giving effect to such Requested Disbursement.

For the avoidance of doubt, (A) with respect to Requested Disbursements related to Lender Commitments and/or Permitted Expenses, the Administrative Agent shall not be required to authorize a disbursement from the Custody Account with respect to any Requested Disbursement unless all three (3) conditions set forth in clauses (i) through (iii) above shall have been satisfied and (B) with respect to Requested Disbursements related to Protective Advances, the Administrative Agent shall have no obligation to authorize a disbursement from the Custody Account.

With respect to clauses (x)(ii) and (y)(ii), in exigent circumstances outside of the Issuer's reasonable control, the relevant request may be provided with less time in advance of the date the Issuer desires for the funds to be disbursed and the Administrative Agent shall not unreasonably withhold its consent with respect to authorizing the relevant disbursement of funds.

(b)     The Issuer acknowledges and agrees that the Administrative Agent is authorized to instruct the Bank to make the following disbursement of funds (the "Disbursements") to an account designated by the Administrative Agent (the "Gottex Account"), on the tenth (10th) day of each month: all amounts credited to the Custody Account in excess of the sum of (i) $750,000 and (ii) any amounts authorized to be disbursed pursuant to a Requested Disbursement and not yet disbursed, as of such tenth (10th) day.

(c)     The Disbursements shall be applied to the amounts outstanding under the Notes in the following order:

(1)     to any outstanding expenses and indemnities payable by the Issuer under the Notes or any other Note Agreement; and

(2)     then, to any accrued but unpaid interest under the Notes.

(d)     To the extent that there are any Unallocated Disbursements, the Unallocated Disbursements shall be reserved by the Administrative Agent for application in accordance with clauses (c)(1) and (c)(2) above (the "Reserved Unallocated Disbursements"), except that any portion of such Reserved Unallocated Disbursements

· 6

that has been reserved for more than sixty-one (61) days (the "Unreserved Unallocated Disbursements") will be applied toward the principal due under the Notes.

For illustration purposes only, assume that:

(1) all interest required to paid through April 2008 was paid on or prior to the applicable Interest Payment Date;

(2) monthly interest is always $750,000;

(3) during the month of May 2008, a total of $1,400,000 in Disbursements has been paid, and $0 in indemnities and expenses were incurred, leaving $650,000 in Reserved Unallocated Disbursements from May 2008 (which becomes Unreserved Unallocated Disbursements applicable toward principal in August 2008);

(4) during the month of June 2008, a total of $850,000 in Disbursements has been paid, and $0 in indemnities and expenses were incurred, leaving $100,000 in Reserved Unallocated Disbursements from June 2008 (which becomes Unreserved Unallocated Disbursements applicable toward principal in September 2008);

(5) during the month of July 2008, a total of $550,000 in Disbursements has been paid, and $20,000 of indemnities and expenses has been incurred, resulting in a shortfall of $220,000 with respect to the $750,000 in interest due for July 2008; and

(6) during the month of August 2008, a total of $450,000 in Disbursements has been paid and $0 in indemnities and expenses has been incurred, resulting in a shortfall of $300,000 with respect to the $750,000 in interest due for August 2008.

Under this example:

(A) the $650,000 in Reserved Unallocated Disbursements from May 2008 is applied against the $220,000 shortfall for July 2008, leaving $430,000 of Reserved Unallocated Disbursements from May 2008;

(B) in August 2008, the $430,000 in Reserved Unallocated Disbursements from May 2008 becomes $430,000 in Unreserved Unallocated Disbursements and is applied toward the principal due under the Notes;

(C) the $430,000 in now Unreserved Unallocated Disbursements from May is not available to cover the $300,000 shortfall in August 2008;

(D) the $100,000 in Reserved Unallocated Disbursements from June 2008 is applied to the $300,000 shortfall in August 2008, leaving $200,000 outstanding for August 2008; and

7

(E)      the Issuer must make a cash payment of $200,000 to cover the shortfall for August 2008 on the applicable Interest Payment Date.

(e)      Whenever any payment under any Note would be due or is otherwise payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day, and such extension of time shall in such case be included in the computation of the payment of interest.

(f)      Within five (5) Business Days following each payment or Disbursement, the Administrative Agent shall provide to the Issuer a written statement (the "Disbursement Report") reflecting the application of such payments by the Administrative Agent in accordance with this Section 4.  In addition to information regarding application of such payments, the Disbursement Report shall include the amount of Unallocated Distributions and an aging report for such Unallocated Distributions.

## 5.      **Events of Default**.

If any of the following events ("Events of Default") shall occur and be continuing:

(a)      the failure by the Issuer to pay this Note on or before December 1, 2008;

(b)      subject to the Disbursement Procedures, the failure to pay interest hereunder when due and such failure remains unremedied for five (5) Business Days following the date notice of such failure shall have been provided by the Administrative Agent to the Issuer;

(c)      the failure by the Administrative Agent to receive any Substantive Information when required to be delivered and such failure remains unremedied for ten (10) Business Days following the date notice of such failure shall have been provided by the Administrative Agent to the Issuer;

(d)      the failure by the Issuer to comply with Section 2 or Section 3 of the Waiver Agreement;

(e)      the incurrence by the Issuer of any Debt that is ranked senior to or pari passu with the Debt incurred pursuant to this Note without the prior written consent of the Administrative Agent;

(f)      subject to section 4 of the Waiver Agreement, the failure by the Administrative Agent, as agent for the Noteholder, at any time to have a continuously

8

perfected first priority Lien on and security interest in the Collateral subject to no other Lien;

(g)     the Issuer shall grant or permit any further security interest or Lien or encumbrance of any kind upon all or any portion of the Collateral except for (a) the Bank's contractual right of set-off and Lien as set out in the Custody Agreement appointing Alliance Bank as Bank of the Issuer, which right shall be capped at 5% of the net asset value of the Issuer and (b) Liens imposed by applicable law for taxes that are not yet due or are being contested in good faith by appropriate proceedings;

(h)     the Issuer shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against the Issuer seeking to adjudicate it bankrupt or insolvent, or seeking liquidation, dissolution, winding-up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property and assets and, in the case of any such proceeding instituted against the Issuer, such proceeding shall remain undismissed or unstayed for a period of 30 days; or the Issuer shall take any limited liability company action to authorize any of the actions set forth above in this clause (i);

(i)     any judgment or order for the payment of money in excess of $7,000,000 shall be rendered against the Issuer and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order which shall not have been stayed or dismissed within 30 days after the commencement of such proceedings or (ii) there shall be any period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(j)     a Collateral Breach shall occur and such breach remains unremedied for ten (10) Business Days following the date notice of such breach shall have been provided by the Administrative Agent to the Issuer;

(k)     the Issuer shall fail to provide to the Administrative Agent the 2006 audit by July 15, 2008;

(l) the Issuer shall fail to provide to the Administrative Agent the 2007 audit by August 15, 2008;

(m)     any representation or warranty by the Issuer herein shall be incorrect in any material respect when made or deemed made;

(n)     (i) except with respect to Section 9(c), the Issuer shall fail to perform or observe any term, covenant or agreement herein or under any other Note Agreement, and in each case such failure remains unremedied for ten (10) Business Days following the date notice of such failure shall have been provided by the Administrative Agent to the Issuer or (ii) the Issuer shall fail to comply with Section 9(c);

(o)     the Issuer shall fail to receive on or prior to the date that is thirty (30) days from the date hereof, a report prepared by the Valuation Agent setting forth the Value of each Loan and each piece of real property owned by the Issuer as of December 31, 2007;

(p)     the Issuer shall fail to receive on or prior to the date that is thirty (30) days from September 30, 2008, a report prepared by the Valuation Agent setting forth the Value of each Loan and each piece of real property owned by the Issuer as of June 30, 2008;

then, and in any such event, the Administrative Agent may, by written notice to the Issuer declare the principal amount outstanding hereunder, all accrued interest thereon, all fees and all other accrued amounts payable under this Note and the other Note Agreements to be forthwith due and payable, whereupon the principal amount outstanding hereunder, all such interest and fees and all such other amounts hereunder and under the other Note Agreements shall be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Issuer provided, however, that upon the occurrence of any event in clauses (h) or (i) above, the principal amount outstanding hereunder, all accrued interest and all accrued other amounts payable, including fees, under this Agreement and under the other Note Agreements shall automatically become and be due and payable, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Issuer.

No failure on the part of the Noteholder or the Administrative to exercise, and no delay in exercising, any right hereunder, under this Note shall operate as a waiver thereof nor shall the single or partial exercise, of any such right preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.  No notice to or demand on the Issuer in any case shall entitle the Issuer to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Noteholder or the Administrative Agent to any other or further action in any circumstance without notice or demand.

6.     <u>**Representations and Warranties of the Issuer**</u>.

As of the date hereof, the Issuer represents and warrants to the Noteholder as follows:

10

(a)     The Issuer (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation and (ii) is duly qualified and in good standing as a foreign limited liability company in each other jurisdiction in which it owns or leases property or in which the conduct of its business requires it to so qualify or be licensed and where, in each case, failure to so qualify and be in good standing could have a Material Adverse Effect.

(b)     The execution, delivery and performance by the Issuer of this Note is within its limited liability company powers, has been duly authorized by all necessary limited liability company action, and does not (i) contravene the Issuer's organizational documents, (ii) contravene any contractual restriction binding on it, (iii) require any consent under any agreement or instrument to which it is a party or by which any of its properties or assets is bound, (iv) result in or require the creation or imposition of Lien upon any property or assets of the Issuer other than Liens permitted hereunder or (v) violate any law, writ, judgment, injunction, decree, determination or award.  The Issuer is not in violation of any such law, writ, judgment, injunction, decree, determination or award or in breach of any contractual restriction binding upon it, except for such violation or breach which would not have a Material Adverse Effect.

(c)     No order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption or waiver by, any governmental authority or any other third party (except as have been obtained or made and are in full force and effect), is required to authorize, or is required in connection with, (i) the execution, delivery and performance by the Issuer of this Note or (ii) the legality, validity, binding effect or enforceability of this Note.

(d)     This Note when delivered for value hereunder will be legal, valid and binding obligations of the Issuer enforceable against the Issuer in accordance with its respective terms in all respects.

(e)     The Issuer is not required to register as an "investment company," and is not a person "controlled by" an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended.

(f)     All information with respect to the Issuer (i) provided by or on behalf of the Issuer, to the Noteholder or the Administrative Agent in connection with the negotiation, execution and delivery of this Note, including, without limitation, any financial statements of the Issuer provided to the Noteholder, or (ii) provided or to be provided by the Issuer in any offering document of the Issuer (except as to information about the Noteholder furnished by it specifically for inclusion therein) was or will be, on or as of the applicable date of provision thereof complete and correct in all material respects and did not (or will not) contain any untrue statement of a material fact or omit

11

to state a fact necessary to make the statements contained therein not misleading in light of the time and circumstances under which such statements were made.

(g)     All licenses, permits, approvals, concessions or other authorizations necessary to the conduct of the business of the Issuer have been duly obtained and are in full force and effect other than those where the failure to obtain and maintain any of the foregoing would not have a Material Adverse Effect.   There are no restrictions or requirements which limit the Issuer's ability to lawfully conduct its business or perform its obligations under this Note.

(h)     With respect to each Loan owned by the Issuer as of the date hereof, the Issuer shall have delivered to the Administrative Agent a complete Loan Package.

(i)     With respect to any real property owned by the Issuer as of the date hereof, the Administrative Agent shall have received a complete Property Package.

7.     **Security Interest**.

This Note shall constitute a secured obligation of the Issuer in accordance with the Security Agreement.

8.     **Affirmative Covenants**.

So long as any amounts hereunder remain unpaid, the Issuer covenants and agrees that:

(a)     The Issuer shall maintain its limited liability company existence.   The Issuer shall comply with all applicable laws.

(b)     All Proceeds of the Collateral will be deposited into the Custody Account.

(c)     The Issuer shall keep proper books of record and accounts as are necessary to prepare financial statements in accordance with U.S. GAAP.

(d)     The Issuer shall notify the Administrative Agent, as soon as reasonably practicable, if an event occurs that results in the revocation, suspension or termination of any license, permit or approval held by any other fund managed by the Manager.

(e)     The Issuer shall remain principally engaged in its business as conducted by it as of the date hereof.

(f)     The Issuer shall furnish, or shall cause same to be furnished, to the Noteholder and the Administrative Agent: (i) as soon as available and in any event within ninety (90) days after the end of each fiscal year of the Issuer, its unaudited annual consolidated financial statements, including all notes thereto, which statements shall

12

include a consolidated statement of financial position as of the end of the relevant fiscal year and statement of operations and a statement of cash flows for such fiscal year, all setting forth in comparative form the corresponding figures from the previous fiscal year, all prepared in conformity with U.S. GAAP, accompanied by a certificate of the chief financial officer of the Issuer which shall state that said consolidated financial statements fairly present the consolidated financial condition and results of operations of the Issuer as of the end of, and for, such period, and a report setting forth each asset of the Issuer and the applicable NAV (as defined below) thereof; (ii) as soon as available and in any event within 30 days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Issuer, its unaudited quarterly consolidated financial statements, which statements shall include the consolidated statement of financial position as of the end of the relevant quarterly fiscal period and statement of operations and statement of cash flows for such quarterly fiscal period, all setting forth in comparative form the corresponding figures from the corresponding quarterly fiscal period in the previous fiscal year, all prepared in conformity with U.S. GAAP, accompanied by a certificate of the chief financial officer of the Issuer which shall state that said quarterly consolidated financial statements fairly present the consolidated financial condition and results of operations of the Issuer as of the end of, and for, such period (subject to footnotes and ordinary year-end adjustments), and a report setting forth each asset of the Issuer and the applicable NAV thereof; and (iii) any and all documents, instruments, filings or agreements received in connection with any Loan or piece of real property owned by the Issuer (including, but not limited to, all amendments, supplements or other modifications made to any document or agreement in a Loan Package or a Property Package). The Issuer shall furnish to the Noteholder and the Administrative Agent, at the time it furnishes its financial statements, a certificate of an authorized officer of the Issuer that no Event of Default (as defined below) has occurred and no event has occurred and is continuing which with the lapse of time or the giving of notice or both would constitute an Event of Default.

(g)     The Issuer shall furnish, or shall cause the same to be furnished, to the Noteholder and the Administrative Agent:

(i) not later than 60 days after the end of each calendar quarter, the NAV Calculation; and

(ii) within 5 calendar days of the end of each month, a statement setting forth the principal amount of all Notes outstanding and all accrued and unpaid interest thereon as of such date.

(h)     The Issuer shall furnish to the Noteholder and the Administrative Agent promptly after request therefor, such other business and financial information respecting the condition or operations, financial or otherwise, of the Issuer as the Noteholder or the Administrative Agent may from time to time reasonably request.

13

(i)     No later than the last Business Day of each month, the Issuer shall provide to the Administrative Agent the following reports with respect to the last Business Day of the immediately preceding month:

(i)     a list (the "Loan List") of all Loans;

(ii)     with respect to each Loan, a statement setting forth (a) the outstanding principal amount thereunder, (b) the accrued and unpaid interest thereunder, (c) the amount of any undrawn commitment made by the Issuer with respect to such Loan and (d) an estimated reserve for uncollectible amounts with respect to such Loan, if any;

(iii)     a list of all Impaired Loans;

(iv)     a statement of all redemption requests submitted to the Issuer and MKA Real Estate Opportunity Fund, Ltd.; provided, that such statement shall not include the identities of the relevant member or shareholder or any other confidential information with respect to the relevant member or shareholder, as applicable;

(v)     a statement setting forth all Debts of the Issuer and MKA Real Estate Opportunity Fund, Ltd., the scheduled payment dates for such Debts and the maturity dates for such Debts;

(vi)     monthly unaudited financial statements, including a balance sheet, income statement and cash flow statement for the Issuer and MKA Real Estate Opportunity Fund, Ltd.;

(vii)     a certification from the Manager of the Issuer that all representations and warranties in the Notes are true and correct and that the Issuer is in compliance with each covenant in the Notes; and

(viii)     as soon as possible and in any event within two (2) days after the Issuer obtains actual knowledge of the occurrence of any actual litigation against the Issuer, the Manager or MKA Real Estate Opportunity Fund, Ltd., a statement of the Manager setting forth the details thereof and the action which the Issuer, the Manager or MKA Real Estate Opportunity Fund, Ltd., as applicable, has taken and proposes to take with respect thereto.

14

(j)     The Issuer shall cause the Bank to provide to the Administrative Agent (via e-mail to amy.lai@gottexfunds.com and Gustavo.Dominguez@gottexfunds.com) a daily account statement with respect to the Custody Account.

(k)     If after the date hereof the Issuer appoints an auditor other than Rothstein Kass, the Issuer shall, within three (3) Business Days' of such appointment, deliver a copy of an executed engagement letter between the Issuer and such auditor evidencing that such auditor has been retained as auditor to the Issuer together with (if such information is not in the engagement letter) documentation setting forth the scope of the duties of such auditor with respect to its engagement with respect to the Issuer.

9.    **Negative Covenants**.

So long as any amounts hereunder remain unpaid, the Issuer covenants and agrees that:

(a)     The Issuer shall not change its fiscal year or its method of accounting as in effect on the date hereof.

(b)     (i) The Issuer shall not appoint a custodian other than Alliance Bank without the prior written consent of the Administrative Agent and (ii) the Issuer shall not appoint an auditor other than Rothstein Kass, PricewaterhouseCoopers; Deloitte; Ernst & Young; or KPMG without the prior written consent of the Administrative Agent, such consent not to be unreasonable withheld.

(c)     The Issuer shall not (i) declare or make any dividend payment or other distribution of assets, property, cash, rights, obligations or securities on account of any equity interests in the Issuer, or purchase, redeem, retire or otherwise acquire for value any equity interests in the Issuer unless the Issuer shall have received the prior written consent of the Administrative Agent or (ii) without duplication, make (or authorize or otherwise permit the making of) any distribution, payment, disbursement or dividend of any kind, from cash in the Custody Account or otherwise, to any Person other than the Administrative Agent without the prior written consent of the Administrative Agent.

(d)     The Issuer shall not merge or consolidate with or into, or convey, transfer, lease or otherwise dispose of, whether in one transaction or in a series of transactions, all or substantially all of the property and assets (whether now owned or hereafter acquired) of the Issuer to, any Person.

10.    **Amendments**.

Neither this Note nor any provision hereof may be waived, amended or modified, except pursuant to an agreement or agreements in writing entered into by the Issuer and the Noteholder.

15

11.   __Notices__

All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, sent by facsimile or sent by electronic mail as follows:

If the notice is to the Issuer, such address is:

Gregory Contillo, President
MKA Real Estate Opportunity Fund I, LLC
c/o MKA Capital Group Advisors LLC
26 Corporate Plaza, Suite 250
Newport Beach, CA 92660
Telephone:  (949) 729 - 1660
Facsimile:  (949) 729 – 1665
E-mail: gcontillo@mkacap.com

with a copy to:

Van C. Durrer, II, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071
Telephone: (213) 687-5200
Facsimile: (213) 621-5200
E-mail: van.durrer@skadden.com

With a copy to:

Daniel D. White
26 Corporate Plaza Drive, Suite 260
Newport Beach, CA 92660
Telephone: (949) 729-9119
E-mail: dan@ddwlaw.com

If the notice is to the Noteholder, such address is:

__Gottex ABL (Cayman) Limited__
Gottex Fund Management Sarl
Avenue de Rhodanie 48
Lausanne 1007
Switzerland
Attention: William H. Woolverton, General Counsel
Telephone:  (617) 532 - 0202
Facsimile:  (617) 532 - 0219
E-mail: william.woolverton@gottexfunds.com

16

with a copy to the Administrative Agent at:

Gottex Fund Management Ltd.
One International Place
14th Floor
Boston, MA 02110
Attention:  William H. Woolverton, General Counsel
Telephone:  (617) 532 - 0202
Facsimile:  (617) 532 - 0219
E-mail: william.woolverton@gottexfunds.com


with a copy to:

Stuart Richter, Esq.
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone:  (310) 788-4582
Facsimile:  (310) 712-8434
E-mail: stuart.richter@kattenlaw.com


Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile or electronic mail shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, such notice shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  The Issuer, the Noteholder and the Administrative Agent may change its address, e-mail address or facsimile number for notices and other communications hereunder by notice to the other in the same manner as described herein.

12.    **Enforcement.**

In the case any one or more of the Events of Default specified herein shall have occurred and be continuing, the Noteholder may proceed to protect and enforce its rights either by suit in equity and/or by action at law, whether for the specific performance of any covenant or agreement contained herein or may proceed to enforce the payment of all sums then due (whether by acceleration or otherwise) hereunder or to enforce any other legal or equitable right of the Noteholder.  If an Event of Default shall have occurred and is continuing and the Noteholder shall (or the Administrative Agent on its behalf shall), in the exercise of its rights hereunder, retain attorneys, or incur other costs and expenses for the collection of payments due or to become due, or for the enforcement or performance or observance of any obligation or agreement of the Issuer hereunder, the Issuer shall pay to the Noteholder or the Administrative Agent, as applicable, on demand the reasonable fees of such attorneys together with all other costs and expenses incurred by the Noteholder and the Administrative Agent.

13.    **Governing Law.**

17

This Agreement shall be governed by, and construed in accordance with, the laws of the State of California, without giving effect to its conflict of laws provisions other than Section 1646.5 of the California Civil Code.

14. **Submission to Jurisdiction.**

THE ISSUER AND THE NOTEHOLDER CONSENT TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE OF CALIFORNIA. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS NOTE MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT SITTING IN LOS ANGELES, CALIFORNIA, AND EACH OF THE ISSUER AND THE NOTEHOLDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE NON-EXCLUSIVE JURISDICTION OF THOSE COURTS.

15. **Waiver of Venue.**

The Issuer and the Noteholder irrevocably and unconditionally waive, to the fullest extent permitted by applicable law, any objection that they may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Note in any court referred to in the Section 14. The Issuer and the Noteholder hereby irrevocably waive, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such Court.

16. **Service of Process.**

The Issuer and the Noteholder irrevocably consent to service of process in the manner provided for in Section 11. Nothing in this Agreement will affect the right of the Noteholder or the Issuer to serve process in any other manner permitted by applicable law.

17. **Waiver of Jury Trial.**

THE ISSUER AND THE NOTEHOLDER HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY, ARISING OUT OF OR RELATING TO THIS NOTE (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). THE ISSUER AND THE NOTEHOLDER (A) CERTIFY THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OR ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGE THAT THEY HAVE BEEN INDUCED TO ISSUE THIS NOTE BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED HEREIN.

18. **Right of Set-off.**

If an Event of Default shall have occurred and be continuing, the Noteholder is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set-off and apply any and all amounts held by a Noteholder at any time owing by the Noteholder to or for the credit or the account of the Issuer against any and all of the obligations of the Issuer

18

A&R Note - Gottex ABL/ MKA

now or hereafter existing under this Note to the Noteholder, irrespective of whether or not the Noteholder shall have made any demand under this Note and although such obligations of the Issuer may be contingent or unmatured. The rights of the Noteholder under this Section are in addition to other rights and remedies (including other rights of setoff) that the Noteholder may have. The Noteholder agrees to notify the Issuer in writing prior to the application of any such set-off, provided that the failure to give such notice shall not affect the validity of such set-off and application.

19. **Assignment.**

This Note and the obligations of the Issuer hereunder may not be assigned or delegated by the Issuer without the prior written consent of the Noteholder. This Note and the Noteholder's rights hereunder may be assigned without the Issuer's consent in accordance with Section 23. Whenever in this Note reference is made to the Noteholder or the Issuer, such reference shall be deemed to include, as applicable, a reference to their respective successors and permitted assigns. The provisions of this Note shall be binding upon and shall inure to the benefit of such successors and assigns. The Issuer's successors and assigns shall include, without limitation, a receiver, trustee, or debtor in possession of or for the Issuer.

Subject to Section 23, if in connection with any purchase by a third party of the Note, Noteholder receives the unpaid principal amount outstanding hereunder, together with all accrued and unpaid interest thereon and all other amounts payable to the Noteholder hereunder and under the other Note Agreements, Noteholder shall, at no cost to Noteholder, take any and all steps reasonably necessary to assign this Note to such third party purchaser, including, without limitation, delivering such documents as are reasonably necessary or appropriate to effect such assignment of the Note, provided however, that such assignment shall be on an as is, where is basis and without recourse to Noteholder, and Noteholder shall not incur any liability in connection with such assignment, or be required to make any representations or warranties (other than customary warranties of due authorization and no encumbrance of title to such note) to any assignee, Issuer, or any other third party in connection with such assignment.

20. **Severability.**

In case any provision in this Note shall be held to be invalid, illegal or unenforceable, such provision shall be severable from the rest of this Note, as the case may be, and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

21. **Counterparts; Integration.**

This Note may be executed in counterparts, each of which shall constitute an original, and all of which when taken together shall constitute a single contract. This Note (together with the Waiver Agreement and the Security Agreement) constitutes the entire contract among the parties relating to the subject matter hereof. Except as expressly set forth in Section 5 of the Waiver Agreement, this Note completely restates, amends and supersedes those certain Amended and Restated Promissory Notes made by Issuer in favor of Noteholder dated April 12,

A&R Note - Gottex ABL/ MKA

2006, June 6, 2006 and June 30, 2006, and all other previous agreements and understandings, oral or written, relating to the subject matter hereof.

22.    **Registered Instrument.**

This Note is a registered instrument and is not a bearer instrument. This Note is registered as to both principal and interest with the Issuer and all payments hereunder shall be made to the named Noteholder or, in the event of a transfer pursuant to Section 23, to the transferee identified in the record of ownership of this Note maintained by the Noteholder on behalf of the Issuer. Transfer of this Note may not be effected except in accordance with the provisions of Section 23.

23.    **Transfer.**

(a)    If this Note is held by or assigned or transferred to a noteholder that is not a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended from time to time (the "Code"), then (x) all interest accrued and paid on this Note will qualify for exemption from United States withholding tax as "portfolio interest" because this Note is an obligation which is in "registered form" within the meaning of Sections 871(h)(2)(B) and 881(c)(2)(B) of the Code, and the applicable Treasury Regulations promulgated thereunder, and (y) as such, all interest accrued and paid on this Note will be exempt from United States information reporting under Sections 6041 and 6049 of the Code and United States backup withholding under Section 3406 of the Code. In furtherance of the foregoing, the Issuer shall require that any such transferee or assignee noteholder that is not a United States person shall represent, warrant and covenant to the Issuer that (i) such noteholder is not, and will not be as long as any amounts due under this Note have not been paid in full, a "United States person," within the meaning of Section 7701(a)(30) of the Code; (ii) such noteholder is not, and will not be as long as any amounts due under this Note have not been paid in full, a person described in Section 881(c)(3) of the Code; (iii) on or prior to the date of transfer or assignment and on or prior to each anniversary of such date until all amounts due under this Note have been paid in full, such noteholder shall provide the Issuer with a properly executed U.S. Internal Revenue Service ("IRS") Form W-8BEN, Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding (or any successor form prescribed by the IRS), certifying as to such noteholder's status for purposes of determining exemption from United States withholding tax, information reporting and backup withholding with respect to all payments to be made to such noteholder hereunder; (iv) if an event occurs that would require a change in the exempt status of such noteholder or any of the other information provided on the most recent IRS Form W-8BEN (or successor form) previously submitted by such noteholder to the Issuer hereunder, such noteholder will so inform the Issuer in writing (or by submitting to the Issuer a new IRS Form W-8BEN or successor form) within 30 days after the occurrence of such event; and (v) such noteholder will not assign or otherwise transfer this Note or any of its rights hereunder except in accordance with the provisions of the paragraph below.

(b)    Transfer of this Note may be effected only by (i) surrender of this Note to the Issuer and the re-issuance of this Note to the transferee, or the Issuer's issuance to the Noteholder of a new note in the same form as this Note but with the transferee denoted as the Noteholder, or (ii) the recording by the Administrative Agent of the identity of the transferee in a

20

A&R Note - Gottex ABL/ MKA

record of ownership of this Note maintained by the Administrative Agent on behalf of, and as agent to, the Issuer.  The terms and conditions of this Note shall be binding upon and inure to the benefit of the Issuer and the Noteholder and their permitted assigns; provided, however, that if any such assignment (whether by operation of law, by way of transfer or participation, or otherwise) is to any noteholder that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code, then such noteholder shall submit to the Issuer on or before the date of such assignment an IRS Form W-8BEN (or any successor form) certifying as to such noteholder's status for purposes of determining exemption from United States withholding tax, information reporting and backup withholding with respect to all payments to be made to such noteholder under the new note (or other instrument).  Any attempted transfer in violation of this Section 23 shall be void and of no force and effect.  Until there has been a valid transfer of this Note and of all of the rights hereunder by the Noteholder (or the Administrative Agent on its behalf) in accordance with this Section 23, the Issuer shall deem and treat the Noteholder as the absolute beneficial owner and holder of this Note and of all of the rights hereunder for all purposes (including, without limitation, for the purpose of receiving all payments to be made under this Note).

## 24.   Indemnification.

The Issuer hereby agrees to indemnify the Administrative Agent, the Noteholder, their respective affiliates and their respective partners, directors, officers, employees, agents and advisors (each such person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable fees, charges and disbursements of any counsel for any Indemnitee whether incurred in any action or proceeding between the parties or otherwise) incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Issuer or any affiliate, partner, director, officer, employee, agent or advisor of the Issuer arising out of, in connection with, or as a result of (a) the execution or delivery of this Note, any other Note Agreement or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (b) any purchase or issuance of a Note or the use or proposed use of the proceeds therefrom, or (c) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Issuer or any affiliate, partner, director, officer, employee, agent or advisor of the Issuer, and regardless of whether any Indemnitee is a party thereto, provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) result from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by the Issuer or any affiliate, partner, director, officer, employee, agent or advisor of the Issuer against an Indemnitee for any material breach of such Indemnitee's obligations hereunder or under any Note.  The provisions of this Section 24 shall survive the repayment of the amounts owed to the Noteholder hereunder and the termination of the other Note Agreements.

*[Remainder of page intentionally left blank; signature page to follow]*

21

IN WITNESS WHEREOF, the undersigned has executed this Note as of the date first set forth above.

MAKER:

MKA REAL ESTATE OPPORTUNITY FUND I,
LLC, a California limited liability company

By:     Its Manager, MKA Capital Advisors, LLC,
        a California limited liability company

By:     ~~Gregory Contillo~~ Michael A. Abraham
        ~~President~~ Chairman of the Board

22

## Annex A

See Attached

MKA RE Opportunity Fund I, LLC
Cash Account analysis
Effective Date

| | | | | |
|---|---|---|---|---|
| Checking Balance | $ | - | Effective Date | |
| MM Balance | $ | - | Effective Date | |
| Escrow Balance | $ | - | Effective Date | |
| Less Open pre-approved balance | $ | - | Effective Date | From Alliance Bank |
| Other | $ | - | | |
| Available Cash | $ | - | | |

| | | | | |
|---|---|---|---|---|
| Proposed Wire to Gottex | $ | - | * | |
| Builder Draws (Detail Below) | $ | - | * | |
| Builder Loan Fees (Detail Below) | $ | - | * | |
| Open A/P (Detail Below) | $ | - | * | |
| Other | $ | - | * | |
| Remaining | $ | - | | $750,000 Sweep over this amount |

*Net requested cash release    $    -

**Builder Draws**

**Builder Loan/Management Fees**

**Open A/P**

| Monthly Legal/Audit Recap | |
|---|---|
| Max | $  300,000 |
| Available | $  300,000 |

**Other**

## Schedule I

"Loan Package" means, with respect to each Loan, (i) all negotiable promissory notes, if any (ii) copies of the relevant (1) loan agreement, if any, (2) security agreement and all documents executed or filed in connection therewith, (3) deed of trust or mortgage, (4) fully executed Assignment of deed of trust or mortgage substantially in the form of Exhibit A hereto (each, an "Assignment"), (5) title insurance policy on the relevant deed of trust or mortgage, and (6) all amendments, modifications, and extensions of the foregoing and such other documents and agreements as the Administrative Agent may reasonably request, (iii) evidence that the lien granted to the Administrative Agent on the mortgage or deed of trust, as the case may be, has been recorded in the relevant county title office and (iv) copies of all assignment of leases and rents, guaranties and indemnities (completion guaranties, guaranties of principal and/or interest and/or other financial issues, environmental indemnities, so-called bad-boy or non-recourse carveout guaranties), relevant opinions (including non-consolidation, single purpose entity opinions and enforceability opinions), cash management agreements, rate cap agreements and pledges thereof, UCC financing statements, closing statements and certificates, any other documents, certificates or other agreements executed in connection with the foregoing, if any

"Property Package" means, with respect to each piece of real property owned by the Issuer, (i) copies of the relevant (1) grant deed, (2) title insurance policy on the relevant grant deed, and (3) all amendments, modifications, and extensions of the foregoing and such other documents and agreements as the Administrative Agent may reasonably request, (ii) evidence that the grant deed has been recorded in the relevant county title office and (iii) copies of all ground leases, leases, contracts, construction contracts, architects contracts and other related documents, closing statements and certificates, and any other documents, certificates or other agreements executed in connection with the foregoing, if any.

A&R Note - Gottex ABL/ MKA

Ex. 06, p. 136

Exhibit A

RECORDING REQUESTED BY:

WHEN RECORDED MAIL TO:

_____

_____

_____

Attention: _____

_____

*SPACE ABOVE LINE FOR RECORDER'S USE*

ASSIGNMENT OF DEED OF TRUST

FOR VALUE RECEIVED, the undersigned MKA Real Estate Opportunity Fund I, LLC ("Assignor") hereby grants, transfers and assigns to Gottex Fund Management Ltd. ("Assignee"), as agent for each of GVA ABL PORTFOLIO LIMITED, GOTTEX ABL (CAYMAN) LIMITED and GOTTEX ABI MASTER FUND LIMITED, all beneficial interest under that certain [Deed of Trust and Assignment of Rents, Security Agreement and Fixture Filing] (the "Deed of Trust"), dated _____, 2006, executed by _____, as Trustor ("Trustor"), in favor, of _____, as Trustee, and _____, as Beneficiary, covering the land described in Annex "A" attached hereto and incorporated herein by this reference, and recorded on _____, 2008, as Instrument No. _____ in the Official Records of the County Recorder's office of _____ County, California, TOGETHER WITH the note or notes described or referred to in the Deed of Trust and all other obligations secured thereby, all money due and to become due thereon with interest, and all rights accrued or to accrue under the Deed of Trust.

Assignor represents and warrants to Assignee as follows:

ARTICLE I.  Assignor has the right, power and authority, and has taken all action necessary, to assign the Deed of Trust to Assignee pursuant to this Assignment;

ARTICLE II.  The Deed of Trust has not been supplemented, amended, modified, terminated, released or cancelled nor has Assignor waived any of its rights thereunder;

ARTICLE III.  Except with respect to the assignment by Assignor in favor of Alliance Bank, Assignor owns the entire interest of the beneficiary under the Deed of Trust free

1-25

and clear of any claim or interest of any kind whatsoever (whether present or contingent, conditional or unconditional, choate or inchoate) by any other party, whether by encumbrance, pledge, assignment, participation, option or otherwise;

ARTICLE IV.  Assignor is not in default of any of its obligations under the Deed of Trust; and

ARTICLE V.  To the best knowledge of Assignor, Trustor is not in default of any of its obligations under the Deed of Trust and does not have any defense, claim, offset or counterclaim to the enforcement of its obligations thereunder.

This Assignment (i) shall be binding on Assignor and its successors and assigns and shall inure to the benefit of Assignee and its successors and assigns, (ii) shall be governed by the law of the State of California and (iii) may not be modified orally, but only by a writing executed by Assignor and Assignee.

Dated: _____, 200[ ]

<br>

By: _____
     Title: _____

By: _____
     Title: _____

1-26

Ex. 06, p. 138

Annex "A" to
Assignment of Deed of Trust

LEGAL DESCRIPTION OF LAND

A&R Note - Gottex ABL/ MKA

Ex. 06, p. 139

**[Confirm with Title Company]**

STATE OF _____          }
                              }ss.
COUNTY OF _____          }

On _____, before me, _____ personally appeared, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.          *This area for official notarial seal*

Signature_____

My Commission Expires: _____

1-28

A&R Note  - Gottex ABL/ MKA                                    **Ex. 06, p. 140**

# EXHIBIT 7

EXECUTION COPY

PURSUANT TO THE WAIVER AGREEMENT DATED AS OF APRIL 1, 2008 (THE "WAIVER AGREEMENT"), BY AND AMONG MKA REAL ESTATE OPPORTUNITY FUND I, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY (THE "ISSUER"), AND MKA CAPITAL GROUP ADVISORS, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY (THE "MANAGER"), ON THE ONE HAND, AND GOTTEX ABI MASTER FUND LIMITED, A CAYMAN ISLANDS EXEMPTED COMPANY, GOTTEX ABL (CAYMAN) LIMITED, A CAYMAN ISLANDS EXEMPTED COMPANY, GVA ABL PORTFOLIO LIMITED, A BRITISH VIRGIN ISLANDS COMPANY, HUDSON ABL FUND LIMITED, A CAYMAN ISLANDS EXEMPTED COMPANY (COLLECTIVELY, "GOTTEX"), AND GOTTEX FUND MANAGEMENT, LTD. ("ADMINISTRATIVE AGENT"), ON THE OTHER, EXCEPT AS SET FORTH IN SECTION 5 OF THE WAIVER AGREEMENT, THIS PROMISSORY NOTE AMENDS AND RESTATES THAT CERTAIN AMENDED AND RESTATED PROMISSORY NOTE MADE BY THE ISSUER IN FAVOR OF HUDSON ABL FUND LIMITED (THE "NOTEHOLDER") DATED JUNE 6, 2006 FOR $5,000,000.

## SECOND AMENDED AND RESTATED PROMISSORY NOTE

$4,986,536                                                 Dated as of April 1, 2008

For value received, the Issuer promises to pay to the Noteholder the principal amount of Four Million Nine Hundred Eighty Six Thousand Five Hundred Thirty Six Dollars ($4,986,536) at an interest rate equal to fifteen percent (15%) per annum (the "Base Rate") from April 1, 2008 until paid in full.

1.    **Definitions**. Capitalized terms not defined herein shall have the meanings ascribed to them in that certain Amended and Restated Security Agreement dated April 12, 2006 by and between the Issuer and the Administrative Agent (as amended, supplemented or otherwise modified from time to time, the "Security Agreement") and the following terms shall have the following meanings.

"Acceptable Loan" means Loan in respect of which the Administrative Agent shall have received a complete Loan Package.

"Acceptable Property" means real property owned by the Issuer as of the date hereof that satisfies the following criteria:  (i) the Administrative Agent shall have received a complete Property Package with respect thereto and (ii) the Administrative Agent shall have determined (in its sole discretion) that it has a first priority perfected security interest in such real property. For the avoidance of doubt, "Acceptable Property" excludes REO.

"Bank" means Alliance Bank or such other bank as the parties may agree upon.

"Business Day" means any day on which banking institutions in California are open for the transaction of banking business.

A&R Note  - Hudson/ MKA

"Collateral Breach" means, as of any date of determination, the quotient (expressed as a percentage) of (i) the Total Loan Amount and (ii) the Value, in the aggregate, of each Acceptable Loan and each Acceptable Property plus the amount of cash in the Custody Account, exceeds 50%.

"Custody Account" means the one or more custody accounts (including, without limitation, any bank account(s)) established and maintained by the Bank under and pursuant to the Custody Agreement dated as of the date hereof between the Issuer and the Bank (the "Custody Agreement"), and all assets from time to time held in or standing to the credit of any such account (or any successor account), and all Proceeds of the foregoing held in any such account (or successor account).

"Debt" means at any date without duplication (i) indebtedness for borrowed money, (ii) obligations evidenced by bonds, debentures, notes or other similar instruments, (iii) obligations to pay the deferred purchase price of property or services (excluding trade payables and other accounts payable incurred in the ordinary course of business), (iv) capital lease obligations, (v) indebtedness of others secured by a Lien on the Issuer's property, (vi) the maximum amount available to be drawn under all letters of credit and all unpaid drawings in respect of such letters of credit, (vii) all obligations to pay a specified purchase price for goods or services, whether or not delivered or accepted, i.e., take-or-pay and similar obligations, (viii) all obligations created or arising under any conditional sale or other title retention agreement or incurred as financing, (ix) the net obligations under Derivatives and (x) obligations under a guaranty of debt of others of the kinds referred to in clauses (i) through (ix) above.

"Derivatives" means derivative transactions, including, without limitation, swap agreements or commodity transactions.

"Impaired Loan" means any Loan referenced on the Loan List in respect of which the obligor thereunder (i) has failed to make a payment of principal or interest and such failure shall not have been cured for more than two (2) months or (ii) has failed to comply with any material term, covenant or agreement in the relevant loan documents or is otherwise in default thereunder, in each case, regardless of whether the relevant failure has been waived.

"Lender Commitments" means, with respect to any Loan, advances required or permitted to be made by the Issuer under such Loan to the relevant borrower, whether such advance is paid to such borrower or to one or more of such borrower's senior lenders.

"Lien" means any lien, pledge, security interest or other charge or encumbrance of any kind, or any other type of preferential arrangement.

"Loan" means each loan (i) in respect of which, as of the date hereof, the Issuer is the lender of record or an assignee thereof or in which the Issuer owns a participation and (ii) that is secured by a security interest in a mortgage, deed of trust or similar collateral agreement.

"Loan Package" has the meaning set forth in Schedule I hereto.

"Material Adverse Effect" means a material adverse effect on (1) the ability of the Issuer to perform any of its obligations under any of the Note Agreements, (2) the legality, validity or

2

enforceability of any provision of this Note or any other Note Agreement, (3) the business, condition (financial or otherwise), assets, prospects or results of operations of the Issuer or (4) the value of, or the priority of the Administrative Agent's security interest, in the Collateral securing the obligations of the Issuer under any Note, in each case, as determined by the Administrative Agent in its reasonable discretion; provided, however, that any material adverse effect that is being suffered on an industry-wide basis in the industry in which the Issuer is a participant shall not constitute a "Material Adverse Effect."

"Maturity Date" means December 1, 2008.

"NAV" means the net asset value of the Issuer as determined in accordance with U.S. generally accepted accounting principles ("U.S. GAAP").

"NAV Calculation" means a written statement by the Issuer certifying as to the NAV and each Loan and piece of real property owned by the Issuer as of the date hereof, as of the end of the applicable quarter or the date of such notice, as applicable, together with (in reasonable detail) a schedule of the computations used by the Issuer or its designee in determining the applicable NAV.

"Note Agreements" means, collectively, all of the Notes, the Subordination Agreement, the Security Agreement, the Control Agreement, any other document securing the Notes and each other document executed in connection therewith or pursuant thereto, each as amended, supplemented or otherwise modified from time to time. "Note Agreements" does not include the Note Purchase Agreement.

"Notes" means the new promissory notes (including this Note) that, pursuant to the terms of the Waiver Agreement, amend and restate each of the seven (7) secured registered promissory notes identified in Exhibit A to the Waiver Agreement.

"Permitted Expenses" means (i) legal and auditing expenses, not to exceed $300,000 per month and (ii) any other payments the Administrative Agent permits the Issuer to pay.

"Permitted Liens" means liens imposed by applicable law for taxes that are not yet due or are being contested in good faith by appropriate proceedings.

"Person" means a firm, unincorporated organization, corporation, partnership or any other entity.

"Property Package" has the meaning set forth in Schedule I hereto.

"Protective Advances" means, with respect to any Loan, an advance or payment the Issuer desires to make in order to protect or preserve the relevant asset constituting Collateral.

"REO" means an Acceptable Loan that has been converted into real property owned by Issuer as a result of foreclosure, deed in lieu of foreclosure or other enforcement of the Acceptable Loan.

3

A&R Note - Hudson/ MKA

"Subordination Agreement" means that certain subordination agreement among the Administrative Agent, the Issuer, Freestone Capital Partners L.P., Freestone Capital Qualified Partners L.P., Freestone Low Volatility Partners LP, Freestone Low Volatility Qualified Partners LP, GVA ABL Portfolio Limited, Gottex ABL (Cayman) Limited and Gottex ABI Master Fund Limited dated as of February 20, 2007 (as amended, supplemented or otherwise modified from time to time).

"Substantive Information" means any information required to be delivered pursuant to Section 8(f) through Section 8(i) of this Note.

"Total Loan Amount" means the unpaid principal amount outstanding under the Notes, together with all accrued and unpaid interest thereon.

"Unallocated Disbursements" means, with respect to any month for which interest is due, the amount by which the Disbursements during such month exceeds the amount of interest payable and any expenses and indemnities payable for such month.

"Value" means, as of any date of determination, (i) with respect to each Loan, (A) an amount determined by the Issuer equal to the lesser of the then outstanding principal amount thereunder and the fair market value thereof or (B) if the Valuation Agent has determined the value of the Loan, the value thereof as determined by the Valuation Agent and as set forth on a statement provided by the Valuation Agent to the Administrative Agent, as applicable; and (ii) with respect to each piece of real property owned by the Issuer, (A) an amount determined by the Issuer equal to the fair market value thereof or (B) if the Valuation Agent has determined the value thereof, the value thereof as determined by the Valuation Agent and as set forth on a statement provided by the Valuation Agent to the Administrative Agent, as applicable.

"Valuation Agent" means (i) FMV Opinions, Inc. as its independent valuation agent or (ii) any successor thereto appointed in accordance with the Waiver Agreement, as the context requires.

2.    **Repayment.**

The principal amount of this Note, together with all accrued and unpaid interest and all other amounts payable to the Noteholder hereunder, shall be paid no later than the Maturity Date.

Principal, interest and all other sums due under this Note are payable in lawful money of the United States.  The Issuer may prepay any or all amounts due under this Note, in its sole discretion, without premium or penalty, at any time.  Any such prepayment shall be applied first, to outstanding expenses and indemnities payable to the Noteholder or the Administrative Agent hereunder or under any other Note Agreement, if any, then to accrued and unpaid accrued interest, if any, and, thereafter, to the principal amount outstanding hereunder.

3.    **Interest.**

Interest shall be payable on this Note on the tenth (10th) day of the month following the month for which interest is due (each, an "Interest Payment Date") and shall accrue from the first day of each month through (and including) the last day of the month; provided, that the first

4

Interest Payment Date shall be May 10, 2008 for interest due for the month of April 2008 and that on such date Issuer shall also pay to Gottex $37,000 representing costs and expenses payable by Issuer pursuant to Section 12 of the Waiver Agreement.  The applicable interest shall be calculated at the interest rate applicable to this Note (15% per annum) based on the actual number of days in the applicable month divided by 360.

With respect to any date on which any payment or disbursement is to be made or is due hereunder or under the Waiver Agreement (a "Due Date"), (1) Due Dates shall be determined based on then-current Pacific Time in the United States and (2) if the Due Date falls on a weekend or a bank holiday, such Due Date shall be extended to the first Business Day thereafter.

If any interest payment or other charge or fee payable hereunder exceeds the maximum amount then permitted by applicable law, then the Issuer shall pay the maximum amount then permitted by applicable law.

4.      **Distributions and Disbursements from the Custody Account**.

(a)      No disbursements or other distributions shall be made (or instructed to be made) from the Custody Account without the prior written consent of the Administrative Agent; provided, that:

(x)      with respect to one request per week (which request shall be submitted to the Administrative Agent on Wednesday of each week) to authorize the disbursement of funds from the Custody Account (a "Requested Disbursement") related to a Lender Commitment and/or a Permitted Expense, the Administrative Agent shall approve such Requested Disbursement if:

(i)      the disbursed funds are being used by the Issuer to fund a Lender Commitment and/or a Permitted Expense;

(ii)      the Administrative Agent receives a request substantially in the form of the specimen attached hereto as Annex A, which request shall be provided three (3) calendar days prior to the date the Issuer desires the relevant funds to be disbursed; and

(iii)      no Event of Default shall have occurred or would be reasonably likely to occur with the passage of time after giving effect to such Requested Disbursement; and

(y)      with respect to any Requested Disbursement related to a Protective Advance, the Administrative Agent shall not unreasonably withhold its consent with respect to authorizing the relevant disbursement and the satisfaction of the requirements set forth in clauses (i) through (iii) below shall be a condition precedent to any such authorization:

5

(i)     the disbursed funds are being used by the Issuer to fund a Protective Advance;

(ii)    the Administrative Agent receives a request substantially in the form of the specimen attached hereto as Annex A, which request shall be provided three (3) calendar days prior to the date the Issuer desires the relevant funds to be disbursed; and

(iii)   no Event of Default shall have occurred or would be reasonably likely to occur with the passage of time after giving effect to such Requested Disbursement.

For the avoidance of doubt, (A) with respect to Requested Disbursements related to Lender Commitments and/or Permitted Expenses, the Administrative Agent shall not be required to authorize a disbursement from the Custody Account with respect to any Requested Disbursement unless all three (3) conditions set forth in clauses (i) through (iii) above shall have been satisfied and (B) with respect to Requested Disbursements related to Protective Advances, the Administrative Agent shall have no obligation to authorize a disbursement from the Custody Account.

With respect to clauses (x)(ii) and (y)(ii), in exigent circumstances outside of the Issuer's reasonable control, the relevant request may be provided with less time in advance of the date the Issuer desires for the funds to be disbursed and the Administrative Agent shall not unreasonably withhold its consent with respect to authorizing the relevant disbursement of funds.

(b)    The Issuer acknowledges and agrees that the Administrative Agent is authorized to instruct the Bank to make the following disbursement of funds (the "Disbursements") to an account designated by the Administrative Agent (the "Gottex Account"), on the tenth (10th) day of each month: all amounts credited to the Custody Account in excess of the sum of (i) $750,000 and (ii) any amounts authorized to be disbursed pursuant to a Requested Disbursement and not yet disbursed, as of such tenth (10th) day.

(c)    The Disbursements shall be applied to the amounts outstanding under the Notes in the following order:

(1)    to any outstanding expenses and indemnities payable by the Issuer under the Notes or any other Note Agreement; and

(2)    then, to any accrued but unpaid interest under the Notes.

(d)    To the extent that there are any Unallocated Disbursements, the Unallocated Disbursements shall be reserved by the Administrative Agent for application in accordance with clauses (c)(1) and (c)(2) above (the "Reserved Unallocated Disbursements"), except that any portion of such Reserved Unallocated Disbursements

6

that has been reserved for more than sixty-one (61) days (the "Unreserved Unallocated Disbursements") will be applied toward the principal due under the Notes.

For illustration purposes only, assume that:

(1)     all interest required to paid through April 2008 was paid on or prior to the applicable Interest Payment Date;

(2)     monthly interest is always $750,000;

(3)     during the month of May 2008, a total of $1,400,000 in Disbursements has been paid, and $0 in indemnities and expenses were incurred, leaving $650,000 in Reserved Unallocated Disbursements from May 2008 (which becomes Unreserved Unallocated Disbursements applicable toward principal in August 2008);

(4)     during the month of June 2008, a total of $850,000 in Disbursements has been paid, and $0 in indemnities and expenses were incurred, leaving $100,000 in Reserved Unallocated Disbursements from June 2008 (which becomes Unreserved Unallocated Disbursements applicable toward principal in September 2008);

(5)     during the month of July 2008, a total of $550,000 in Disbursements has been paid, and $20,000 of indemnities and expenses has been incurred, resulting in a shortfall of $220,000 with respect to the $750,000 in interest due for July 2008; and

(6)     during the month of August 2008, a total of $450,000 in Disbursements has been paid and $0 in indemnities and expenses has been incurred, resulting in a shortfall of $300,000 with respect to the $750,000 in interest due for August 2008.

Under this example:

(A)     the $650,000 in Reserved Unallocated Disbursements from May 2008 is applied against the $220,000 shortfall for July 2008, leaving $430,000 of Reserved Unallocated Disbursements from May 2008;

(B)     in August 2008, the $430,000 in Reserved Unallocated Disbursements from May 2008 becomes $430,000 in Unreserved Unallocated Disbursements and is applied toward the principal due under the Notes;

(C)     the $430,000 in now Unreserved Unallocated Disbursements from May is not available to cover the $300,000 shortfall in August 2008;

(D)     the $100,000 in Reserved Unallocated Disbursements from June 2008 is applied to the $300,000 shortfall in August 2008, leaving $200,000 outstanding for August 2008; and

7

(E)     the Issuer must make a cash payment of $200,000 to cover the shortfall for August 2008 on the applicable Interest Payment Date.

(e)     Whenever any payment under any Note would be due or is otherwise payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day, and such extension of time shall in such case be included in the computation of the payment of interest.

(f)     Within five (5) Business Days following each payment or Disbursement, the Administrative Agent shall provide to the Issuer a written statement (the "Disbursement Report") reflecting the application of such payments by the Administrative Agent in accordance with this Section 4.  In addition to information regarding application of such payments, the Disbursement Report shall include the amount of Unallocated Distributions and an aging report for such Unallocated Distributions.

5.     **Events of Default**.

If any of the following events ("Events of Default") shall occur and be continuing:

(a)     the failure by the Issuer to pay this Note on or before December 1, 2008;

(b)     subject to the Disbursement Procedures, the failure to pay interest hereunder when due and such failure remains unremedied for five (5) Business Days following the date notice of such failure shall have been provided by the Administrative Agent to the Issuer;

(c)     the failure by the Administrative Agent to receive any Substantive Information when required to be delivered and such failure remains unremedied for ten (10) Business Days following the date notice of such failure shall have been provided by the Administrative Agent to the Issuer;

(d)     the failure by the Issuer to comply with Section 2 or Section 3 of the Waiver Agreement;

(e)     the incurrence by the Issuer of any Debt that is ranked senior to or pari passu with the Debt incurred pursuant to this Note without the prior written consent of the Administrative Agent;

(f)     subject to section 4 of the Waiver Agreement, the failure by the Administrative Agent, as agent for the Noteholder, at any time to have a continuously

8

perfected first priority Lien on and security interest in the Collateral subject to no other Lien;

(g)     the Issuer shall grant or permit any further security interest or Lien or encumbrance of any kind upon all or any portion of the Collateral except for (a) the Bank's contractual right of set-off and Lien as set out in the Custody Agreement appointing Alliance Bank as Bank of the Issuer, which right shall be capped at 5% of the net asset value of the Issuer and (b) Liens imposed by applicable law for taxes that are not yet due or are being contested in good faith by appropriate proceedings;

(h)     the Issuer shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against the Issuer seeking to adjudicate it bankrupt or insolvent, or seeking liquidation, dissolution, winding-up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property and assets and, in the case of any such proceeding instituted against the Issuer, such proceeding shall remain undismissed or unstayed for a period of 30 days; or the Issuer shall take any limited liability company action to authorize any of the actions set forth above in this clause (i);

(i)     any judgment or order for the payment of money in excess of $7,000,000 shall be rendered against the Issuer and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order which shall not have been stayed or dismissed within 30 days after the commencement of such proceedings or (ii) there shall be any period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(j)     a Collateral Breach shall occur and such breach remains unremedied for ten (10) Business Days following the date notice of such breach shall have been provided by the Administrative Agent to the Issuer;

(k)     the Issuer shall fail to provide to the Administrative Agent the 2006 audit by July 15, 2008;

(l) the Issuer shall fail to provide to the Administrative Agent the 2007 audit by August 15, 2008;

(m)     any representation or warranty by the Issuer herein shall be incorrect in any material respect when made or deemed made;

9

(n)     (i) except with respect to Section 9(c), the Issuer shall fail to perform or observe any term, covenant or agreement herein or under any other Note Agreement, and in each case such failure remains unremedied for ten (10) Business Days following the date notice of such failure shall have been provided by the Administrative Agent to the Issuer or (ii) the Issuer shall fail to comply with Section 9(c);

(o)     the Issuer shall fail to receive on or prior to the date that is thirty (30) days from the date hereof, a report prepared by the Valuation Agent setting forth the Value of each Loan and each piece of real property owned by the Issuer as of December 31, 2007;

(p)     the Issuer shall fail to receive on or prior to the date that is thirty (30) days from September 30, 2008, a report prepared by the Valuation Agent setting forth the Value of each Loan and each piece of real property owned by the Issuer as of June 30, 2008;

then, and in any such event, the Administrative Agent may, by written notice to the Issuer declare the principal amount outstanding hereunder, all accrued interest thereon, all fees and all other accrued amounts payable under this Note and the other Note Agreements to be forthwith due and payable, whereupon the principal amount outstanding hereunder, all such interest and fees and all such other amounts hereunder and under the other Note Agreements shall be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Issuer provided, however, that upon the occurrence of any event in clauses (h) or (i) above, the principal amount outstanding hereunder, all accrued interest and all accrued other amounts payable, including fees, under this Agreement and under the other Note Agreements shall automatically become and be due and payable, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Issuer.

No failure on the part of the Noteholder or the Administrative to exercise, and no delay in exercising, any right hereunder, under this Note shall operate as a waiver thereof nor shall the single or partial exercise, of any such right preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.  No notice to or demand on the Issuer in any case shall entitle the Issuer to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Noteholder or the Administrative Agent to any other or further action in any circumstance without notice or demand.

6.     <u>**Representations and Warranties of the Issuer**</u>.

As of the date hereof, the Issuer represents and warrants to the Noteholder as follows:

(a)     The Issuer (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation and (ii) is duly qualified and in good standing as a foreign limited liability company in each other jurisdiction in which it owns or leases property or in which the conduct of its business requires it to so qualify or be licensed and where, in each case, failure to so qualify and be in good standing could have a Material Adverse Effect.

(b)     The execution, delivery and performance by the Issuer of this Note is within its limited liability company powers, has been duly authorized by all necessary limited liability company action, and does not (i) contravene the Issuer's organizational documents, (ii) contravene any contractual restriction binding on it, (iii) require any consent under any agreement or instrument to which it is a party or by which any of its properties or assets is bound, (iv) result in or require the creation or imposition of Lien upon any property or assets of the Issuer other than Liens permitted hereunder or (v) violate any law, writ, judgment, injunction, decree, determination or award.  The Issuer is not in violation of any such law, writ, judgment, injunction, decree, determination or award or in breach of any contractual restriction binding upon it, except for such violation or breach which would not have a Material Adverse Effect.

(c)     No order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption or waiver by, any governmental authority or any other third party (except as have been obtained or made and are in full force and effect), is required to authorize, or is required in connection with, (i) the execution, delivery and performance by the Issuer of this Note or (ii) the legality, validity, binding effect or enforceability of this Note.

(d)     This Note when delivered for value hereunder will be legal, valid and binding obligations of the Issuer enforceable against the Issuer in accordance with its respective terms in all respects.

(e)     The Issuer is not required to register as an "investment company," and is not a person "controlled by" an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended.

(f)     All information with respect to the Issuer (i) provided by or on behalf of the Issuer, to the Noteholder or the Administrative Agent in connection with the negotiation, execution and delivery of this Note, including, without limitation, any financial statements of the Issuer provided to the Noteholder, or (ii) provided or to be provided by the Issuer in any offering document of the Issuer (except as to information about the Noteholder furnished by it specifically for inclusion therein) was or will be, on or as of the applicable date of provision thereof complete and correct in all material respects and did not (or will not) contain any untrue statement of a material fact or omit

11

to state a fact necessary to make the statements contained therein not misleading in light of the time and circumstances under which such statements were made.

(g)     All licenses, permits, approvals, concessions or other authorizations necessary to the conduct of the business of the Issuer have been duly obtained and are in full force and effect other than those where the failure to obtain and maintain any of the foregoing would not have a Material Adverse Effect.   There are no restrictions or requirements which limit the Issuer's ability to lawfully conduct its business or perform its obligations under this Note.

(h)     With respect to each Loan owned by the Issuer as of the date hereof, the Issuer shall have delivered to the Administrative Agent a complete Loan Package.

(i)     With respect to any real property owned by the Issuer as of the date hereof, the Administrative Agent shall have received a complete Property Package.

7.     **Security Interest**.

This Note shall constitute a secured obligation of the Issuer in accordance with the Security Agreement.

8.     **Affirmative Covenants.**

So long as any amounts hereunder remain unpaid, the Issuer covenants and agrees that:

(a)     The Issuer shall maintain its limited liability company existence.   The Issuer shall comply with all applicable laws.

(b)     All Proceeds of the Collateral will be deposited into the Custody Account.

(c)     The Issuer shall keep proper books of record and accounts as are necessary to prepare financial statements in accordance with U.S. GAAP.

(d)     The Issuer shall notify the Administrative Agent, as soon as reasonably practicable, if an event occurs that results in the revocation, suspension or termination of any license, permit or approval held by any other fund managed by the Manager.

(e)     The Issuer shall remain principally engaged in its business as conducted by it as of the date hereof.

(f)     The Issuer shall furnish, or shall cause same to be furnished, to the Noteholder and the Administrative Agent: (i) as soon as available and in any event within ninety (90) days after the end of each fiscal year of the Issuer, its unaudited annual consolidated financial statements, including all notes thereto, which statements shall

12

include a consolidated statement of financial position as of the end of the relevant fiscal year and statement of operations and a statement of cash flows for such fiscal year, all setting forth in comparative form the corresponding figures from the previous fiscal year, all prepared in conformity with U.S. GAAP, accompanied by a certificate of the chief financial officer of the Issuer which shall state that said consolidated financial statements fairly present the consolidated financial condition and results of operations of the Issuer as of the end of, and for, such period, and a report setting forth each asset of the Issuer and the applicable NAV (as defined below) thereof; (ii) as soon as available and in any event within 30 days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Issuer, its unaudited quarterly consolidated financial statements, which statements shall include the consolidated statement of financial position as of the end of the relevant quarterly fiscal period and statement of operations and statement of cash flows for such quarterly fiscal period, all setting forth in comparative form the corresponding figures from the corresponding quarterly fiscal period in the previous fiscal year, all prepared in conformity with U.S. GAAP, accompanied by a certificate of the chief financial officer of the Issuer which shall state that said quarterly consolidated financial statements fairly present the consolidated financial condition and results of operations of the Issuer as of the end of, and for, such period (subject to footnotes and ordinary year-end adjustments), and a report setting forth each asset of the Issuer and the applicable NAV thereof; and (iii) any and all documents, instruments, filings or agreements received in connection with any Loan or piece of real property owned by the Issuer (including, but not limited to, all amendments, supplements or other modifications made to any document or agreement in a Loan Package or a Property Package).  The Issuer shall furnish to the Noteholder and the Administrative Agent, at the time it furnishes its financial statements, a certificate of an authorized officer of the Issuer that no Event of Default (as defined below) has occurred and no event has occurred and is continuing which with the lapse of time or the giving of notice or both would constitute an Event of Default.

(g)     The Issuer shall furnish, or shall cause the same to be furnished, to the Noteholder and the Administrative Agent:

(i) not later than 60 days after the end of each calendar quarter, the NAV Calculation; and

(ii) within 5 calendar days of the end of each month, a statement setting forth the principal amount of all Notes outstanding and all accrued and unpaid interest thereon as of such date.

(h)     The Issuer shall furnish to the Noteholder and the Administrative Agent promptly after request therefor, such other business and financial information respecting the condition or operations, financial or otherwise, of the Issuer as the Noteholder or the Administrative Agent may from time to time reasonably request.

13

(i)     No later than the last Business Day of each month, the Issuer shall provide to the Administrative Agent the following reports with respect to the last Business Day of the immediately preceding month:

(i)     a list (the "Loan List") of all Loans;

(ii)    with respect to each Loan, a statement setting forth (a) the outstanding principal amount thereunder, (b) the accrued and unpaid interest thereunder, (c) the amount of any undrawn commitment made by the Issuer with respect to such Loan and (d) an estimated reserve for uncollectible amounts with respect to such Loan, if any;

(iii)   a list of all Impaired Loans;

(iv)    a statement of all redemption requests submitted to the Issuer and MKA Real Estate Opportunity Fund, Ltd.; provided, that such statement shall not include the identities of the relevant member or shareholder or any other confidential information with respect to the relevant member or shareholder, as applicable;

(v)     a statement setting forth all Debts of the Issuer and MKA Real Estate Opportunity Fund, Ltd., the scheduled payment dates for such Debts and the maturity dates for such Debts;

(vi)    monthly unaudited financial statements, including a balance sheet, income statement and cash flow statement for the Issuer and MKA Real Estate Opportunity Fund, Ltd.;

(vii)   a certification from the Manager of the Issuer that all representations and warranties in the Notes are true and correct and that the Issuer is in compliance with each covenant in the Notes; and

(viii)  as soon as possible and in any event within two (2) days after the Issuer obtains actual knowledge of the occurrence of any actual litigation against the Issuer, the Manager or MKA Real Estate Opportunity Fund, Ltd., a statement of the Manager setting forth the details thereof and the action which the Issuer, the Manager or MKA Real Estate Opportunity Fund, Ltd., as applicable, has taken and proposes to take with respect thereto.

14

(j)     The Issuer shall cause the Bank to provide to the Administrative Agent (via e-mail to amy.lai@gottexfunds.com and Gustavo.Dominguez@gottexfunds.com) a daily account statement with respect to the Custody Account.

(k)     If after the date hereof the Issuer appoints an auditor other than Rothstein Kass, the Issuer shall, within three (3) Business Days' of such appointment, deliver a copy of an executed engagement letter between the Issuer and such auditor evidencing that such auditor has been retained as auditor to the Issuer together with (if such information is not in the engagement letter) documentation setting forth the scope of the duties of such auditor with respect to its engagement with respect to the Issuer.

## 9.     Negative Covenants.

So long as any amounts hereunder remain unpaid, the Issuer covenants and agrees that:

(a)     The Issuer shall not change its fiscal year or its method of accounting as in effect on the date hereof.

(b)     (i) The Issuer shall not appoint a custodian other than Alliance Bank without the prior written consent of the Administrative Agent and (ii) the Issuer shall not appoint an auditor other than Rothstein Kass, PricewaterhouseCoopers; Deloitte; Ernst & Young; or KPMG without the prior written consent of the Administrative Agent, such consent not to be unreasonable withheld.

(c)     The Issuer shall not (i) declare or make any dividend payment or other distribution of assets, property, cash, rights, obligations or securities on account of any equity interests in the Issuer, or purchase, redeem, retire or otherwise acquire for value any equity interests in the Issuer unless the Issuer shall have received the prior written consent of the Administrative Agent or (ii) without duplication, make (or authorize or otherwise permit the making of) any distribution, payment, disbursement or dividend of any kind, from cash in the Custody Account or otherwise, to any Person other than the Administrative Agent without the prior written consent of the Administrative Agent.

(d)     The Issuer shall not merge or consolidate with or into, or convey, transfer, lease or otherwise dispose of, whether in one transaction or in a series of transactions, all or substantially all of the property and assets (whether now owned or hereafter acquired) of the Issuer to, any Person.

## 10.    Amendments.

Neither this Note nor any provision hereof may be waived, amended or modified, except pursuant to an agreement or agreements in writing entered into by the Issuer and the Noteholder.

15

A&R Note - Hudson/ MKA

11.    <u>Notices</u>

All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, sent by facsimile or sent by electronic mail as follows:

If the notice is to the Issuer, such address is:

Gregory Contillo, President
MKA Real Estate Opportunity Fund I, LLC
c/o MKA Capital Group Advisors LLC
26 Corporate Plaza, Suite 250
Newport Beach, CA 92660
Telephone:  (949) 729 - 1660
Facsimile:  (949) 729 – 1665
E-mail: gcontillo@mkacap.com

with a copy to:

Van C. Durrer, II, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071
Telephone: (213) 687-5200
Facsimile: (213) 621-5200
E-mail: van.durrer@skadden.com

With a copy to:

Daniel D. White
26 Corporate Plaza Drive, Suite 260
Newport Beach, CA 92660
Telephone: (949) 729-9119
E-mail: dan@ddwlaw.com

If the notice is to the Noteholder, such address is:

HUDSON ABL Fund Limited
Gottex Fund Management Sarl
Avenue de Rhodanie 48
Lausanne 1007
Switzerland
Attention: William H. Woolverton, General Counsel
Telephone:  (617) 532 - 0202
Facsimile:  (617) 532 - 0219
E-mail: william.woolverton@gottexfunds.com

16

with a copy to the Administrative Agent at:

Gottex Fund Management Ltd.
One International Place
14th Floor
Boston, MA 02110
Attention:  William H. Woolverton, General Counsel
Telephone:  (617) 532 - 0202
Facsimile:  (617) 532 - 0219
E-mail: william.woolverton@gottexfunds.com


with a copy to:

Stuart Richter, Esq.
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone:  (310) 788-4582
Facsimile:  (310) 712-8434
E-mail: stuart.richter@kattenlaw.com


Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile or electronic mail shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, such notice shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  The Issuer, the Noteholder and the Administrative Agent may change its address, e-mail address or facsimile number for notices and other communications hereunder by notice to the other in the same manner as described herein.

12.   **Enforcement.**

In the case any one or more of the Events of Default specified herein shall have occurred and be continuing, the Noteholder may proceed to protect and enforce its rights either by suit in equity and/or by action at law, whether for the specific performance of any covenant or agreement contained herein or may proceed to enforce the payment of all sums then due (whether by acceleration or otherwise) hereunder or to enforce any other legal or equitable right of the Noteholder.  If an Event of Default shall have occurred and is continuing and the Noteholder shall (or the Administrative Agent on its behalf shall), in the exercise of its rights hereunder, retain attorneys, or incur other costs and expenses for the collection of payments due or to become due, or for the enforcement or performance or observance of any obligation or agreement of the Issuer hereunder, the Issuer shall pay to the Noteholder or the Administrative Agent, as applicable, on demand the reasonable fees of such attorneys together with all other costs and expenses incurred by the Noteholder and the Administrative Agent.

13.   **Governing Law.**

17

A&R Note - Hudson/ MKA

This Agreement shall be governed by, and construed in accordance with, the laws of the State of California, without giving effect to its conflict of laws provisions other than Section 1646.5 of the California Civil Code.

**14.**     **Submission to Jurisdiction.**

THE ISSUER AND THE NOTEHOLDER CONSENT TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE OF CALIFORNIA. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS NOTE MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT SITTING IN LOS ANGELES, CALIFORNIA, AND EACH OF THE ISSUER AND THE NOTEHOLDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE NON-EXCLUSIVE JURISDICTION OF THOSE COURTS.

**15.**     **Waiver of Venue.**

The Issuer and the Noteholder irrevocably and unconditionally waive, to the fullest extent permitted by applicable law, any objection that they may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Note in any court referred to in the Section 14. The Issuer and the Noteholder hereby irrevocably waive, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such Court.

**16.**     **Service of Process.**

The Issuer and the Noteholder irrevocably consent to service of process in the manner provided for in Section 11. Nothing in this Agreement will affect the right of the Noteholder or the Issuer to serve process in any other manner permitted by applicable law.

**17.**     **Waiver of Jury Trial.**

THE ISSUER AND THE NOTEHOLDER HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY, ARISING OUT OF OR RELATING TO THIS NOTE (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). THE ISSUER AND THE NOTEHOLDER (A) CERTIFY THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OR ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGE THAT THEY HAVE BEEN INDUCED TO ISSUE THIS NOTE BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED HEREIN.

**18.**     **Right of Set-off.**

If an Event of Default shall have occurred and be continuing, the Noteholder is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set-off and apply any and all amounts held by a Noteholder at any time owing by the Noteholder to or for the credit or the account of the Issuer against any and all of the obligations of the Issuer

18

now or hereafter existing under this Note to the Noteholder, irrespective of whether or not the Noteholder shall have made any demand under this Note and although such obligations of the Issuer may be contingent or unmatured.  The rights of the Noteholder under this Section are in addition to other rights and remedies (including other rights of setoff) that the Noteholder may have. The Noteholder agrees to notify the Issuer in writing prior to the application of any such set-off, provided that the failure to give such notice shall not affect the validity of such set-off and application.

19. **Assignment.**

This Note and the obligations of the Issuer hereunder may not be assigned or delegated by the Issuer without the prior written consent of the Noteholder.  This Note and the Noteholder's rights hereunder may be assigned without the Issuer's consent in accordance with Section 23.  Whenever in this Note reference is made to the Noteholder or the Issuer, such reference shall be deemed to include, as applicable, a reference to their respective successors and permitted assigns.  The provisions of this Note shall be binding upon and shall inure to the benefit of such successors and assigns.  The Issuer's successors and assigns shall include, without limitation, a receiver, trustee, or debtor in possession of or for the Issuer.

Subject to Section 23, if in connection with any purchase by a third party of the Note, Noteholder receives the unpaid principal amount outstanding hereunder, together with all accrued and unpaid interest thereon and all other amounts payable to the Noteholder hereunder and under the other Note Agreements, Noteholder shall, at no cost to Noteholder, take any and all steps reasonably necessary to assign this Note to such third party purchaser, including, without  limitation, delivering such documents as are reasonably necessary or appropriate to effect such assignment of the Note, provided however, that such assignment shall be on an as is, where is basis and without recourse to Noteholder, and Noteholder shall not incur any liability in connection with such assignment, or be required to make any representations or warranties (other than customary warranties of due authorization and no encumbrance of title to such note) to any assignee, Issuer, or any other third party in connection with such assignment.

20. **Severability.**

In case any provision in this Note shall be held to be invalid, illegal or unenforceable, such provision shall be severable from the rest of this Note, as the case may be, and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

21. **Counterparts; Integration.**

This Note may be executed in counterparts, each of which shall constitute an original, and all of which when taken together shall constitute a single contract.  This Note (together with the Waiver Agreement and the Security Agreement) constitutes the entire contract among the parties relating to the subject matter hereof.  Except as expressly set forth in Section 5 of the Waiver Agreement, this Note completely restates, amends and supersedes that certain Amended and Restated Promissory Note made by Issuer in favor of Noteholder dated June 6, 2006, and all

A&R Note - Hudson/ MKA

other previous agreements and understandings, oral or written, relating to the subject matter hereof.

22.    **Registered Instrument.**

This Note is a registered instrument and is not a bearer instrument.  This Note is registered as to both principal and interest with the Issuer and all payments hereunder shall be made to the named Noteholder or, in the event of a transfer pursuant to Section 23, to the transferee identified in the record of ownership of this Note maintained by the Noteholder on behalf of the Issuer. Transfer of this Note may not be effected except in accordance with the provisions of Section 23.

23.    **Transfer.**

(a)    If this Note is held by or assigned or transferred to a noteholder that is not a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended from time to time (the "Code"), then (x) all interest accrued and paid on this Note will qualify for exemption from United States withholding tax as "portfolio interest" because this Note is an obligation which is in "registered form" within the meaning of Sections 871(h)(2)(B) and 881(c)(2)(B) of the Code, and the applicable Treasury Regulations promulgated thereunder, and (y) as such, all interest accrued and paid on this Note will be exempt from United States information reporting under Sections 6041 and 6049 of the Code and United States backup withholding under Section 3406 of the Code.  In furtherance of the foregoing, the Issuer shall require that any such transferee or assignee noteholder that is not a United States person shall represent, warrant and covenant to the Issuer that (i) such noteholder is not, and will not be as long as any amounts due under this Note have not been paid in full, a "United States person," within the meaning of Section 7701(a)(30) of the Code; (ii) such noteholder is not, and will not be as long as any amounts due under this Note have not been paid in full, a person described in Section 881(c)(3) of the Code; (iii) on or prior to the date of transfer or assignment and on or prior to each anniversary of such date until all amounts due under this Note have been paid in full, such noteholder shall provide the Issuer with a properly executed U.S. Internal Revenue Service ("IRS") Form W-8BEN, Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding (or any successor form prescribed by the IRS), certifying as to such noteholder's status for purposes of determining exemption from United States withholding tax, information reporting and backup withholding with respect to all payments to be made to such noteholder hereunder; (iv) if an event occurs that would require a change in the exempt status of such noteholder or any of the other information provided on the most recent IRS Form W-8BEN (or successor form) previously submitted by such noteholder to the Issuer hereunder, such noteholder will so inform the Issuer in writing (or by submitting to the Issuer a new IRS Form W-8BEN or successor form) within 30 days after the occurrence of such event; and (v) such noteholder will not assign or otherwise transfer this Note or any of its rights hereunder except in accordance with the provisions of the paragraph below.

(b)    Transfer of this Note may be effected only by (i) surrender of this Note to the Issuer and the re-issuance of this Note to the transferee, or the Issuer's issuance to the Noteholder of a new note in the same form as this Note but with the transferee denoted as the Noteholder, or (ii) the recording by the Administrative Agent of the identity of the transferee in a

A&R Note  - Hudson/ MKA

record of ownership of this Note maintained by the Administrative Agent on behalf of, and as agent to, the Issuer.  The terms and conditions of this Note shall be binding upon and inure to the benefit of the Issuer and the Noteholder and their permitted assigns; provided, however, that if any such assignment (whether by operation of law, by way of transfer or participation, or otherwise) is to any noteholder that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code, then such noteholder shall submit to the Issuer on or before the date of such assignment an IRS Form W-8BEN (or any successor form) certifying as to such noteholder's status for purposes of determining exemption from United States withholding tax, information reporting and backup withholding with respect to all payments to be made to such noteholder under the new note (or other instrument).  Any attempted transfer in violation of this Section 23 shall be void and of no force and effect.  Until there has been a valid transfer of this Note and of all of the rights hereunder by the Noteholder (or the Administrative Agent on its behalf) in accordance with this Section 23, the Issuer shall deem and treat the Noteholder as the absolute beneficial owner and holder of this Note and of all of the rights hereunder for all purposes (including, without limitation, for the purpose of receiving all payments to be made under this Note).

### 24.     Indemnification.

The Issuer hereby agrees to indemnify the Administrative Agent, the Noteholder, their respective affiliates and their respective partners, directors, officers, employees, agents and advisors (each such person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable fees, charges and disbursements of any counsel for any Indemnitee whether incurred in any action or proceeding between the parties or otherwise) incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Issuer or any affiliate, partner, director, officer, employee, agent or advisor of the Issuer arising out of, in connection with, or as a result of (a) the execution or delivery of this Note, any other Note Agreement or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (b) any purchase or issuance of a Note or the use or proposed use of the proceeds therefrom, or (c) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Issuer or any affiliate, partner, director, officer, employee, agent or advisor of the Issuer, and regardless of whether any Indemnitee is a party thereto, provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) result from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by the Issuer or any affiliate, partner, director, officer, employee, agent or advisor of the Issuer against an Indemnitee for any material breach of such Indemnitee's obligations hereunder or under any Note.  The provisions of this Section 24 shall survive the repayment of the amounts owed to the Noteholder hereunder and the termination of the other Note Agreements.

*[Remainder of page intentionally left blank; signature page to follow]*

21

IN WITNESS WHEREOF, the undersigned has executed this Note as of the date first set forth above.

MAKER:

MKA REAL ESTATE OPPORTUNITY FUND I,
LLC, a California limited liability company

By:     Its Manager, MKA Capital Advisors, LLC,
        a California limited liability company

By:     ~~Gregory Contillo~~ Michael Abraham
        ~~President~~ Chairman of The Board

22

A&R Note - Hudson/ MKA

**Ex. 07, p. 162**

## Annex A

See Attached

MKA RE Opportunity Fund I, LLC
Cash Account analysis
Effective Date

| | | | |
|---|---|---|---|
| Checking Balance | $ | - | Effective Date |
| MM Balance | $ | - | Effective Date |
| Escrow Balance | $ | - | Effective Date |
| Less Open pre-approved balance | $ | - | Effective Date   From Alliance Bank |
| Other | $ | - | |
| Available Cash | $ | - | |

| | | | |
|---|---|---|---|
| Proposed Wire to Gottex | $ | - | * |
| Builder Draws (Detail Below) | $ | - | * |
| Builder Loan Fees (Detail Below) | $ | - | * |
| Open A/P (Detail Below) | $ | - | * |
| Other | $ | - | * |
| Remaining | $ | - | $750,000   Sweep over this amount |

*Net requested cash release   $   -

**Builder Draws**

**Builder Loan/Management Fees**

**Open A/P**

| Monthly Legal/Audit Recap | |
|---|---|
| | |
| Max | $  300,000 |
| Available | $  300,000 |

**Other**

Ex. 07, p. 164

## Schedule I

"Loan Package" means, with respect to each Loan, (i) all negotiable promissory notes, if any (ii) copies of the relevant (1) loan agreement, if any, (2) security agreement and all documents executed or filed in connection therewith, (3) deed of trust or mortgage, (4) fully executed Assignment of deed of trust or mortgage substantially in the form of Exhibit A hereto (each, an "Assignment"), (5) title insurance policy on the relevant deed of trust or mortgage, and (6) all amendments, modifications, and extensions of the foregoing and such other documents and agreements as the Administrative Agent may reasonably request, (iii) evidence that the lien granted to the Administrative Agent on the mortgage or deed of trust, as the case may be, has been recorded in the relevant county title office and (iv) copies of all assignment of leases and rents, guaranties and indemnities (completion guaranties, guaranties of principal and/or interest and/or other financial issues, environmental indemnities, so-called bad-boy or non-recourse carveout guaranties), relevant opinions (including non-consolidation, single purpose entity opinions and enforceability opinions), cash management agreements, rate cap agreements and pledges thereof, UCC financing statements, closing statements and certificates, any other documents, certificates or other agreements executed in connection with the foregoing, if any

"Property Package" means, with respect to each piece of real property owned by the Issuer, (i) copies of the relevant (1) grant deed, (2) title insurance policy on the relevant grant deed, and (3) all amendments, modifications, and extensions of the foregoing and such other documents and agreements as the Administrative Agent may reasonably request, (ii) evidence that the grant deed has been recorded in the relevant county title office and (iii) copies of all ground leases, leases, contracts, construction contracts, architects contracts and other related documents, closing statements and certificates, and any other documents, certificates or other agreements executed in connection with the foregoing, if any.

A&R Note - Hudson/ MKA

Ex. 07, p. 165

Exhibit A

RECORDING REQUESTED BY:

WHEN RECORDED MAIL TO:

_____
_____
_____
Attention:  _____

_____
*SPACE ABOVE LINE FOR RECORDER'S USE*

ASSIGNMENT OF DEED OF TRUST

FOR VALUE RECEIVED, the undersigned MKA Real Estate Opportunity Fund I, LLC ("Assignor") hereby grants, transfers and assigns to Gottex Fund Management Ltd. ("Assignee"), as agent for each of GVA ABL PORTFOLIO LIMITED, GOTTEX ABL (CAYMAN) LIMITED and GOTTEX ABI MASTER FUND LIMITED, all beneficial interest under that certain [Deed of Trust and Assignment of Rents, Security Agreement and Fixture Filing] (the "Deed of Trust"), dated _____, 2006, executed by _____, as Trustor ("Trustor"), in favor of _____, as Trustee, and _____, as Beneficiary, covering the land described in Annex "A" attached hereto and incorporated herein by this reference, and recorded on _____, 2008, as Instrument No. _____ in the Official Records of the County Recorder's office of _____ County, California, TOGETHER WITH the note or notes described or referred to in the Deed of Trust and all other obligations secured thereby, all money due and to become due thereon with interest, and all rights accrued or to accrue under the Deed of Trust.

Assignor represents and warrants to Assignee as follows:

ARTICLE I.  Assignor has the right, power and authority, and has taken all action necessary, to assign the Deed of Trust to Assignee pursuant to this Assignment;

ARTICLE II.  The Deed of Trust has not been supplemented, amended, modified, terminated, released or cancelled nor has Assignor waived any of its rights thereunder;

ARTICLE III.  Except with respect to the assignment by Assignor in favor of Alliance Bank, Assignor owns the entire interest of the beneficiary under the Deed of Trust free

1-25

and clear of any claim or interest of any kind whatsoever (whether present or contingent, conditional or unconditional, choate or inchoate) by any other party, whether by encumbrance, pledge, assignment, participation, option or otherwise;

ARTICLE IV.  Assignor is not in default of any of its obligations under the Deed of Trust; and

ARTICLE V.  To the best knowledge of Assignor, Trustor is not in default of any of its obligations under the Deed of Trust and does not have any defense, claim, offset or counterclaim to the enforcement of its obligations thereunder.

This Assignment (i) shall be binding on Assignor and its successors and assigns and shall inure to the benefit of Assignee and its successors and assigns, (ii) shall be governed by the law of the State of California and (iii) may not be modified orally, but only by a writing executed by Assignor and Assignee.

Dated: _____, 200[ ]

<br>

_____

By: _____
    Title: _____

By: _____
    Title: _____

A&R Note - Hudson/ MKA

Ex. 07, p. 167

Annex "A" to
Assignment of Deed of Trust

LEGAL DESCRIPTION OF LAND

1-27

EXECUTION COPY

**[Confirm with Title Company]**

STATE OF    _____        }
                                       }ss.

COUNTY OF _____       }

On _____, before me, _____ personally appeared, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.         *This area for official notarial seal*

Signature_____

My Commission Expires: _____

1-28

A&R Note - Hudson/ MKA

**Ex. 07, p. 169**

# EXHIBIT 8

EXECUTION COPY

PURSUANT TO THE WAIVER AGREEMENT DATED AS OF APRIL 1, 2008 (THE "WAIVER AGREEMENT"), BY AND AMONG MKA REAL ESTATE OPPORTUNITY FUND I, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY (THE "ISSUER"), AND MKA CAPITAL GROUP ADVISORS, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY (THE "MANAGER"), ON THE ONE HAND, AND GOTTEX ABI MASTER FUND LIMITED, A CAYMAN ISLANDS EXEMPTED COMPANY, GOTTEX ABL (CAYMAN) LIMITED, A CAYMAN ISLANDS EXEMPTED COMPANY, GVA ABL PORTFOLIO LIMITED, A BRITISH VIRGIN ISLANDS COMPANY, HUDSON ABL FUND LIMITED, A CAYMAN ISLANDS EXEMPTED COMPANY (COLLECTIVELY, "GOTTEX"), AND GOTTEX FUND MANAGEMENT, LTD. ("ADMINISTRATIVE AGENT"), ON THE OTHER, EXCEPT AS SET FORTH IN SECTION 5 OF THE WAIVER AGREEMENT, THIS PROMISSORY NOTE AMENDS AND RESTATES THOSE CERTAIN AMENDED AND RESTATED PROMISSORY NOTES MADE BY THE ISSUER IN FAVOR OF GVA ABL PORTFOLIO LIMITED (THE "NOTEHOLDER") DATED APRIL 12, 2006, AND JUNE 30, 2006 FOR $8,000,000 AND $21,000,000, RESPECTIVELY.

## SECOND AMENDED AND RESTATED PROMISSORY NOTE

$1,061,659                                               Dated as of April 1, 2008

For value received, the Issuer promises to pay to the Noteholder the principal amount of One Million Sixty One Thousand Six Hundred Fifty Nine Dollars ($1,061,659) at an interest rate equal to fifteen percent (15%) per annum (the "Base Rate") from April 1, 2008 until paid in full.

1.    **Definitions**. Capitalized terms not defined herein shall have the meanings ascribed to them in that certain Amended and Restated Security Agreement dated April 12, 2006 by and between the Issuer and the Administrative Agent (as amended, supplemented or otherwise modified from time to time, the "Security Agreement") and the following terms shall have the following meanings.

"Acceptable Loan" means Loan in respect of which the Administrative Agent shall have received a complete Loan Package.

"Acceptable Property" means real property owned by the Issuer as of the date hereof that satisfies the following criteria:  (i) the Administrative Agent shall have received a complete Property Package with respect thereto and (ii) the Administrative Agent shall have determined (in its sole discretion) that it has a first priority perfected security interest in such real property. For the avoidance of doubt, "Acceptable Property" excludes REO.

"Bank" means Alliance Bank or such other bank as the parties may agree upon.

"Business Day" means any day on which banking institutions in California are open for the transaction of banking business.

"Collateral Breach" means, as of any date of determination, the quotient (expressed as a percentage) of (i) the Total Loan Amount and (ii) the Value, in the aggregate, of each Acceptable Loan and each Acceptable Property plus the amount of cash in the Custody Account, exceeds 50%.

"Custody Account" means the one or more custody accounts (including, without limitation, any bank account(s)) established and maintained by the Bank under and pursuant to the Custody Agreement dated as of the date hereof between the Issuer and the Bank (the "Custody Agreement"), and all assets from time to time held in or standing to the credit of any such account (or any successor account), and all Proceeds of the foregoing held in any such account (or successor account).

"Debt" means at any date without duplication (i) indebtedness for borrowed money, (ii) obligations evidenced by bonds, debentures, notes or other similar instruments, (iii) obligations to pay the deferred purchase price of property or services (excluding trade payables and other accounts payable incurred in the ordinary course of business), (iv) capital lease obligations, (v) indebtedness of others secured by a Lien on the Issuer's property, (vi) the maximum amount available to be drawn under all letters of credit and all unpaid drawings in respect of such letters of credit, (vii) all obligations to pay a specified purchase price for goods or services, whether or not delivered or accepted, i.e., take-or-pay and similar obligations, (viii) all obligations created or arising under any conditional sale or other title retention agreement or incurred as financing, (ix) the net obligations under Derivatives and (x) obligations under a guaranty of debt of others of the kinds referred to in clauses (i) through (ix) above.

"Derivatives" means derivative transactions, including, without limitation, swap agreements or commodity transactions.

"Impaired Loan" means any Loan referenced on the Loan List in respect of which the obligor thereunder (i) has failed to make a payment of principal or interest and such failure shall not have been cured for more than two (2) months or (ii) has failed to comply with any material term, covenant or agreement in the relevant loan documents or is otherwise in default thereunder, in each case, regardless of whether the relevant failure has been waived.

"Lender Commitments" means, with respect to any Loan, advances required or permitted to be made by the Issuer under such Loan to the relevant borrower, whether such advance is paid to such borrower or to one or more of such borrower's senior lenders.

"Lien" means any lien, pledge, security interest or other charge or encumbrance of any kind, or any other type of preferential arrangement.

"Loan" means each loan (i) in respect of which, as of the date hereof, the Issuer is the lender of record or an assignee thereof or in which the Issuer owns a participation and (ii) that is secured by a security interest in a mortgage, deed of trust or similar collateral agreement.

"Loan Package" has the meaning set forth in Schedule I hereto.

"Material Adverse Effect" means a material adverse effect on (1) the ability of the Issuer to perform any of its obligations under any of the Note Agreements, (2) the legality, validity or

2

enforceability of any provision of this Note or any other Note Agreement, (3) the business, condition (financial or otherwise), assets, prospects or results of operations of the Issuer or (4) the value of, or the priority of the Administrative Agent's security interest, in the Collateral securing the obligations of the Issuer under any Note, in each case, as determined by the Administrative Agent in its reasonable discretion; provided, however, that any material adverse effect that is being suffered on an industry-wide basis in the industry in which the Issuer is a participant shall not constitute a "Material Adverse Effect."

"Maturity Date" means December 1, 2008.

"NAV" means the net asset value of the Issuer as determined in accordance with U.S. generally accepted accounting principles ("U.S. GAAP").

"NAV Calculation" means a written statement by the Issuer certifying as to the NAV and each Loan and piece of real property owned by the Issuer as of the date hereof, as of the end of the applicable quarter or the date of such notice, as applicable, together with (in reasonable detail) a schedule of the computations used by the Issuer or its designee in determining the applicable NAV.

"Note Agreements" means, collectively, all of the Notes, the Subordination Agreement, the Security Agreement, the Control Agreement, any other document securing the Notes and each other document executed in connection therewith or pursuant thereto, each as amended, supplemented or otherwise modified from time to time. "Note Agreements" does not include the Note Purchase Agreement.

"Notes" means the new promissory notes (including this Note) that, pursuant to the terms of the Waiver Agreement, amend and restate each of the seven (7) secured registered promissory notes identified in Exhibit A to the Waiver Agreement.

"Permitted Expenses" means (i) legal and auditing expenses, not to exceed $300,000 per month and (ii) any other payments the Administrative Agent permits the Issuer to pay.

"Permitted Liens" means liens imposed by applicable law for taxes that are not yet due or are being contested in good faith by appropriate proceedings.

"Person" means a firm, unincorporated organization, corporation, partnership or any other entity.

"Property Package" has the meaning set forth in Schedule I hereto.

"Protective Advances" means, with respect to any Loan, an advance or payment the Issuer desires to make in order to protect or preserve the relevant asset constituting Collateral.

"REO" means an Acceptable Loan that has been converted into real property owned by Issuer as a result of foreclosure, deed in lieu of foreclosure or other enforcement of the Acceptable Loan.

3

"Subordination Agreement" means that certain subordination agreement among the Administrative Agent, the Issuer, Freestone Capital Partners L.P., Freestone Capital Qualified Partners L.P., Freestone Low Volatility Partners LP, Freestone Low Volatility Qualified Partners LP, GVA ABL Portfolio Limited, Gottex ABL (Cayman) Limited and Gottex ABI Master Fund Limited dated as of February 20, 2007 (as amended, supplemented or otherwise modified from time to time).

"Substantive Information" means any information required to be delivered pursuant to Section 8(f) through Section 8(i) of this Note.

"Total Loan Amount" means the unpaid principal amount outstanding under the Notes, together with all accrued and unpaid interest thereon.

"Unallocated Disbursements" means, with respect to any month for which interest is due, the amount by which the Disbursements during such month exceeds the amount of interest payable and any expenses and indemnities payable for such month.

"Value" means, as of any date of determination, (i) with respect to each Loan, (A) an amount determined by the Issuer equal to the lesser of the then outstanding principal amount thereunder and the fair market value thereof or (B) if the Valuation Agent has determined the value of the Loan, the value thereof as determined by the Valuation Agent and as set forth on a statement provided by the Valuation Agent to the Administrative Agent, as applicable; and (ii) with respect to each piece of real property owned by the Issuer, (A) an amount determined by the Issuer equal to the fair market value thereof or (B) if the Valuation Agent has determined the value thereof, the value thereof as determined by the Valuation Agent and as set forth on a statement provided by the Valuation Agent to the Administrative Agent, as applicable.

"Valuation Agent" means (i) FMV Opinions, Inc. as its independent valuation agent or (ii) any successor thereto appointed in accordance with the Waiver Agreement, as the context requires.

2.    **Repayment.**

The principal amount of this Note, together with all accrued and unpaid interest and all other amounts payable to the Noteholder hereunder, shall be paid no later than the Maturity Date.

Principal, interest and all other sums due under this Note are payable in lawful money of the United States.  The Issuer may prepay any or all amounts due under this Note, in its sole discretion, without premium or penalty, at any time.  Any such prepayment shall be applied first, to outstanding expenses and indemnities payable to the Noteholder or the Administrative Agent hereunder or under any other Note Agreement, if any, then to accrued and unpaid accrued interest, if any, and, thereafter, to the principal amount outstanding hereunder.

3.    **Interest**.

Interest shall be payable on this Note on the tenth (10th) day of the month following the month for which interest is due (each, an "Interest Payment Date") and shall accrue from the first day of each month through (and including) the last day of the month; provided, that the first

4

Interest Payment Date shall be May 10, 2008 for interest due for the month of April 2008 and that on such date Issuer shall also pay to Gottex $37,000 representing costs and expenses payable by Issuer pursuant to Section 12 of the Waiver Agreement.  The applicable interest shall be calculated at the interest rate applicable to this Note (15% per annum) based on the actual number of days in the applicable month divided by 360.

With respect to any date on which any payment or disbursement is to be made or is due hereunder or under the Waiver Agreement (a "Due Date"), (1) Due Dates shall be determined based on then-current Pacific Time in the United States and (2) if the Due Date falls on a weekend or a bank holiday, such Due Date shall be extended to the first Business Day thereafter.

If any interest payment or other charge or fee payable hereunder exceeds the maximum amount then permitted by applicable law, then the Issuer shall pay the maximum amount then permitted by applicable law.

4.     **Distributions and Disbursements from the Custody Account**.

(a)     No disbursements or other distributions shall be made (or instructed to be made) from the Custody Account without the prior written consent of the Administrative Agent; provided, that:

(x)     with respect to one request per week (which request shall be submitted to the Administrative Agent on Wednesday of each week) to authorize the disbursement of funds from the Custody Account (a "Requested Disbursement") related to a Lender Commitment and/or a Permitted Expense, the Administrative Agent shall approve such Requested Disbursement if:

(i)     the disbursed funds are being used by the Issuer to fund a Lender Commitment and/or a Permitted Expense;

(ii)     the Administrative Agent receives a request substantially in the form of the specimen attached hereto as Annex A, which request shall be provided three (3) calendar days prior to the date the Issuer desires the relevant funds to be disbursed; and

(iii)     no Event of Default shall have occurred or would be reasonably likely to occur with the passage of time after giving effect to such Requested Disbursement; and

(y)     with respect to any Requested Disbursement related to a Protective Advance, the Administrative Agent shall not unreasonably withhold its consent with respect to authorizing the relevant disbursement and the satisfaction of the requirements set forth in clauses (i) through (iii) below shall be a condition precedent to any such authorization:

5

A&R Note - GVA ABL/ MKA

(i)     the disbursed funds are being used by the Issuer to fund a Protective Advance;

(ii)    the Administrative Agent receives a request substantially in the form of the specimen attached hereto as Annex A, which request shall be provided three (3) calendar days prior to the date the Issuer desires the relevant funds to be disbursed; and

(iii)   no Event of Default shall have occurred or would be reasonably likely to occur with the passage of time after giving effect to such Requested Disbursement.

For the avoidance of doubt, (A) with respect to Requested Disbursements related to Lender Commitments and/or Permitted Expenses, the Administrative Agent shall not be required to authorize a disbursement from the Custody Account with respect to any Requested Disbursement unless all three (3) conditions set forth in clauses (i) through (iii) above shall have been satisfied and (B) with respect to Requested Disbursements related to Protective Advances, the Administrative Agent shall have no obligation to authorize a disbursement from the Custody Account.

With respect to clauses (x)(ii) and (y)(ii), in exigent circumstances outside of the Issuer's reasonable control, the relevant request may be provided with less time in advance of the date the Issuer desires for the funds to be disbursed and the Administrative Agent shall not unreasonably withhold its consent with respect to authorizing the relevant disbursement of funds.

(b)     The Issuer acknowledges and agrees that the Administrative Agent is authorized to instruct the Bank to make the following disbursement of funds (the "Disbursements") to an account designated by the Administrative Agent (the "Gottex Account"), on the tenth (10th) day of each month: all amounts credited to the Custody Account in excess of the sum of (i) $750,000 and (ii) any amounts authorized to be disbursed pursuant to a Requested Disbursement and not yet disbursed, as of such tenth (10th) day.

(c)     The Disbursements shall be applied to the amounts outstanding under the Notes in the following order:

(1)     to any outstanding expenses and indemnities payable by the Issuer under the Notes or any other Note Agreement; and

(2)     then, to any accrued but unpaid interest under the Notes.

(d)     To the extent that there are any Unallocated Disbursements, the Unallocated Disbursements shall be reserved by the Administrative Agent for application in accordance with clauses (c)(1) and (c)(2) above (the "Reserved Unallocated Disbursements"), except that any portion of such Reserved Unallocated Disbursements

6

A&R Note - GVA ABL/ MKA

that has been reserved for more than sixty-one (61) days (the "Unreserved Unallocated Disbursements") will be applied toward the principal due under the Notes.

For illustration purposes only, assume that:

(1)   all interest required to paid through April 2008 was paid on or prior to the applicable Interest Payment Date;

(2)   monthly interest is always $750,000;

(3)   during the month of May 2008, a total of $1,400,000 in Disbursements has been paid, and $0 in indemnities and expenses were incurred, leaving $650,000 in Reserved Unallocated Disbursements from May 2008 (which becomes Unreserved Unallocated Disbursements applicable toward principal in August 2008);

(4)   during the month of June 2008, a total of $850,000 in Disbursements has been paid, and $0 in indemnities and expenses were incurred, leaving $100,000 in Reserved Unallocated Disbursements from June 2008 (which becomes Unreserved Unallocated Disbursements applicable toward principal in September 2008);

(5)   during the month of July 2008, a total of $550,000 in Disbursements has been paid, and $20,000 of indemnities and expenses has been incurred, resulting in a shortfall of $220,000 with respect to the $750,000 in interest due for July 2008; and

(6)   during the month of August 2008, a total of $450,000 in Disbursements has been paid and $0 in indemnities and expenses has been incurred, resulting in a shortfall of $300,000 with respect to the $750,000 in interest due for August 2008.

Under this example:

(A)   the $650,000 in Reserved Unallocated Disbursements from May 2008 is applied against the $220,000 shortfall for July 2008, leaving $430,000 of Reserved Unallocated Disbursements from May 2008;

(B)   in August 2008, the $430,000 in Reserved Unallocated Disbursements from May 2008 becomes $430,000 in Unreserved Unallocated Disbursements and is applied toward the principal due under the Notes;

(C)   the $430,000 in now Unreserved Unallocated Disbursements from May is not available to cover the $300,000 shortfall in August 2008;

(D)   the $100,000 in Reserved Unallocated Disbursements from June 2008 is applied to the $300,000 shortfall in August 2008, leaving $200,000 outstanding for August 2008; and

7

(E)      the Issuer must make a cash payment of $200,000 to cover the shortfall for August 2008 on the applicable Interest Payment Date.

(e)      Whenever any payment under any Note would be due or is otherwise payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day, and such extension of time shall in such case be included in the computation of the payment of interest.

(f)      Within five (5) Business Days following each payment or Disbursement, the Administrative Agent shall provide to the Issuer a written statement (the "Disbursement Report") reflecting the application of such payments by the Administrative Agent in accordance with this Section 4.  In addition to information regarding application of such payments, the Disbursement Report shall include the amount of Unallocated Distributions and an aging report for such Unallocated Distributions.

## 5.      Events of Default.

If any of the following events ("Events of Default") shall occur and be continuing:

(a)      the failure by the Issuer to pay this Note on or before December 1, 2008;

(b)      subject to the Disbursement Procedures, the failure to pay interest hereunder when due and such failure remains unremedied for five (5) Business Days following the date notice of such failure shall have been provided by the Administrative Agent to the Issuer;

(c)      the failure by the Administrative Agent to receive any Substantive Information when required to be delivered and such failure remains unremedied for ten (10) Business Days following the date notice of such failure shall have been provided by the Administrative Agent to the Issuer;

(d)      the failure by the Issuer to comply with Section 2 or Section 3 of the Waiver Agreement;

(e)      the incurrence by the Issuer of any Debt that is ranked senior to or pari passu with the Debt incurred pursuant to this Note without the prior written consent of the Administrative Agent;

(f)      subject to section 4 of the Waiver Agreement, the failure by the Administrative Agent, as agent for the Noteholder, at any time to have a continuously

8

perfected first priority Lien on and security interest in the Collateral subject to no other Lien;

(g)     the Issuer shall grant or permit any further security interest or Lien or encumbrance of any kind upon all or any portion of the Collateral except for (a) the Bank's contractual right of set-off and Lien as set out in the Custody Agreement appointing Alliance Bank as Bank of the Issuer, which right shall be capped at 5% of the net asset value of the Issuer and (b) Liens imposed by applicable law for taxes that are not yet due or are being contested in good faith by appropriate proceedings;

(h)     the Issuer shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against the Issuer seeking to adjudicate it bankrupt or insolvent, or seeking liquidation, dissolution, winding-up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property and assets and, in the case of any such proceeding instituted against the Issuer, such proceeding shall remain undismissed or unstayed for a period of 30 days; or the Issuer shall take any limited liability company action to authorize any of the actions set forth above in this clause (i);

(i)     any judgment or order for the payment of money in excess of $7,000,000 shall be rendered against the Issuer and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order which shall not have been stayed or dismissed within 30 days after the commencement of such proceedings or (ii) there shall be any period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(j)     a Collateral Breach shall occur and such breach remains unremedied for ten (10) Business Days following the date notice of such breach shall have been provided by the Administrative Agent to the Issuer;

(k)     the Issuer shall fail to provide to the Administrative Agent the 2006 audit by July 15, 2008;

(l) the Issuer shall fail to provide to the Administrative Agent the 2007 audit by August 15, 2008;

(m)     any representation or warranty by the Issuer herein shall be incorrect in any material respect when made or deemed made;

9

(n)     (i) except with respect to Section 9(c), the Issuer shall fail to perform or observe any term, covenant or agreement herein or under any other Note Agreement, and in each case such failure remains unremedied for ten (10) Business Days following the date notice of such failure shall have been provided by the Administrative Agent to the Issuer or (ii) the Issuer shall fail to comply with Section 9(c);

(o)     the Issuer shall fail to receive on or prior to the date that is thirty (30) days from the date hereof, a report prepared by the Valuation Agent setting forth the Value of each Loan and each piece of real property owned by the Issuer as of December 31, 2007;

(p)     the Issuer shall fail to receive on or prior to the date that is thirty (30) days from September 30, 2008, a report prepared by the Valuation Agent setting forth the Value of each Loan and each piece of real property owned by the Issuer as of June 30, 2008;

then, and in any such event, the Administrative Agent may, by written notice to the Issuer declare the principal amount outstanding hereunder, all accrued interest thereon, all fees and all other accrued amounts payable under this Note and the other Note Agreements to be forthwith due and payable, whereupon the principal amount outstanding hereunder, all such interest and fees and all such other amounts hereunder and under the other Note Agreements shall be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Issuer provided, however, that upon the occurrence of any event in clauses (h) or (i) above, the principal amount outstanding hereunder, all accrued interest and all accrued other amounts payable, including fees, under this Agreement and under the other Note Agreements shall automatically become and be due and payable, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Issuer.

No failure on the part of the Noteholder or the Administrative to exercise, and no delay in exercising, any right hereunder, under this Note shall operate as a waiver thereof nor shall the single or partial exercise, of any such right preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.  No notice to or demand on the Issuer in any case shall entitle the Issuer to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Noteholder or the Administrative Agent to any other or further action in any circumstance without notice or demand.

6.     <u>**Representations and Warranties of the Issuer**</u>.

As of the date hereof, the Issuer represents and warrants to the Noteholder as follows:

10

(a)     The Issuer (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation and (ii) is duly qualified as a foreign limited liability company in each other jurisdiction in which it owns or leases property or in which the conduct of its business requires it to so qualify or be licensed and where, in each case, failure to so qualify and be in good standing could have a Material Adverse Effect.

(b)     The execution, delivery and performance by the Issuer of this Note is within its limited liability company powers, has been duly authorized by all necessary limited liability company action, and does not (i) contravene the Issuer's organizational documents, (ii) contravene any contractual restriction binding on it, (iii) require any consent under any agreement or instrument to which it is a party or by which any of its properties or assets is bound, (iv) result in or require the creation or imposition of Lien upon any property or assets of the Issuer other than Liens permitted hereunder or (v) violate any law, writ, judgment, injunction, decree, determination or award.  The Issuer is not in violation of any such law, writ, judgment, injunction, decree, determination or award or in breach of any contractual restriction binding upon it, except for such violation or breach which would not have a Material Adverse Effect.

(c)     No order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption or waiver by, any governmental authority or any other third party (except as have been obtained or made and are in full force and effect), is required to authorize, or is required in connection with, (i) the execution, delivery and performance by the Issuer of this Note or (ii) the legality, validity, binding effect or enforceability of this Note.

(d)     This Note when delivered for value hereunder will be legal, valid and binding obligations of the Issuer enforceable against the Issuer in accordance with its respective terms in all respects.

(e)     The Issuer is not required to register as an "investment company," and is not a person "controlled by" an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended.

(f)     All information with respect to the Issuer (i) provided by or on behalf of the Issuer, to the Noteholder or the Administrative Agent in connection with the negotiation, execution and delivery of this Note, including, without limitation, any financial statements of the Issuer provided to the Noteholder, or (ii) provided or to be provided by the Issuer in any offering document of the Issuer (except as to information about the Noteholder furnished by it specifically for inclusion therein) was or will be, on or as of the applicable date of provision thereof complete and correct in all material respects and did not (or will not) contain any untrue statement of a material fact or omit

11

to state a fact necessary to make the statements contained therein not misleading in light of the time and circumstances under which such statements were made.

(g)    All licenses, permits, approvals, concessions or other authorizations necessary to the conduct of the business of the Issuer have been duly obtained and are in full force and effect other than those where the failure to obtain and maintain any of the foregoing would not have a Material Adverse Effect.   There are no restrictions or requirements which limit the Issuer's ability to lawfully conduct its business or perform its obligations under this Note.

(h)    With respect to each Loan owned by the Issuer as of the date hereof, the Issuer shall have delivered to the Administrative Agent a complete Loan Package.

(i)    With respect to any real property owned by the Issuer as of the date hereof, the Administrative Agent shall have received a complete Property Package.

**7.    Security Interest**.

This Note shall constitute a secured obligation of the Issuer in accordance with the Security Agreement.

**8.    Affirmative Covenants.**

So long as any amounts hereunder remain unpaid, the Issuer covenants and agrees that:

(a)    The Issuer shall maintain its limited liability company existence.   The Issuer shall comply with all applicable laws.

(b)    All Proceeds of the Collateral will be deposited into the Custody Account.

(c)    The Issuer shall keep proper books of record and accounts as are necessary to prepare financial statements in accordance with U.S. GAAP.

(d)    The Issuer shall notify the Administrative Agent, as soon as reasonably practicable, if an event occurs that results in the revocation, suspension or termination of any license, permit or approval held by any other fund managed by the Manager.

(e)    The Issuer shall remain principally engaged in its business as conducted by it as of the date hereof.

(f)    The Issuer shall furnish, or shall cause same to be furnished, to the Noteholder and the Administrative Agent: (i) as soon as available and in any event within ninety (90) days after the end of each fiscal year of the Issuer, its unaudited annual consolidated financial statements, including all notes thereto, which statements shall

12

include a consolidated statement of financial position as of the end of the relevant fiscal year and statement of operations and a statement of cash flows for such fiscal year, all setting forth in comparative form the corresponding figures from the previous fiscal year, all prepared in conformity with U.S. GAAP, accompanied by a certificate of the chief financial officer of the Issuer which shall state that said consolidated financial statements fairly present the consolidated financial condition and results of operations of the Issuer as of the end of, and for, such period, and a report setting forth each asset of the Issuer and the applicable NAV (as defined below) thereof; (ii) as soon as available and in any event within 30 days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Issuer, its unaudited quarterly consolidated financial statements, which statements shall include the consolidated statement of financial position as of the end of the relevant quarterly fiscal period and statement of operations and statement of cash flows for such quarterly fiscal period, all setting forth in comparative form the corresponding figures from the corresponding quarterly fiscal period in the previous fiscal year, all prepared in conformity with U.S. GAAP, accompanied by a certificate of the chief financial officer of the Issuer which shall state that said quarterly consolidated financial statements fairly present the consolidated financial condition and results of operations of the Issuer as of the end of, and for, such period (subject to footnotes and ordinary year-end adjustments), and a report setting forth each asset of the Issuer and the applicable NAV thereof; and (iii) any and all documents, instruments, filings or agreements received in connection with any Loan or piece of real property owned by the Issuer (including, but not limited to, all amendments, supplements or other modifications made to any document or agreement in a Loan Package or a Property Package).  The Issuer shall furnish to the Noteholder and the Administrative Agent, at the time it furnishes its financial statements, a certificate of an authorized officer of the Issuer that no Event of Default (as defined below) has occurred and no event has occurred and is continuing which with the lapse of time or the giving of notice or both would constitute an Event of Default.

(g)     The Issuer shall furnish, or shall cause the same to be furnished, to the Noteholder and the Administrative Agent:

(i) not later than 60 days after the end of each calendar quarter, the NAV Calculation; and

(ii) within 5 calendar days of the end of each month, a statement setting forth the principal amount of all Notes outstanding and all accrued and unpaid interest thereon as of such date.

(h)     The Issuer shall furnish to the Noteholder and the Administrative Agent promptly after request therefor, such other business and financial information respecting the condition or operations, financial or otherwise, of the Issuer as the Noteholder or the Administrative Agent may from time to time reasonably request.

13

(i)     No later than the last Business Day of each month, the Issuer shall provide to the Administrative Agent the following reports with respect to the last Business Day of the immediately preceding month:

(i)     a list (the "Loan List") of all Loans;

(ii)     with respect to each Loan, a statement setting forth (a) the outstanding principal amount thereunder, (b) the accrued and unpaid interest thereunder, (c) the amount of any undrawn commitment made by the Issuer with respect to such Loan and (d) an estimated reserve for uncollectible amounts with respect to such Loan, if any;

(iii)     a list of all Impaired Loans;

(iv)     a statement of all redemption requests submitted to the Issuer and MKA Real Estate Opportunity Fund, Ltd.; provided, that such statement shall not include the identities of the relevant member or shareholder or any other confidential information with respect to the relevant member or shareholder, as applicable;

(v)     a statement setting forth all Debts of the Issuer and MKA Real Estate Opportunity Fund, Ltd., the scheduled payment dates for such Debts and the maturity dates for such Debts;

(vi)     monthly unaudited financial statements, including a balance sheet, income statement and cash flow statement for the Issuer and MKA Real Estate Opportunity Fund, Ltd.;

(vii)     a certification from the Manager of the Issuer that all representations and warranties in the Notes are true and correct and that the Issuer is in compliance with each covenant in the Notes; and

(viii)     as soon as possible and in any event within two (2) days after the Issuer obtains actual knowledge of the occurrence of any actual litigation against the Issuer, the Manager or MKA Real Estate Opportunity Fund, Ltd., a statement of the Manager setting forth the details thereof and the action which the Issuer, the Manager or MKA Real Estate Opportunity Fund, Ltd., as applicable, has taken and proposes to take with respect thereto.

14

(j)     The Issuer shall cause the Bank to provide to the Administrative Agent (via e-mail to amy.lai@gottexfunds.com and Gustavo.Dominguez@gottexfunds.com) a daily account statement with respect to the Custody Account.

(k)     If after the date hereof the Issuer appoints an auditor other than Rothstein Kass, the Issuer shall, within three (3) Business Days' of such appointment, deliver a copy of an executed engagement letter between the Issuer and such auditor evidencing that such auditor has been retained as auditor to the Issuer together with (if such information is not in the engagement letter) documentation setting forth the scope of the duties of such auditor with respect to its engagement with respect to the Issuer.

9.     **Negative Covenants**.

So long as any amounts hereunder remain unpaid, the Issuer covenants and agrees that:

(a)     The Issuer shall not change its fiscal year or its method of accounting as in effect on the date hereof.

(b)     (i) The Issuer shall not appoint a custodian other than Alliance Bank without the prior written consent of the Administrative Agent and (ii) the Issuer shall not appoint an auditor other than Rothstein Kass, PricewaterhouseCoopers; Deloitte; Ernst & Young; or KPMG without the prior written consent of the Administrative Agent, such consent not to be unreasonable withheld.

(c)     The Issuer shall not (i) declare or make any dividend payment or other distribution of assets, property, cash, rights, obligations or securities on account of any equity interests in the Issuer, or purchase, redeem, retire or otherwise acquire for value any equity interests in the Issuer unless the Issuer shall have received the prior written consent of the Administrative Agent or (ii) without duplication, make (or authorize or otherwise permit the making of) any distribution, payment, disbursement or dividend of any kind, from cash in the Custody Account or otherwise, to any Person other than the Administrative Agent without the prior written consent of the Administrative Agent.

(d)     The Issuer shall not merge or consolidate with or into, or convey, transfer, lease or otherwise dispose of, whether in one transaction or in a series of transactions, all or substantially all of the property and assets (whether now owned or hereafter acquired) of the Issuer to, any Person.

10.     **Amendments.**

Neither this Note nor any provision hereof may be waived, amended or modified, except pursuant to an agreement or agreements in writing entered into by the Issuer and the Noteholder.

15

11.    **Notices**

     All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, sent by facsimile or sent by electronic mail as follows:

     If the notice is to the Issuer, such address is:

Gregory Contillo, President
MKA Real Estate Opportunity Fund I, LLC
c/o MKA Capital Group Advisors LLC
26 Corporate Plaza, Suite 250
Newport Beach, CA 92660
Telephone:  (949) 729 - 1660
Facsimile:  (949) 729 – 1665
E-mail: gcontillo@mkacap.com

with a copy to:

Van C. Durrer, II, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071
Telephone: (213) 687-5200
Facsimile: (213) 621-5200
E-mail: van.durrer@skadden.com

With a copy to:

Daniel D. White
26 Corporate Plaza Drive, Suite 260
Newport Beach, CA 92660
Telephone: (949) 729-9119
E-mail: dan@ddwlaw.com

     If the notice is to the Noteholder, such address is:

GVA ABL Portfolio Limited
Gottex Fund Management Sarl
Avenue de Rhodanie 48
Lausanne 1007
Switzerland
Attention: William H. Woolverton, General Counsel
Telephone:  (617) 532 - 0202
Facsimile:  (617) 532 - 0219
E-mail: william.woolverton@gottexfunds.com

16

with a copy to the Administrative Agent at:

Gottex Fund Management Ltd.
One International Place
14th Floor
Boston, MA 02110
Attention:  William H. Woolverton, General Counsel
Telephone:  (617) 532 - 0202
Facsimile:  (617) 532 - 0219
E-mail: william.woolverton@gottexfunds.com


with a copy to:

Stuart Richter, Esq.
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone:  (310) 788-4582
Facsimile:  (310) 712-8434
E-mail: stuart.richter@kattenlaw.com


Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile or electronic mail shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, such notice shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  The Issuer, the Noteholder and the Administrative Agent may change its address, e-mail address or facsimile number for notices and other communications hereunder by notice to the other in the same manner as described herein.

12.    **Enforcement.**

In the case any one or more of the Events of Default specified herein shall have occurred and be continuing, the Noteholder may proceed to protect and enforce its rights either by suit in equity and/or by action at law, whether for the specific performance of any covenant or agreement contained herein or may proceed to enforce the payment of all sums then due (whether by acceleration or otherwise) hereunder or to enforce any other legal or equitable right of the Noteholder.  If an Event of Default shall have occurred and is continuing and the Noteholder shall (or the Administrative Agent on its behalf shall), in the exercise of its rights hereunder, retain attorneys, or incur other costs and expenses for the collection of payments due or to become due, or for the enforcement or performance or observance of any obligation or agreement of the Issuer hereunder, the Issuer shall pay to the Noteholder or the Administrative Agent, as applicable, on demand the reasonable fees of such attorneys together with all other costs and expenses incurred by the Noteholder and the Administrative Agent.

13.    **Governing Law.**

A&R Note - GVA ABL/ MKA

This Agreement shall be governed by, and construed in accordance with, the laws of the State of California, without giving effect to its conflict of laws provisions other than Section 1646.5 of the California Civil Code.

14. **Submission to Jurisdiction.**

THE ISSUER AND THE NOTEHOLDER CONSENT TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE OF CALIFORNIA. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS NOTE MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT SITTING IN LOS ANGELES, CALIFORNIA, AND EACH OF THE ISSUER AND THE NOTEHOLDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE NON-EXCLUSIVE JURISDICTION OF THOSE COURTS.

15. **Waiver of Venue.**

The Issuer and the Noteholder irrevocably and unconditionally waive, to the fullest extent permitted by applicable law, any objection that they may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Note in any court referred to in the Section 14. The Issuer and the Noteholder hereby irrevocably waive, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such Court.

16. **Service of Process.**

The Issuer and the Noteholder irrevocably consent to service of process in the manner provided for in Section 11. Nothing in this Agreement will affect the right of the Noteholder or the Issuer to serve process in any other manner permitted by applicable law.

17. **Waiver of Jury Trial.**

THE ISSUER AND THE NOTEHOLDER HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY, ARISING OUT OF OR RELATING TO THIS NOTE (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). THE ISSUER AND THE NOTEHOLDER (A) CERTIFY THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OR ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGE THAT THEY HAVE BEEN INDUCED TO ISSUE  THIS NOTE BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED HEREIN.

18. **Right of Set-off.**

If an Event of Default shall have occurred and be continuing, the Noteholder is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set-off and apply any and all amounts held by a Noteholder at any time owing by the Noteholder to or for the credit or the account of the Issuer against any and all of the obligations of the Issuer

18

now or hereafter existing under this Note to the Noteholder, irrespective of whether or not the Noteholder shall have made any demand under this Note and although such obligations of the Issuer may be contingent or unmatured. The rights of the Noteholder under this Section are in addition to other rights and remedies (including other rights of setoff) that the Noteholder may have. The Noteholder agrees to notify the Issuer in writing prior to the application of any such set-off, provided that the failure to give such notice shall not affect the validity of such set-off and application.

19.    **Assignment.**

This Note and the obligations of the Issuer hereunder may not be assigned or delegated by the Issuer without the prior written consent of the Noteholder. This Note and the Noteholder's rights hereunder may be assigned without the Issuer's consent in accordance with Section 23. Whenever in this Note reference is made to the Noteholder or the Issuer, such reference shall be deemed to include, as applicable, a reference to their respective successors and permitted assigns. The provisions of this Note shall be binding upon and shall inure to the benefit of such successors and assigns. The Issuer's successors and assigns shall include, without limitation, a receiver, trustee, or debtor in possession of or for the Issuer.

Subject to Section 23, if in connection with any purchase by a third party of the Note, Noteholder receives the unpaid principal amount outstanding hereunder, together with all accrued and unpaid interest thereon and all other amounts payable to the Noteholder hereunder and under the other Note Agreements, Noteholder shall, at no cost to Noteholder, take any and all steps reasonably necessary to assign this Note to such third party purchaser, including, without limitation, delivering such documents as are reasonably necessary or appropriate to effect such assignment of the Note, provided however, that such assignment shall be on an as is, where is basis and without recourse to Noteholder, and Noteholder shall not incur any liability in connection with such assignment, or be required to make any representations or warranties (other than customary warranties of due authorization and no encumbrance of title to such note) to any assignee, Issuer, or any other third party in connection with such assignment.

20.    **Severability.**

In case any provision in this Note shall be held to be invalid, illegal or unenforceable, such provision shall be severable from the rest of this Note, as the case may be, and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

21.    **Counterparts; Integration.**

This Note may be executed in counterparts, each of which shall constitute an original, and all of which when taken together shall constitute a single contract. This Note (together with the Waiver Agreement and the Security Agreement) constitutes the entire contract among the parties relating to the subject matter hereof. Except as expressly set forth in Section 5 of the Waiver Agreement, this Note completely restates, amends and supersedes those certain Amended and Restated Promissory Notes made by Issuer in favor of Noteholder dated April 12,

2006 and June 30, 2006, and all other previous agreements and understandings, oral or written, relating to the subject matter hereof.

### 22.    Registered Instrument.

This Note is a registered instrument and is not a bearer instrument. This Note is registered as to both principal and interest with the Issuer and all payments hereunder shall be made to the named Noteholder or, in the event of a transfer pursuant to Section 23, to the transferee identified in the record of ownership of this Note maintained by the Noteholder on behalf of the Issuer. Transfer of this Note may not be effected except in accordance with the provisions of Section 23.

### 23.    Transfer.

(a)    If this Note is held by or assigned or transferred to a noteholder that is not a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended from time to time (the "Code"), then (x) all interest accrued and paid on this Note will qualify for exemption from United States withholding tax as "portfolio interest" because this Note is an obligation which is in "registered form" within the meaning of Sections 871(h)(2)(B) and 881(c)(2)(B) of the Code, and the applicable Treasury Regulations promulgated thereunder, and (y) as such, all interest accrued and paid on this Note will be exempt from United States information reporting under Sections 6041 and 6049 of the Code and United States backup withholding under Section 3406 of the Code. In furtherance of the foregoing, the Issuer shall require that any such transferee or assignee noteholder that is not a United States person shall represent, warrant and covenant to the Issuer that (i) such noteholder is not, and will not be as long as any amounts due under this Note have not been paid in full, a "United States person," within the meaning of Section 7701(a)(30) of the Code; (ii) such noteholder is not, and will not be as long as any amounts due under this Note have not been paid in full, a person described in Section 881(c)(3) of the Code; (iii) on or prior to the date of transfer or assignment and on or prior to each anniversary of such date until all amounts due under this Note have been paid in full, such noteholder shall provide the Issuer with a properly executed U.S. Internal Revenue Service ("IRS") Form W-8BEN, Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding (or any successor form prescribed by the IRS), certifying as to such noteholder's status for purposes of determining exemption from United States withholding tax, information reporting and backup withholding with respect to all payments to be made to such noteholder hereunder; (iv) if an event occurs that would require a change in the exempt status of such noteholder or any of the other information provided on the most recent IRS Form W-8BEN (or successor form) previously submitted by such noteholder to the Issuer hereunder, such noteholder will so inform the Issuer in writing (or by submitting to the Issuer a new IRS Form W-8BEN or successor form) within 30 days after the occurrence of such event; and (v) such noteholder will not assign or otherwise transfer this Note or any of its rights hereunder except in accordance with the provisions of the paragraph below.

(b)    Transfer of this Note may be effected only by (i) surrender of this Note to the Issuer and the re-issuance of this Note to the transferee, or the Issuer's issuance to the Noteholder of a new note in the same form as this Note but with the transferee denoted as the Noteholder, or (ii) the recording by the Administrative Agent of the identity of the transferee in a

20

record of ownership of this Note maintained by the Administrative Agent on behalf of, and as agent to, the Issuer.  The terms and conditions of this Note shall be binding upon and inure to the benefit of the Issuer and the Noteholder and their permitted assigns; provided, however, that if any such assignment (whether by operation of law, by way of transfer or participation, or otherwise) is to any noteholder that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code, then such noteholder shall submit to the Issuer on or before the date of such assignment an IRS Form W-8BEN (or any successor form) certifying as to such noteholder's status for purposes of determining exemption from United States withholding tax, information reporting and backup withholding with respect to all payments to be made to such noteholder under the new note (or other instrument).  Any attempted transfer in violation of this Section 23 shall be void and of no force and effect.  Until there has been a valid transfer of this Note and of all of the rights hereunder by the Noteholder (or the Administrative Agent on its behalf) in accordance with this Section 23, the Issuer shall deem and treat the Noteholder as the absolute beneficial owner and holder of this Note and of all of the rights hereunder for all purposes (including, without limitation, for the purpose of receiving all payments to be made under this Note).

24.   **Indemnification**.

The Issuer hereby agrees to indemnify the Administrative Agent, the Noteholder, their respective affiliates and their respective partners, directors, officers, employees, agents and advisors (each such person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable fees, charges and disbursements of any counsel for any Indemnitee whether incurred in any action or proceeding between the parties or otherwise) incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Issuer or any affiliate, partner, director, officer, employee, agent or advisor of the Issuer arising out of, in connection with, or as a result of (a) the execution or delivery of this Note, any other Note Agreement or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (b) any purchase or issuance of a Note or the use or proposed use of the proceeds therefrom, or (c) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Issuer or any affiliate, partner, director, officer, employee, agent or advisor of the Issuer, and regardless of whether any Indemnitee is a party thereto, provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) result from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by the Issuer or any affiliate, partner, director, officer, employee, agent or advisor of the Issuer against an Indemnitee for any material breach of such Indemnitee's obligations hereunder or under any Note.  The provisions of this Section 24 shall survive the repayment of the amounts owed to the Noteholder hereunder and the termination of the other Note Agreements.

*[Remainder of page intentionally left blank; signature page to follow]*

21

A&R Note - GVA ABL/ MKA

IN WITNESS WHEREOF, the undersigned has executed this Note as of the date first set forth above.

MAKER:

MKA REAL ESTATE OPPORTUNITY FUND I,
LLC, a California limited liability company

By:     Its Manager, MKA Capital Advisors, LLC,
        a California limited liability company

By:     _Michael A. Abraham_

~~Gregory Contillo~~ Michael A. Abraham
~~President~~ Chairman of the Board

22

**Ex. 08, p. 191**

## Annex A

See Attached

Ex. 08, p. 192

MKA RE Opportunity Fund I, LLC
Cash Account analysis
Effective Date

| | | | |
|---|---|---|---|
| Checking Balance | $ | - | Effective Date |
| MM Balance | $ | - | Effective Date |
| Escrow Balance | $ | - | Effective Date |
| Less Open pre-approved balance | $ | - | Effective Date   From Alliance Bank |
| Other | $ | - | |
| | | | |
| Available Cash | $ | - | |

| | | | |
|---|---|---|---|
| Proposed Wire to Gottex | $ | - | * |
| Builder Draws (Detail Below) | $ | - | * |
| Builder Loan Fees (Detail Below) | $ | - | * |
| Open A/P (Detail Below) | $ | - | * |
| Other | $ | - | * |
| Remaining | $ | - | $750,000  Sweep over this amount |
| | | | |
| *Net requested cash release | $ | - | |

**Builder Draws**


**Builder Loan/Management Fees**


**Open A/P**

| Monthly Legal/Audit Recap | |
|---|---|
| | |
| Max | $  300,000 |
| Available | $  300,000 |

**Other**

Ex. 08, p. 193

## Schedule I

"Loan Package" means, with respect to each Loan, (i) all negotiable promissory notes, if any (ii) copies of the relevant (1) loan agreement, if any, (2) security agreement and all documents executed or filed in connection therewith, (3) deed of trust or mortgage, (4) fully executed Assignment of deed of trust or mortgage substantially in the form of Exhibit A hereto (each, an "Assignment"), (5) title insurance policy on the relevant deed of trust or mortgage, and (6) all amendments, modifications, and extensions of the foregoing and such other documents and agreements as the Administrative Agent may reasonably request, (iii) evidence that the lien granted to the Administrative Agent on the mortgage or deed of trust, as the case may be, has been recorded in the relevant county title office and (iv) copies of all assignment of leases and rents, guaranties and indemnities (completion guaranties, guaranties of principal and/or interest and/or other financial issues, environmental indemnities, so-called bad-boy or non-recourse carveout guaranties), relevant opinions (including non-consolidation, single purpose entity opinions and enforceability opinions), cash management agreements, rate cap agreements and pledges thereof, UCC financing statements, closing statements and certificates, any other documents, certificates or other agreements executed in connection with the foregoing, if any

"Property Package" means, with respect to each piece of real property owned by the Issuer, (i) copies of the relevant (1) grant deed, (2) title insurance policy on the relevant grant deed, and (3) all amendments, modifications, and extensions of the foregoing and such other documents and agreements as the Administrative Agent may reasonably request, (ii) evidence that the grant deed has been recorded in the relevant county title office and (iii) copies of all ground leases, leases, contracts, construction contracts, architects contracts and other related documents, closing statements and certificates, and any other documents, certificates or other agreements executed in connection with the foregoing, if any.

Exhibit A

RECORDING REQUESTED BY:

WHEN RECORDED MAIL TO:

_____

_____

_____

Attention: _____

_____

*SPACE ABOVE LINE FOR RECORDER'S USE*

ASSIGNMENT OF DEED OF TRUST

      FOR VALUE RECEIVED, the undersigned MKA Real Estate Opportunity Fund I, LLC ("Assignor") hereby grants, transfers and assigns to Gottex Fund Management Ltd. ("Assignee"), as agent for each of GVA ABL PORTFOLIO LIMITED, GOTTEX ABL (CAYMAN) LIMITED and GOTTEX ABI MASTER FUND LIMITED, all beneficial interest under that certain [Deed of Trust and Assignment of Rents, Security Agreement and Fixture Filing] (the "Deed of Trust"), dated _____, 2006, executed by _____, as Trustor ("Trustor"), in favor, of _____, as Trustee, and _____, as Beneficiary, covering the land described in Annex "A" attached hereto and incorporated herein by this reference, and recorded on _____, 2008, as Instrument No. _____ in the Official Records of the County Recorder's office of _____ County, California, TOGETHER WITH the note or notes described or referred to in the Deed of Trust and all other obligations secured thereby, all money due and to become due thereon with interest, and all rights accrued or to accrue under the Deed of Trust.

      Assignor represents and warrants to Assignee as follows:

      ARTICLE I.  Assignor has the right, power and authority, and has taken all action necessary, to assign the Deed of Trust to Assignee pursuant to this Assignment;

      ARTICLE II.  The Deed of Trust has not been supplemented, amended, modified, terminated, released or cancelled nor has Assignor waived any of its rights thereunder;

      ARTICLE III.  Except with respect to the assignment by Assignor in favor of Alliance Bank, Assignor owns the entire interest of the beneficiary under the Deed of Trust free

1-25

A&R Note - GVA ABL/ MKA

and clear of any claim or interest of any kind whatsoever (whether present or contingent, conditional or unconditional, choate or inchoate) by any other party, whether by encumbrance, pledge, assignment, participation, option or otherwise;

ARTICLE IV.  Assignor is not in default of any of its obligations under the Deed of Trust; and

ARTICLE V.  To the best knowledge of Assignor, Trustor is not in default of any of its obligations under the Deed of Trust and does not have any defense, claim, offset or counterclaim to the enforcement of its obligations thereunder.

This Assignment (i) shall be binding on Assignor and its successors and assigns and shall inure to the benefit of Assignee and its successors and assigns, (ii) shall be governed by the law of the State of California and (iii) may not be modified orally, but only by a writing executed by Assignor and Assignee.

Dated:  _____, 200[ ]


                                        _____

                                        By: _____
                                            Title: _____

                                        By: _____
                                            Title: _____


1-26

Annex "A" to
Assignment of Deed of Trust

LEGAL DESCRIPTION OF LAND

A&R Note - GVA ABL/ MKA

**Ex. 08, p. 197**

**[Confirm with Title Company]**

STATE OF   _____        }
                                  }ss.

COUNTY OF _____        }

On _____, before me, _____ personally appeared, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.        *This area for official notarial seal*

Signature_____

My Commission Expires: _____

1-28

**Ex. 08, p. 198**

# EXHIBIT 9

## MODIFICATION AGREEMENT

This Modification Agreement ("Agreement") is made and entered into as of December __, 2008, by and among MKA Real Estate Opportunity Fund I, LLC, a California limited liability company (the "Issuer"), and MKA Capital Group Advisors, LLC, a California limited liability company (the "Manager"), on the one hand, and Gottex ABI Master Fund Limited, a Cayman Islands exempted company ("Gottex ABI"), Gottex ABL (Cayman) Limited, a Cayman Islands exempted company ("ABL (Cayman)"), GVA ABL Portfolio Limited, a British Virgin Islands company ("GVA ABL"), Hudson ABL Fund Limited, a Cayman Islands exempted company ("Hudson") (collectively, the "Noteholders") and Gottex Fund Management, Ltd. ("Administrative Agent" and, collectively with the Noteholders, "Gottex"), on the other.

## RECITALS

WHEREAS, on April 1, 2008, Issuer, Manager, Noteholders and Administrative Agent entered into that certain Waiver Agreement ("Waiver Agreement") pursuant to which, inter alia, the parties resolved certain disputes and entered into certain amended and restated promissory notes (collectively, "New Notes").

WHEREAS, the New Notes were modified pursuant to the terms of certain Amendments to Amended and Restated Promissory Notes dated as of August 8, 2008 ("First Amendments to Notes"). The New Notes as amended by the First Amendments to Notes, are hereinafter referred to as the "First Amended Notes."

WHEREAS, Gottex ABI, concurrent herewith is executing a Second Amendment to Amended and Restated Promissory Note and each of ABL (Cayman), GVA ABL and Hudson concurrent herewith are executing a Second Amendment to Second Amended and Restated Promissory Note (each, a "Second Amendment to Note"). The New Notes as amended by the First Amendments to Notes and the Second Amendments to Notes, are hereinafter referred to as the "Notes."

WHEREAS, the parties now desire to modify certain terms and provisions of the First Amended Notes, that certain Amended and Restated Security Agreement applicable thereto (as modified, the "Security Agreement") and the Waiver Agreement and related documents all as more particularly described herein;

WHEREAS, capitalized terms referred to herein without definition have the meanings given to them in the Notes, Security Agreement and/or in the Waiver Agreement, as applicable.

NOW, THEREFORE, for and in consideration of the covenant and agreements hereinafter set forth, the receipt of which is hereby acknowledged, and other good and valuable consideration, the parties hereto agree as follows:

31464762_335429-00007

1.  Modification of Waiver Agreement/Lien Rights.

    (a)  The second subparagraph of Paragraph 4 of the Waiver Agreement commencing with "Notwithstanding anything to the contrary. . . ." and ending with ". . .except as set forth below:" is hereby deleted and replaced with the following:

    > "Issuer hereby further agrees that notwithstanding anything to the contrary in this Agreement, the Security Agreement, the New Notes or any other agreement:"

    (b)  The parties hereby agree that upon the Effective Date (as defined below), the Waiver Agreement shall be (i) deemed modified such that any references to the New Notes in the Waiver Agreement shall be deemed to refer to the Notes, and (ii) amended as set forth herein.

2.  Modification of Waiver Agreement/Real Property Collateral.

    Paragraph 4(a) of the Waiver Agreement, commencing with "if, at any time...", is hereby deleted in its entirety and replaced with the following:

    "(a)  As further security for the full and prompt payment and performance and discharge when due (whether at stated maturity, by acceleration or otherwise) of the Secured Obligations (as defined in the Security Agreement), Issuer hereby grants and agrees to grant, as applicable, to Administrative Agent as agent for the Noteholders a first priority security interest in all real property now or hereafter owned by Issuer (including all REO) including without limitation the properties identified on Exhibit E hereto. At least ten (10) business days prior to acquiring any real property whether by purchase (whether or not in connection with a loan made or held by Issuer), foreclosure, deed in lieu or otherwise Issuer shall provide Administrative Agent and Noteholders written notice thereof. Concurrent with the closing of such purchase, foreclosure, deed in lieu or other acquisition, Issuer shall cause the recordation of a first priority deed of trust or mortgage in favor of Administrative Agent as agent for the Noteholders in form and substance acceptable to Noteholders. Upon execution hereof, Issuer shall deliver first priority deeds of trust or mortgages, as applicable, on the REO properties listed on Exhibit A hereto, which shall be in form and substance acceptable to Noteholders. Notwithstanding the foregoing, the "Paulson" deed of trust will be a second priority deed of trust. "

    Exhibit A hereto is hereby added to the Waiver Agreement as modified hereby as Exhibit E.

3.  Modification of Security Agreement.

2

(a)    The following sentence shall be added to the end of the definition of "Custody Account":

"The term "Custody Account" shall include without limitation (i) that certain account at Alliance Bank under Account number_____ and any replacement thereof at Alliance Bank or such other financial institution approved in writing by Gottex in its sole discretion, and (ii) any other custody or bank account established pursuant to the terms of this Agreement as same may be subsequently modified, together with, in each case, all assets from time to time held in or standing to the credit of any such account (or any successor account), and all Proceeds of the foregoing held in any such account (or successor account)."

(b)    The parties hereby agree that (a) upon the Effective Date, the Security Agreement shall be (i) deemed modified such that any references to the New Notes in the Security Agreement shall be deemed to refer to the Notes, and (ii) amended as set forth herein.   On the Effective Date, the parties agree to execute and deliver counterparts to each Second Amendment to Note.  Except as expressly provided below, nothing herein shall be deemed nor construed to impair Gottex's existing liens on the Collateral under the Security Agreement and the terms of the Security Agreement shall remain in full force and effect.

4.    Principal Payments.  Notwithstanding anything to the contrary in the Notes, Security Agreement or other documents executed in connection therewith, Issuer shall make periodic payments of principal ("Principal Payments") under the Notes as follows:

(a)    Subject to subsection (e), on or prior to March 1, 2009 (the "First Principal Payment Date"), Issuer shall make a principal payment of $18,000,000.00 (the "First Principal Payment"), provided that, by written notice delivered to Administrative Agent, Issuer may elect to defer payment of up to a maximum of $8,000,000 from the First Principal Payment (the "First Rollover Amount") to June 1, 2009 (the "Second Principal Payment Date").

(b)    Subject to subsection (e), on or prior to the Second Principal Payment Date, Issuer shall make an additional principal payment of $8,000,000 (the "Second Principal Payment"), plus the First Rollover Amount, if such amount has not already been paid, provided that Issuer may elect to defer payment of up to a maximum of $4,000,000 from the Second Principal Payment (the "Second Rollover Amount") to September 1, 2009 (the "Third Principal Payment Date").  If Issuer elects to defer payment pursuant to 4(a) or 4(b) and the amount deferred is not delivered to Gottex within 30 days after the applicable Principal Payment Date, Issuer acknowledges that (i) Gottex shall have no obligation to allocate the funds to the Preservation Reserve pursuant to any Second Amendment to Note, and (ii) funds that would have otherwise been reserved in the Preservation Reserve shall be delivered to Gottex and applied to repayment of Principal.

31464762_335429-00007

(c)     Subject to subsection (e), on or prior to the Third Principal Payment Date, Issuer shall make an additional principal payment of $10,000,000 (the "Third Principal Payment"), plus the Second Rollover Amount, if such amount has not already been paid.

(d)     On December 1, 2009 (the "Maturity Date"), Issuer shall pay the outstanding principal balance of the Notes, together with all accrued and unpaid interest and all other amounts payable to Gottex under the Notes, Security Agreement, and other documents executed in connection therewith.

(e)     Notwithstanding sections (a)-(c) above, Issuer is permitted to make Principal Payments that are greater than the minimum Principal Payments required pursuant to this Section 4.  To the extent Issuer makes a Principal Payment in excess of the amount required to be made on the applicable Principal Payment Date, then the Principal Payment due on the following Principal Payment Date shall be reduced accordingly, such that, (i)  if on the First Principal Payment Date, Issuer makes a Principal Payment that is greater than the First Principal Payment (the difference being the "Excess First Principal Payment"), then on the Second Principal Payment Date, Issuer may reduce the Second Principal Payment by the Excess First Principal Payment, (ii) if on the Second Principal Payment Date, and provided the First Rollover Amount, if any, has previously been paid in full, Issuer makes a Principal Payment that is greater than the Second Principal Payment (the difference being the "Excess Second Principal Payment"), then on the Third Principal Payment Date, Issuer may reduce the Third Principal Payment by the Excess Second Principal Payment, and (iii) if on the Third Principal Payment Date, and provided the Second Rollover Amount, if any, has previously been paid in full, Issuer makes a Principal Payment that is greater than the Third Principal Payment (the difference being the "Excess Third Principal Payment"), then the outstanding principal balance of the amounts payable to Noteholders shall be reduced by the Excess Third Principal Payment. The parties acknowledge that funds swept from the Custody Account and applied to principal pursuant to the Notes shall be credited toward the then next occurring Principal Payment due pursuant to this Section 4.  The first funds to be credited to the First Principal Payment Date shall be those swept from the Custody Account and applied to principal between the December 1, 2008 and the First Principal Payment Date.

(f)     Issuer acknowledges that the failure to pay (i) any required Principal Payment, subject to the right to defer same pursuant to the foregoing, by the applicable Principal Payment Date, and/or (ii) all of the First Rollover Amount by the Second Principal Payment Date or the Second Rollover Amount by the Third Principal Payment Date, and/or (iii) failure to pay all amounts due as of the Maturity Date shall each constitute an Event of Default under the Notes.

5.     Representations and Warranties. Each of the parties to this Agreement represents and warrants to, and agrees with, each other party hereto, as follows:

4

31464762_335429-00007

(a)  Such party has received independent legal advice from its attorneys with respect to the advisability of making the settlement provided for herein, the advisability of executing this Agreement, and the existence and meaning of section 1542 of the California Civil Code.

(b)  Such party has carefully read, and knows and understands the contents of, this Agreement.  Each party executes this Agreement without fraud, duress, mistake, or undue influence on the part of anyone, including any other party to this Agreement.  No party shall be entitled to set aside or rescind this Agreement on the basis of any claim of fraud, duress, mistake, or undue influence.

(c)  Such party (or any officer, agent, employee, representative, or attorney of or for such party) has not made any statement or representation to any other party regarding any fact relied upon in entering into this Agreement, and such party does not rely upon any statement, representation, or promise of any other party (or of any officer, agent, employee, representative or attorney for any other party) in making and executing this Agreement, except as expressly stated herein.

(d)  Such party has made such investigation of the facts pertaining to the Agreement, and of all the matters pertaining thereto, as it deems necessary.

(e)  The terms of this Agreement are contractual and are the result of arm's-length negotiations on the part of such party.

(f)  Each individual signing this Agreement expressly warrants that he or she is fully authorized to sign this Agreement and bind the party on whose behalf he or she signs to all the terms of this Agreement.

6.  <u>Notice</u>.  Notwithstanding anything to the contrary in the Notes, the Security Agreement or other documents executed in connection therewith, upon the occurrence of an Event of Default (as defined below), Gottex shall notify Issuer in writing of same (a "<u>Notice of Default</u>"), to the addresses below:

> MKA Real Estate Opportunity Fund I, LLC
> c/o MKA Capital Group Advisors LLC
> 26 Corporate Plaza, Suite 250
> Newport Beach, California 92660
> Attn:  Greg Contillo
> Telephone:  (949)729-1660
> Facsimile:  (949) 729-1665
> E-mail:  gcontillo@mkacap.com

MKA Real Estate Opportunity Fund I, LLC
c/o MKA Capital Group Advisors LLC
26 Corporate Plaza, Suite 250
Newport Beach, California 92660
Attn:  Greg Contillo
Telephone:  (949)729-1660
Facsimile:  (949) 729-1665
E-mail:  jsugarman@mkacap.com

with a courtesy copy to:

Law Offices of Dan White
26 Corporate Plaza Drive, Suite 260
Newport Beach, California 92660
Attn:  Daniel D. White
Telephone:  (949) 729-9119
Facsimile:
E-mail:

with a courtesy copy to:

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626-7021
Attn:  Evan D. Smiley
Telephone:  (714) 966-1000
Facsimile: (714) 966-1002
E-mail:  esmiley@wgllp.com

7.    Cure Period.  Any event of default pursuant to the Notes, the Security Agreement or any documents executed in connection therewith (an "Event of Default") shall be deemed to have occurred as of the occurrence of such event, irrespective of the date of the Notice of Default, provided however, that Issuer shall have seven (7) business days after the date of the Notice of Default to cure any Event of Default (the "Cure Period").  From and after the occurrence of an Event of Default and the expiration of the applicable Cure Period if such default is not cured, (i) the entire outstanding principal sum together with all accrued and unpaid interest thereon, and all other payments due under the Notes, the Security Agreement and other documents executed in connection therewith, and together with, to the extent permitted under applicable law, costs and expenses, including reasonable attorneys' fees and disbursements, incurred by Gottex in collecting or enforcing payment thereof, shall be immediately due and payable, and (ii) Gottex shall be entitled to exercise all of its rights and remedies pursuant to the Notes, the Security Agreement, the other Note Agreements and other documents executed in connection therewith, or any other rights and remedies under applicable law, in accordance with applicable law.

6

8.     Junior Liens. Gottex hereby consents to Issuer granting a junior security interest to Albert B. Womble and Aspen Consulting Ltd. Profit Sharing Plan, a profit sharing plan trust ("Womble") that will encumber only collateral in which Gottex had a security interest immediately prior to the date hereof, specifically excluding the REO properties; provided that prior to any such junior encumbrances being permitted, Womble will execute and deliver to Gottex a subordination and intercreditor agreement on terms satisfactory to Gottex, in Gottex's sole discretion. It shall not be an Event of Default if Gottex does not receive a subordination and intercreditor agreement with respect to any non-consensual lien in favor of Womble in connection with a writ of attachment or judgement against Issuer or its assets. Issuer hereby acknowledges and agrees that in no event shall Albert B. Womble, Freestone Capital Partners L.P., Freestone Capital Qualified Partners L.P., Freestone Low Volatility Partners LP, Freestone Low Volatility Qualified Partners or any other lender be permitted to execute or record junior deeds of trust or mortgages encumbering the REO properties.

9.     Budgets. In accordance with the Notes, Gottex will continue to authorize the payment of Permitted Expenses (as defined in the Notes), including, without limitation, legal and auditing expenses not to exceed $300,000 per month.

10.    Delivery of Proceeds/Release of Collateral. Issuer hereby reaffirms its obligations to deliver to Gottex all Proceeds (other than Proceeds of Permitted Transfers), including all Proceeds arising from or relating to any Chattel Paper or Instrument constituting Collateral to Gottex or deposit same in the Custody Account, as such term is amended pursuant to this Modification Agreement, or any other account approved by Gottex in its sole discretion (as such terms are defined in the Security Agreement). Gottex shall have no obligation to release, reconvey, or assign any collateral held as security for the Secured Obligations, including any and all security interests in the REO properties, to Issuer or any assignee of Issuer, unless and until all of the following conditions are satisfied: (i) any and all proceeds paid to Issuer in connection with such release, reconveyance or assignment are, to the extent required by the Notes, Security Agreement or the other documents executed in connection therewith, delivered to Gottex, and (ii) Gottex shall have received countersigned written escrow instructions from a third party escrow addressing delivery of such release, reconveyance or assignment and the concurrent delivery of proceeds to Gottex as described in clause (i) above, and otherwise in form and substance acceptable to Gottex. Notwithstanding the foregoing, but subject to the prior written approval of Gottex, all fees and expenses that are due to Manager under the Loans for existing and past due amounts shall be disbursed directly from escrow to Manager. Subject to the following sentence, to the extent that funds that are due to Manager are inadvertently paid to Issuer, Issuer shall promptly turnover such funds to Manager. Gottex's approval of payments to Manager pursuant to the preceding two sentences shall be subject to receipt by Gottex of a detailed schedule identifying the amount to be paid, the time period as to which such payment applies, the borrower or other party obligated to make such payment, the Loan or other Collateral to which such payment relates and such other information as Gottex may reasonably require.

11.    Further Assurances. Issuer hereby reaffirms its obligations to, from time to time, upon the written request of Administrative Agent, execute and deliver such further documents and diligently perform such other acts and things in any jurisdiction as the Administrative Agent may reasonably request to fully effect the purposes of the Notes, the Security Agreement or

31464762_335429-00007

other documents executed in connection therewith, or to further assure the first priority status of the liens granted to Gottex pursuant thereto, including, without limitation, the deeds of trust with respect to the REO properties.

12. <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. No waiver or modification of the terms hereof shall be valid unless in a writing signed by the parties hereto.

13. <u>Deliveries</u>. The mutual releases set forth in Section 21 hereof (entitled "<u>Mutual Releases</u>") shall be effective on the date (the "<u>Effective Date</u>") that the Administrative Agent or its counsel, by Katten Muchin Rosenman LLP, has received the following:

   (a)   a fully executed copy of this Agreement;

   (b)   executed originals of each Second Amendment to Note;

   (c)   an incumbency certificate, certified by the Manager, certifying the names and true signatures of the Person authorized to sign this Agreement and each Second Amendment to Note; and

   (d)   fully executed and acknowledged recordable copies of a Deed of Trust with respect to each of the Properties on Exhibit A hereto in the form previously approved by Gottex.

14. <u>Governing Law</u>. This Agreement shall be governed by, and shall be construed in accordance with, the internal laws of the State of California, without regard to conflict of law principles.

15. <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NOTES, THE SECURITY AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

16. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute a single agreement.

17. <u>Entire Agreement</u>. The recitals to this Agreement are hereby incorporated into and made a part of this Agreement, and shall constitute covenants and representations of the parties hereto and shall be binding upon and enforceable against each of the parties. This Agreement, constitutes the complete and entire agreement between the parties regarding the subject matter hereof, and shall supersede all prior and contemporaneous oral or written negotiations, representations, agreements, and understandings with respect to such subject matter.

18. <u>Gottex Expenses</u>. In connection with the negotiation documentation of the transactions described herein, Issuer agrees to reimburse Gottex all costs and expenses

8

Ex. 09, p. 206

(including, but not limited to, reasonable attorneys' fees) incurred by Gottex which amount shall be added to the principal outstanding under the Notes.

19.     Additional Agreement. The execution, delivery, and effectiveness of this Agreement shall not be deemed to establish any course of dealing between the parties hereto or create any obligation or agreement of Gottex with respect to any future restructuring, modification, amendment, waiver, or forbearance with respect to the Notes.

20.     Severability. In case any provision in this Agreement shall be held to be invalid, illegal or unenforceable, such provision shall be severable from the rest of this Agreement and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

21.     Mutual Releases.

    (a)     Certain Defined Terms.

        (i)     "Gottex Parties" means the Noteholders and the Administrative Agent, in all capacities, and each of their respective past or present affiliates, subsidiaries, parents, successors and predecessors, officers, directors, agents, employees, attorneys, advisors, insurers, investment advisors, auditors, accountants, representatives, and any person, firm, trust, corporation, officer, director, or other individual or entity in which any of them has a controlling interest or which is related to or affiliated with the Noteholder or the Administrative Agent, and the legal representatives, heirs, successors in interest, or assigns of the Noteholder and the Administrative Agent.

        (ii)     "MKA Parties" means the Issuer and the Manager, in all capacities, and each of their respective past or present affiliates, subsidiaries, parents, successors and predecessors, officers, directors, agents, employees, attorneys, advisors, insurers, investment advisors, auditors, accountants, representatives, and any person, firm, trust, corporation, officer, director, or other individual or entity in which any of them has a controlling interest or which is related to or affiliated with the Issuer or the Manager, and the legal representatives, heirs, successors in interest, or assigns of the Issuer and the Manager.

        (iii)     "Released Claims" means any and all demands, defaults, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages, and any and all claims, defenses, rights of setoff or recoupment, liabilities, liens, security interests, interests, or rights of any nature whatsoever (including claims for losses, damages including consequential damages, unjust enrichment, breach of fiduciary duty, breach of contract, attorneys' fees, disgorgement of fees, litigation costs, injunction, declaration, contribution, indemnification or any other type or nature of

9

legal or equitable relief), whether known or unknown, in law or equity, arising from (i) with respect to the MKA Parties, any Event of Default occurring prior to the Effective Date, and (ii) with respect to the Gottex Parties, any act or omission of the Gottex Parties occurring prior to the Effective Date. Released Claims shall not include any Event of Default with respect to the MKA Parties or any act or omission with respect to the Gottex Parties that occurs after the Effective Date notwithstanding that such post Effective Date Event of Default or act or omission arises out of actions or events similar to those applicable to the matters released hereby.

(b)    Releases by the Gottex Parties.  From and after the Effective Date, each of the Gottex Parties hereby absolutely, unconditionally, and irrevocably releases and forever discharges each of the MKA Parties of and from the Released Claims that any of the Gottex Parties, directly, indirectly, or in any other capacity, ever had or now has, provided, however, that the foregoing release shall not affect or impair the enforceability of (i) this Agreement (including, without limitation, the covenants and representations and warranties herein) or the rights of the parties hereunder, or (ii) the Notes, Security Agreement, Waiver Agreement, the Note Agreements or any other document executed or delivered in connection with the foregoing.  **Each of the Gottex Parties understands and agrees that, subject to the foregoing limitation, the releases given pursuant to this Agreement shall include any Released Claims that are not known or suspected to exist as of the date hereof and that no fact or circumstance, evidence, or transaction which now could be asserted or which may hereafter be discovered shall affect in any way the final, irrevocable, and unconditional nature of the releases set forth above.**  From and after the Effective Date, this Agreement may be pleaded by the MKA Parties as a full and complete defense to any proceeding instituted with respect to any Released Claims.

(c)    Releases by the MKA Parties.  From and after the Effective Date, each of the MKA Parties hereby absolutely, unconditionally, and irrevocably releases and forever discharges each of the Gottex Parties of and from the Released Claims that any of the MKA Parties, directly, indirectly, or in any other capacity, ever had or now has; provided, however, that the foregoing release shall not affect or impair the enforceability of (i) this Agreement, or (ii) the Notes, Security Agreement, Waiver Agreement, the Note Agreements or any other document executed or delivered in connection with the foregoing (including, without limitation, the covenants and representations and warranties herein) or the rights of the parties hereunder.  **Each of the MKA Parties understands and agrees that, subject to the foregoing limitation, the releases given pursuant to this Agreement shall include any Released Claims that are not known or suspected to exist as of the date hereof and that no fact or circumstance, evidence, or transaction which now could be asserted or which may hereafter be discovered shall affect in any way the final, irrevocable, and unconditional nature of the releases set forth above.**  From and after the

10

Ex. 09, p. 208

Effective Date, this Agreement may be pleaded by any of the Gottex Parties as a full and complete defense to any proceeding instituted with respect to any Released Claims.

(d)   Waiver under California Civil Code § 1542.  Within the scope of the releases provided herein, the releases constitute waivers by the parties hereto of any and all rights under section 1542 of the Civil Code of California (or any similar, comparable, or equivalent law of any state or territory of the United States, or principle of common law), which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

22.   <u>No Admissions</u>.  This Agreement constitutes a compromise of disputed claims and does not constitute, and shall not be construed as, an acknowledgement by any party of the validity of any claims or an admission of any liability with respect thereto.

23.   <u>Survival of Representations and Warranties</u>.  The representations and warranties contained in this Agreement shall survive the execution, delivery, and performance of this Agreement.

24.   <u>Neutral Construction</u>.  Each party has cooperated, by and through its counsel, in the drafting and preparation of this Agreement.  Hence, this Agreement will be construed neutrally, and will not be applied more strictly against one party than another.

25.   <u>Headings</u>.  Paragraph headings in this Agreement are for convenience and shall not be considered for any purpose in construing this Agreement.

26.   <u>Modification</u>.  Except as specifically modified hereby and by each Second Amendment to Note, the Security Agreement, the First Amended Notes, the Note Agreements and all other documents executed or delivered in connection with each of the foregoing shall remain unmodified and in full force and effect, and Issuer hereby reaffirms all of its obligations and covenants thereunder.

[Signature pages to follow]

Ex. 09, p. 209

IN WITNESS WHEREOF, the undersigned executed or caused this Agreement to be executed as of the day and year first above written.

**The Issuer:**           MKA REAL ESTATE OPPORTUNITY FUND I, LLC,
a California limited liability company

By:    MKA Capital Group Advisors, LLC
a California limited liability company, Manager

By: *Michael A. Abraham*
Name: Michael A. Abraham
Its: Chairman of the Board

**Manager:**          MKA Capital Group Advisors, LLC,
a California limited liability company

By: *Michael A. Abraham*
Name: Michael A. Abraham
Its: Chairman of the Board

[additional signature pages to follow]

31464762_335429-00007         S-1

Ex. 09, p. 210

Noteholders:

GOTTEX ABI MASTER FUND LIMITED,
a Cayman Islands exempted company

By:   Gottex Fund Management Sarl,
      Its Investment Manager

By: _____
Name: _Joachim Gottschalk_____
Its: _CEO_____

By: _____
Name: _Tim Roniger_____
Its: _CEO_____

GOTTEX ABL (CAYMAN) LIMITED,
a Cayman Islands exempted company

By:   Gottex Fund Management Sarl,
      Its Investment Manager

By: _____
Name: _Joachim Gottschalk_____
Its: _CEO_____

By: _____
Name: _Tim Roniger_____
Its: _CEO_____

[additional signature pages to follow]

31464762_335429-00007                    S-2

GVA ABL PORTFOLIO LIMITED,
a British Virgin Islands company

By:    Gottex Fund Management Sarl,
       Its Investment Manager

       By:
       Name:  Joachim Gottschalk
       Its:    CEO

       By:
       Name:  Tim Roniger
       Its:    CFO

HUDSON ABL FUND LIMITED,
a Cayman Islands exempted company

By:    Gottex Fund Management Sarl,
       Its Investment Manager

       By:
       Name:  Joachim Gottschalk
       Its:    CEO

       By:
       Name:  Tim Roniger
       Its:    CFO

[additional signature page to follow]

Ex. 09, p. 212

**Administrative Agent:**       GOTTEX FUND MANAGEMENT, LTD.,
a Cayman Islands exempted company

By: _____

Name: _William Woolverton_____

Its: _Authorized Signatory_____

Ex. 09, p. 213

## EXHIBIT A

### Real Property

|    | Project Name | Entity Name |
|----|--------------|-------------|
| 1. | 16 Sunset | Sunset AAO, LLC, a Chapter 11 debtor |
| 2. | Desert Travel Center | Hawaii Five-O, LLC |
| 3. | Eagle Ridge | Nicholas' Folly, LLC |
| 4. | Highwater Granada Hills | Down Memory Lane, LLC |
| 5. | Kersey Kohler | Parkside Colorado Development, |
| 6. | Teton Mangini | Teton-Mangini Oakley 116, LLC |
| 7. | Walker Design | Hole In The Wall, LLC |
| 8. | Paulson | ** NO TRANSFER ** |

Ex. 09, p. 214

# EXHIBIT 10

### SECOND AMENDMENT TO AMENDED AND RESTATED PROMISSORY NOTE

This amendment (this "Amendment") is made and entered into as of December __, 2008 among GOTTEX ABI MASTER FUND LIMITED, a Cayman Islands exempted company ("Gottex"), MKA REAL ESTATE OPPORTUNITY FUND I, LLC, a California limited liability company ("Issuer"), MKA Capital Group Advisors, LLC, a California limited liability company ("Manager") and GOTTEX FUND MANAGEMENT, LTD., a Cayman Islands exempted company ("Administrative Agent").

WHEREAS, the parties hereto entered into that certain Amended and Restated Promissory Note dated April 1, 2008, as amended by that certain Amendment to Amended and Restated Promissory Note dated August 8, 2008 (as amended, the "Note");

WHEREAS, concurrently herewith, Gottex, Issuer, Manager, Administrative Agent and the other parties named therein, have entered into that certain Modification Agreement of even date herewith ("Modification Agreement").

WHEREAS, the parties hereto desire to amend the Note in accordance with the provisions referenced below.

NOW, THEREFORE, the parties hereto do hereby agree as follows:

Section 1.  As of December 1, 2008, the outstanding principal balance of the Note was $33,454,261.00 and all accrued and unpaid interest was $14,349.00, for a total unpaid balance of $33,468,610.00.

Section 2.  The definition of Maturity Date is hereby deleted in its entirety and replaced with the following:

"Maturity Date" means December 1, 2009.

Section 3.  "December 1, 2008" in Paragraph 5(a) of the Note is hereby deleted and replaced with "December 1, 2009".

Section 4.  A new subparagraph 4(c)(3) is hereby added to the Note as follows:

"and (3) then, to any amounts then payable as a First Principal Payment, Second Principal Payment or Third Principal Payment, as applicable."

Paragraph 4(d) of the Note is hereby deleted in its entirety and replaced with the following:

"(d)    To the extent that there are any Unallocated Disbursements, Unallocated Disbursements shall be used by the Administrative Agent for application in accordance with clauses (c)(1), (c)(2) and (c)(3) above ("Reserved Unallocated Disbursements"), provided that any portion of such Reserved Unallocated Disbursements that remain in the reserve on the second (2nd) business day after, as applicable, the First Principal Payment

Date, the Second Principal Payment Date or the Third Principal Payment Date or, if applicable, on the second (2nd) business day after an Early Rollover Repayment Date (as defined below) and provided (i) all required Principal Payments have been timely made, and (ii) provided Issuer has not deferred or rolled over any amounts with respect thereto which have not been delivered to Administrative Agent within thirty (30) days after the Principal Payment Date (an "Early Rollover Repayment Date") such were originally payable but for such deferral, the excess reserved funds as of such second (2nd) business day shall be paid *pari passu* 70% to Administrative Agent and applied to repayment of principal and 30% to a reserve account held by Administrative Agent for collateral preservation ("Preservation Reserve").

Funds in the Preservation Reserve ("Preservation Reserve Funds") shall be made available to Issuer pursuant to written requests ("Preservation Reserve Draw Request") from Issuer. The Administrative Agent shall not unreasonably withhold its consent with respect to authorizing the relevant disbursement provided the conditions precedent in clauses (i) through (iv) below have been satisfied:

(i)   The requested Preservation Reserve Funds are being used for a Collateral Preservation Action;

(ii)   The requested Preservation Reserve Funds are for payment (a) to third parties that are not affiliated with Issuer or its lenders or any of their respective members, shareholders, investors or partners, or (b) if to a party affiliated with Issuer, Issuer has provided a detailed description of the services performed, why they were necessary and invoices therefor, the services were provided at competitive fair market rates and such other information as Administrative Agent may reasonably require;

(iii)   Issuer is not in default hereunder or under the Notes, Security Agreement, Waiver Agreement or other documents executed in connection therewith; and

(iv)   Noteholders shall then have a perfected security interest in the collateral or property in question.

As used herein, "Collateral Preservation Action" means an action that Issuer has reasonably and in good faith determined should be taken in order to preserve its security interest in collateral it holds in connection with a Loan or other property owned by Issuer and which is Collateral for the Secured Obligations. Collateral Preservation Actions shall not include, without limitation, payment of redemption claims or any other funds to any member or investor in Issuer or to any affiliate of either of them or payments of any principal, interest or other amounts to any lender, investor, member, shareholder or partner of Issuer or any of their respective affiliates." Notwithstanding the foregoing, in no event shall the amount in the Preservation Reserve exceed Twelve Million and 00/100 Dollars ($12,000,000.00).

LAX01_31464697_335429-00007

Section 5.  Notwithstanding anything to the contrary in Section 8 (f) or (g) of the Note, Issuer shall only be obligated to provide a required NAV Calculation within sixty (60) days after the end of the second (2nd) and fourth (4th) calendar quarter.  The next NAV Calculation is due on or before March 1, 2009.  Notwithstanding the foregoing, Administrative Agent shall have the right to require NAV Calculations with respect to particular Loans or REO on a quarterly basis.

Section 6.  Except as specifically amended hereby and by the terms of the Modification Agreement, the terms and provisions of the Note shall remain in full force and effect.

Section 7.  This Amendment shall be governed by, and shall be construed in accordance with, the internal laws of the State of California, without regard to conflict of law principles.

Section 8.  This Amendment may be executed in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute a single agreement.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their respective officers or representatives thereunto duly authorized as of the date and year first written above.

MKA REAL ESTATE OPPORTUNITY FUND I, LLC,
a California limited liability company

By:     MKA Capital Group Advisors, LLC
        a California limited liability company, Manager

By: _Michael A. Abraham_____
Name: _____
Its: _____

MKA CAPITAL GROUP ADVISORS, LLC,
a California limited liability company

By: _Michael A. Abraham_____
Name: _____
Its: _____

[signatures continue on following page]

Ex. 10, p. 218

GOTTEX ABI MASTER FUND LIMITED,
a Cayman Islands exempted company

By:  Gottex Fund Management Sarl,
     Its Investment Manager

By:_____
Name:_____
Its:_____


By:_____
Name:_____
Its:_____


GOTTEX FUND MANAGEMENT, LTD.,
a Cayman Islands exempted company

By:_____
Name: William Woolverton
Its: Authorized Signatory

S-2

**Ex. 10, p. 219**

GOTTEX ABI MASTER FUND LIMITED,
a Cayman Islands exempted company

By:  Gottex Fund Management Sarl,
     Its Investment Manager

By: _____
Name: _____
Its: _____


By: _____
Name: _____
Its: _____


GOTTEX FUND MANAGEMENT, LTD.,
a Cayman Islands exempted company


By: _____
Name: _____
Its: _____

LAX01_31464697_335429-00007

**Ex. 10, p. 220**

<u>SECOND AMENDMENT TO SECOND AMENDED AND RESTATED PROMISSORY
NOTE</u>

This amendment (this "<u>Amendment</u>") is made and entered into as of December __, 2008 among GVA ABL PORTFOLIO LIMITED, a British Virgin Islands company ("<u>Gottex</u>"), MKA REAL ESTATE OPPORTUNITY FUND I, LLC, a California limited liability company ("<u>Issuer</u>"), MKA Capital Group Advisors, LLC, a California limited liability company ("<u>Manager</u>") and GOTTEX FUND MANAGEMENT, LTD., a Cayman Islands exempted company ("<u>Administrative Agent</u>").

WHEREAS, the parties hereto entered into that certain Second Amended and Restated Promissory Note dated April 1, 2008, as amended by that certain Amendment to Second Amended and Restated Promissory Note dated August 8, 2008 (as amended, the "<u>Note</u>");

WHEREAS, concurrently herewith, Gottex, Issuer, Manager, Administrative Agent and the other parties named therein, have entered into that certain Modification Agreement of even date herewith ("<u>Modification Agreement</u>").

WHEREAS, the parties hereto desire to amend the Note in accordance with the provisions referenced below.

NOW, THEREFORE, the parties hereto do hereby agree as follows:

Section 1.  As of December 1, 2008, the outstanding principal balance of the Note was $960,685.00, and all accrued and unpaid interest was $412.00, for a total unpaid balance of $961,097.00.

Section 2.  The definition of Maturity Date is hereby deleted in its entirety and replaced with the following:

"<u>Maturity Date</u>" means December 1, 2009.

Section 3.  "December 1, 2008" in Paragraph 5(a) of the Note is hereby deleted and replaced with "December 1, 2009".

Section 4.  A new subparagraph 4(c)(3) is hereby added to the Note as follows:

"and (3) then, to any amounts then payable as a First Principal Payment, Second Principal Payment or Third Principal Payment, as applicable."

Paragraph 4(d) of the Note is hereby deleted in its entirety and replaced with the following:

"(d)    To the extent that there are any Unallocated Disbursements, Unallocated Disbursements shall be used by the Administrative Agent for application in accordance with clauses (c)(1), (c)(2) and (c)(3) above ("<u>Reserved Unallocated Disbursements</u>"), provided that any portion of such Reserved Unallocated Disbursements that remain in the

reserve on the second (2nd) business day after, as applicable, the First Principal Payment Date, the Second Principal Payment Date or the Third Principal Payment Date or, if applicable, on the second (2nd) business day after an Early Rollover Repayment Date (as defined below) and provided (i) all required Principal Payments have been timely made, and (ii) provided Issuer has not deferred or rolled over any amounts with respect thereto which have not been delivered to Administrative Agent within thirty (30) days after the Principal Payment Date (an "Early Rollover Repayment Date") such were originally payable but for such deferral, the excess reserved funds as of such second (2nd) business day shall be paid *pari passu* 70% to Administrative Agent and applied to repayment of principal and 30% to a reserve account held by Administrative Agent for collateral preservation ("Preservation Reserve").

Funds in the Preservation Reserve ("Preservation Reserve Funds") shall be made available to Issuer pursuant to written requests ("Preservation Reserve Draw Request") from Issuer.  The Administrative Agent shall not unreasonably withhold its consent with respect to authorizing the relevant disbursement provided the conditions precedent in clauses (i) through (iv) below have been satisfied:

(i)     The requested Preservation Reserve Funds are being used for a Collateral Preservation Action;

(ii)    The requested Preservation Reserve Funds are for payment (a) to third parties that are not affiliated with Issuer or its lenders or any of their respective members, shareholders, investors or partners, or (b) if to a party affiliated with Issuer, Issuer has provided a detailed description of the services performed, why they were necessary and invoices therefor, the services were provided at competitive fair market rates and such other information as Administrative Agent may reasonably require;

(iii)   Issuer is not in default hereunder or under the Notes, Security Agreement, Waiver Agreement or other documents executed in connection therewith; and

(iv)    Noteholders shall then have a perfected security interest in the collateral or property in question.

As used herein, "Collateral Preservation Action" means an action that Issuer has reasonably and in good faith determined should be taken in order to preserve its security interest in collateral it holds in connection with a Loan or other property owned by Issuer and which is Collateral for the Secured Obligations. Collateral Preservation Actions shall not include, without limitation, payment of redemption claims or any other funds to any member or investor in Issuer or to any affiliate of either of them or payments of any principal, interest or other amounts to any lender, investor, member, shareholder or partner of Issuer or any of their respective affiliates."  Notwithstanding the foregoing, in no event shall the amount in the Preservation Reserve exceed Twelve Million and 00/100 Dollars ($12,000,000.00).

2

Section 5.  Notwithstanding anything to the contrary in Section 8 (f) or (g) of the Note, Issuer shall only be obligated to provide a required NAV Calculation within sixty (60) days after the end of the second (2nd) and fourth (4th) calendar quarter.  The next NAV Calculation is due on or before March 1, 2009.  Notwithstanding the foregoing, Administrative Agent shall have the right to require NAV Calculations with respect to particular Loans or REO on a quarterly basis.

Section 6.  Except as specifically amended hereby and by the terms of the Modification Agreement, the terms and provisions of the Note shall remain in full force and effect.

Section 7.  This Amendment shall be governed by, and shall be construed in accordance with, the internal laws of the State of California, without regard to conflict of law principles.

Section 8.  This Amendment may be executed in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute a single agreement.

[Signature Page Follows]

3

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their respective officers or representatives thereunto duly authorized as of the date and year first written above.

MKA REAL ESTATE OPPORTUNITY FUND I, LLC,
a California limited liability company

By:     MKA Capital Group Advisors, LLC
        a California limited liability company, Manager


        By: _____
        Name: _____
        Its: _____


MKA CAPITAL GROUP ADVISORS, LLC,
a California limited liability company

By: _____
Name: _____
Its: _____


[signatures continue on following page]

LAX01_31466234_335429-00007                       S-1

GVA ABL PORTFOLIO LIMITED,
a British Virgin Islands company

By:  Gottex Fund Management Sarl,
     Its Investment Manager

    By:_____
    Name:_____
    Its:_____

    By:_____
    Name:_____
    Its:_____


GOTTEX FUND MANAGEMENT, LTD.,
a Cayman Islands exempted company


By:  _____
Name:  William Woolverton
Its:  Authorized Signatory


S-2

Ex. 10, p. 225

GVA ABL PORTFOLIO LIMITED,
a British Virgin Islands company

By: Gottex Fund Management Sarl,
    Its Investment Manager

By: _____
Name: _Joachim Gottschalk_____
Its: _CEO_____

By: _____
Name: _Tim Roniger_____
Its: _CEO_____

GOTTEX FUND MANAGEMENT, LTD.,
a Cayman Islands exempted company

By: _____
Name: _____
Its: _____

LAX01_31466234_335429-00007

S-2

## SECOND AMENDMENT TO SECOND AMENDED AND RESTATED PROMISSORY NOTE

This amendment (this "Amendment") is made and entered into as of December __, 2008 among GOTTEX ABL CAYMAN LIMITED, a Cayman Islands exempted company ("Gottex"), MKA REAL ESTATE OPPORTUNITY FUND I, LLC, a California limited liability company ("Issuer"), MKA Capital Group Advisors, LLC, a California limited liability company ("Manager") and GOTTEX FUND MANAGEMENT, LTD., a Cayman Islands exempted company ("Administrative Agent").

WHEREAS, the parties hereto entered into that certain Second Amended and Restated Promissory Note dated April 1, 2008, as amended by that certain Amendment to Second Amended and Restated Promissory Note dated August 8, 2008 (as amended, the "Note");

WHEREAS, concurrently herewith, Gottex, Issuer, Manager, Administrative Agent and the other parties named therein, have entered into that certain Modification Agreement of even date herewith ("Modification Agreement").

WHEREAS, the parties hereto desire to amend the Note in accordance with the provisions referenced below.

NOW, THEREFORE, the parties hereto do hereby agree as follows:

Section 1.  As of December 1, 2008, the outstanding principal balance of the Note was $23,575,064.00 and all accrued and unpaid interest was $10,112.00, for a total unpaid balance of $23,585,176.00.

Section 2.  The definition of Maturity Date is hereby deleted in its entirety and replaced with the following:

"Maturity Date" means December 1, 2009.

Section 3.  "December 1, 2008" in Paragraph 5(a) of the Note is hereby deleted and replaced with "December 1, 2009".

Section 4.  A new subparagraph 4(c)(3) is hereby added to the Note as follows:

"and (3) then, to any amounts then payable as a First Principal Payment, Second Principal Payment or Third Principal Payment, as applicable."

Paragraph 4(d) of the Note is hereby deleted in its entirety and replaced with the following:

"(d)     To the extent that there are any Unallocated Disbursements, Unallocated Disbursements shall be used by the Administrative Agent for application in accordance with clauses (c)(1), (c)(2) and (c)(3) above ("Reserved Unallocated Disbursements"), provided that any portion of such Reserved Unallocated Disbursements that remain in the

**Ex. 10, p. 227**

reserve on the second (2nd) business day after, as applicable, the First Principal Payment Date, the Second Principal Payment Date or the Third Principal Payment Date or, if applicable, on the second (2nd) business day after an Early Rollover Repayment Date (as defined below) and provided (i) all required Principal Payments have been timely made, and (ii) provided Issuer has not deferred or rolled over any amounts with respect thereto which have not been delivered to Administrative Agent within thirty (30) days after the Principal Payment Date (an "Early Rollover Repayment Date") such were originally payable but for such deferral, the excess reserved funds as of such second (2nd) business day shall be paid *pari passu* 70% to Administrative Agent and applied to repayment of principal and 30% to a reserve account held by Administrative Agent for collateral preservation ("Preservation Reserve").

Funds in the Preservation Reserve ("Preservation Reserve Funds") shall be made available to Issuer pursuant to written requests ("Preservation Reserve Draw Request") from Issuer. The Administrative Agent shall not unreasonably withhold its consent with respect to authorizing the relevant disbursement provided the conditions precedent in clauses (i) through (iv) below have been satisfied:

(i)     The requested Preservation Reserve Funds are being used for a Collateral Preservation Action;

(ii)    The requested Preservation Reserve Funds are for payment (a) to third parties that are not affiliated with Issuer or its lenders or any of their respective members, shareholders, investors or partners, or (b) if to a party affiliated with Issuer, Issuer has provided a detailed description of the services performed, why they were necessary and invoices therefor, the services were provided at competitive fair market rates and such other information as Administrative Agent may reasonably require;

(iii)   Issuer is not in default hereunder or under the Notes, Security Agreement, Waiver Agreement or other documents executed in connection therewith; and

(iv)    Noteholders shall then have a perfected security interest in the collateral or property in question.

As used herein, "Collateral Preservation Action" means an action that Issuer has reasonably and in good faith determined should be taken in order to preserve its security interest in collateral it holds in connection with a Loan or other property owned by Issuer and which is Collateral for the Secured Obligations. Collateral Preservation Actions shall not include, without limitation, payment of redemption claims or any other funds to any member or investor in Issuer or to any affiliate of either of them or payments of any principal, interest or other amounts to any lender, investor, member, shareholder or partner of Issuer or any of their respective affiliates." Notwithstanding the foregoing, in no event shall the amount in the Preservation Reserve exceed Twelve Million and 00/100 Dollars ($12,000,000.00).

2

Section 5.  Notwithstanding anything to the contrary in Section 8 (f) or (g) of the Note, Issuer shall only be obligated to provide a required NAV Calculation within sixty (60) days after the end of the second (2nd) and fourth (4th) calendar quarter.  The next NAV Calculation is due on or before March 1, 2009. Notwithstanding the foregoing, Administrative Agent shall have the right to require NAV Calculations with respect to particular Loans or REO on a quarterly basis.

Section 6.  Except as specifically amended hereby and by the terms of the Modification Agreement, the terms and provisions of the Note shall remain in full force and effect.

Section 7.  This Amendment shall be governed by, and shall be construed in accordance with, the internal laws of the State of California, without regard to conflict of law principles.

Section 8.  This Amendment may be executed in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute a single agreement.

[Signature Page Follows]

3

LAX01_31466235_335429-00007

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their respective officers or representatives thereunto duly authorized as of the date and year first written above.

MKA REAL ESTATE OPPORTUNITY FUND I LLC,
a California limited liability company

By:     MKA Capital Group Advisors, LLC
        a California limited liability company, Manager

        By: _____
        Name: _____
        Its: _____


MKA CAPITAL GROUP ADVISORS, LLC,
a California limited liability company

By: _____
Name: _____
Its: _____


[signatures continue on following page]

S-1

**Ex. 10, p. 230**

GOTTEX ABL (CAYMAN) LIMITED,
a Cayman Islands exempted company

By:  Gottex Fund Management Sarl,
     Its Investment Manager

        By:_____
        Name:_____
        Its:_____

        By:_____
        Name:_____
        Its:_____

GOTTEX FUND MANAGEMENT, LTD.,
a Cayman Islands exempted company

By:_____
Name:  _William Warwicker_____
Its:  _Authorised Signatory_____

LAX01_31466235_335429-00007

GOTTEX ABL (CAYMAN) LIMITED,
a Cayman Islands exempted company

By:  Gottex Fund Management Sarl,
     Its Investment Manager

By: _____
Name: __Joachim Gottschalk_____
Its: _____CEO_____

By: _____
Name: __Ron Rohner_____
Its: _____CEO_____

GOTTEX FUND MANAGEMENT, LTD.,
a Cayman Islands exempted company


By: _____
Name: _____
Its: _____

S-2

LAX01_31466235_335429-00007

## SECOND AMENDMENT TO SECOND AMENDED AND RESTATED PROMISSORY NOTE

This amendment (this "Amendment") is made and entered into as of December __, 2008 among HUDSON ABL FUND LIMITED, a Cayman Islands exempted company ("Gottex"), MKA REAL ESTATE OPPORTUNITY FUND I, LLC, a California limited liability company ("Issuer"), MKA Capital Group Advisors, LLC, a California limited liability company ("Manager") and GOTTEX FUND MANAGEMENT, LTD., a Cayman Islands exempted company ("Administrative Agent").

WHEREAS, the parties hereto entered into that certain Second Amended and Restated Promissory Note dated April 1, 2008, as amended by that certain Amendment to Second Amended and Restated Promissory Note dated August 8, 2008 (as amended, the "Note");

WHEREAS, concurrently herewith, Gottex, Issuer, Manager, Administrative Agent and the other parties named therein, have entered into that certain Modification Agreement of even date herewith ("Modification Agreement").

WHEREAS, the parties hereto desire to amend the Note in accordance with the provisions referenced below.

NOW, THEREFORE, the parties hereto do hereby agree as follows:

Section 1.  As of December 1, 2008, the outstanding principal balance of the Note was $4,512,265.00 and all accrued and unpaid interest was $1,935.00, for a total unpaid balance of $4,514,200.00.

Section 2.  The definition of Maturity Date is hereby deleted in its entirety and replaced with the following:

"Maturity Date" means December 1, 2009.

Section 3.  "December 1, 2008" in Paragraph 5(a) of the Note is hereby deleted and replaced with "December 1, 2009".

Section 4.  A new subparagraph 4(c)(3) is hereby added to the Note as follows:

"and (3) then, to any amounts then payable as a First Principal Payment, Second Principal Payment or Third Principal Payment, as applicable."

Paragraph 4(d) of the Note is hereby deleted in its entirety and replaced with the following:

"(d)     To the extent that there are any Unallocated Disbursements, Unallocated Disbursements shall be used by the Administrative Agent for application in accordance with clauses (c)(1), (c)(2) and (c)(3) above ("Reserved Unallocated Disbursements"), provided that any portion of such Reserved Unallocated Disbursements that remain in the

1

reserve on the second (2nd) business day after, as applicable, the First Principal Payment Date, the Second Principal Payment Date or the Third Principal Payment Date or, if applicable, on the second (2nd) business day after an Early Rollover Repayment Date (as defined below) and provided (i) all required Principal Payments have been timely made, and (ii) provided Issuer has not deferred or rolled over any amounts with respect thereto which have not been delivered to Administrative Agent within thirty (30) days after the Principal Payment Date (an "Early Rollover Repayment Date") such were originally payable but for such deferral, the excess reserved funds as of such second (2nd) business day shall be paid *pari passu* 70% to Administrative Agent and applied to repayment of principal and 30% to a reserve account held by Administrative Agent for collateral preservation ("Preservation Reserve").

Funds in the Preservation Reserve ("Preservation Reserve Funds") shall be made available to Issuer pursuant to written requests ("Preservation Reserve Draw Request") from Issuer. The Administrative Agent shall not unreasonably withhold its consent with respect to authorizing the relevant disbursement provided the conditions precedent in clauses (i) through (iv) below have been satisfied:

(i)  The requested Preservation Reserve Funds are being used for a Collateral Preservation Action;

(ii)  The requested Preservation Reserve Funds are for payment (a) to third parties that are not affiliated with Issuer or its lenders or any of their respective members, shareholders, investors or partners, or (b) if to a party affiliated with Issuer, Issuer has provided a detailed description of the services performed, why they were necessary and invoices therefor, the services were provided at competitive fair market rates and such other information as Administrative Agent may reasonably require;

(iii)  Issuer is not in default hereunder or under the Notes, Security Agreement, Waiver Agreement or other documents executed in connection therewith; and

(iv)  Noteholders shall then have a perfected security interest in the collateral or property in question.

As used herein, "Collateral Preservation Action" means an action that Issuer has reasonably and in good faith determined should be taken in order to preserve its security interest in collateral it holds in connection with a Loan or other property owned by Issuer and which is Collateral for the Secured Obligations. Collateral Preservation Actions shall not include, without limitation, payment of redemption claims or any other funds to any member or investor in Issuer or to any affiliate of either of them or payments of any principal, interest or other amounts to any lender, investor, member, shareholder or partner of Issuer or any of their respective affiliates." Notwithstanding the foregoing, in no event shall the amount in the Preservation Reserve exceed Twelve Million and 00/100 Dollars ($12,000,000.00).

2

Section 5. Notwithstanding anything to the contrary in Section 8 (f) or (g) of the Note, Issuer shall only be obligated to provide a required NAV Calculation within sixty (60) days after the end of the second (2nd) and fourth (4th) calendar quarter. The next NAV Calculation is due on or before March 1, 2009. Notwithstanding the foregoing, Administrative Agent shall have the right to require NAV Calculations with respect to particular Loans or REO on a quarterly basis.

Section 6. Except as specifically amended hereby and by the terms of the Modification Agreement, the terms and provisions of the Note shall remain in full force and effect.

Section 7. This Amendment shall be governed by, and shall be construed in accordance with, the internal laws of the State of California, without regard to conflict of law principles.

Section 8. This Amendment may be executed in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute a single agreement.

[Signature Page Follows]

LAX01_31466237_335429.00007

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their respective officers or representatives thereunto duly authorized as of the date and year first written above.

MKA REAL ESTATE OPPORTUNITY FUND I, LLC,
a California limited liability company

By:    MKA Capital Group Advisors, LLC
       a California limited liability company, Manager


       By: _Michael A. Abraham_
       Name: _____
       Its: _____


MKA CAPITAL GROUP ADVISORS, LLC,
a California limited liability company

By: _Michael A. Abraham_
Name: _____
Its: _____


[signatures continue on following page]

HUDSON ABL FUND LIMITED,
a Cayman Islands exempted company

By:  Gottex Fund Management Sarl,
     Its Investment Manager

     By:_____
     Name:_____
     Its:_____

     By:_____
     Name:_____
     Its:_____

GOTTEX FUND MANAGEMENT, LTD.,
a Cayman Islands exempted company

By:_____
Name: William Woolverton
Its: Authorized Signatory

S-2

LAX01_31466237_335429-00007

**Ex. 10, p. 237**

HUDSON ABL FUND LIMITED,
a Cayman Islands exempted company

By: Gottex Fund Management Sarl,
Its Investment Manager

By: _____
Name: _Jonchim Gottchalk_____
Its: _____CEO'_____

By: _____
Name: __Eric Radner_____
Its: _____CEO_____

GOTTEX FUND MANAGEMENT, LTD.,
a Cayman Islands exempted company

By: _____
Name: _____
Its: _____

LAX01_31456237_335429-00007

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Cormac J. Carney  and the assigned discovery Magistrate Judge is Robert N. Block.

The case number on all documents filed with the Court should read as follows:

## SACV13- 922 CJC  (RNBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[ ] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

GOTTEX FUND MANAGEMENT, LTD., a Delaware
corporation,

PLAINTIFF(S)

v.

MKA REAL ESTATE OPPORTUNITY FUND I, LLC, *et al.*

(see attached Addendum for complete caption)

DEFENDANT(S).

CASE NUMBER

SACV13-922- CJC (RNBx)

**SUMMONS**

TO:   DEFENDANT(S):   (see attached Addendum for complete list of Defendants)

   A lawsuit has been filed against you.

   Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney. Stuart M. Richter (SBN 126231)_____, whose address is Katten Muchin Rosenman, LLP, 2029 Century Park East, Suite 2600, Los Angeles, CA 90067 ___. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: JUN 1 8 2013

By: _____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (10/11)                                        SUMMONS

## ADDENDUM TO UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SUMMONS

**CAPTION**

GOTTEX FUND MANAGEMENT, LTD., a Delaware corporation,

PLAINTIFF(S)

v.

MKA REAL ESTATE OPPORTUNITY FUND I, LLC; a California limited liability company; MKA CAPITAL GROUP ADVISORS, LLC, a California limited liability company; JASON SUGARMAN, an individual; MICHAEL ABRAHAM, an individual; ELIZABETH SUGARMAN, an individual; LAUSANNE, LLC, a California limited liability company; EQUIPMENT RENTAL & MANAGEMENT, LLC, a Nevada limited liability company; and DOES 1-10,

DEFENDANT(S).

**TO: DEFENDANT(S)**

MKA REAL ESTATE OPPORTUNITY FUND I, LLC
c/o Daniel D. White
1 Corporate Plaza Drive, Suite 110
Newport Beach, CA 92660

MKA CAPITAL GROUP ADVISORS, LLC
c/o Daniel D. White
1 Corporate Plaza Drive, Suite 110
Newport Beach, CA 92660

JASON SUGARMAN
151 S Rodeo Drive
Beverly Hills, CA 90212

MICHAEL ABRAHAM
908 W. Bay Avenue
Newport Beach, CA 92661-1013

ELIZABETH SUGARMAN
14000 W Olympic Blvd, Suite 350
Los Angeles, CA 90064

LAUSANNE, LLC
c/o Elizabeth Sugarman
11400 W Olympic Blvd, Suite 350
Los Angeles, CA 90064

EQUIPMENT RENTAL & MANAGEMENT, LLC
c/o Nevada Corporate Planners, Inc.
7477 W Lake Mead Blvd, Suite 170
Las Vegas, NV 89128

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOTTEX FUND MANAGEMENT, LTD., a Delaware corporation, | CASE NUMBER |
| PLAINTIFF(S) | SACV13-922-CJC (RNBx) |
| v. | |
| MKA REAL ESTATE OPPORTUNITY FUND I, LLC, *et al.* | |
| (see attached Addendum for complete caption) | **SUMMONS** |
| DEFENDANT(S). | |

TO:   DEFENDANT(S):   (see attached Addendum for complete list of Defendants)

A lawsuit has been filed against you.

Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney.   Stuart M. Richter (SBN 126231)_____, whose address is ___ Katten Muchin Rosenman, LLP, 2029 Century Park East, Suite 2600, Los Angeles, CA 90067 ___.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: __JUN 1 8 2013__

By: _____

Deputy Clerk

*(Seal of the Court)*

1227

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

## ADDENDUM TO UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SUMMONS

**CAPTION**

GOTTEX FUND MANAGEMENT, LTD., a Delaware corporation,

PLAINTIFF(S)

v.

MKA REAL ESTATE OPPORTUNITY FUND I, LLC; a California limited liability company; MKA CAPITAL GROUP ADVISORS, LLC, a California limited liability company; JASON SUGARMAN, an individual; MICHAEL ABRAHAM, an individual; ELIZABETH SUGARMAN, an individual; LAUSANNE, LLC, a California limited liability company; EQUIPMENT RENTAL & MANAGEMENT, LLC, a Nevada limited liability company; and DOES 1-10,

DEFENDANT(S).

**TO: DEFENDANT(S)**

MKA REAL ESTATE OPPORTUNITY FUND I, LLC
c/o Daniel D. White
1 Corporate Plaza Drive, Suite 110
Newport Beach, CA 92660

MKA CAPITAL GROUP ADVISORS, LLC
c/o Daniel D. White
1 Corporate Plaza Drive, Suite 110
Newport Beach, CA 92660

JASON SUGARMAN
151 S Rodeo Drive
Beverly Hills, CA 90212

MICHAEL ABRAHAM
908 W. Bay Avenue
Newport Beach, CA 92661-1013

ELIZABETH SUGARMAN
14000 W Olympic Blvd, Suite 350
Los Angeles, CA 90064

LAUSANNE, LLC
c/o Elizabeth Sugarman
11400 W Olympic Blvd, Suite 350
Los Angeles, CA 90064

EQUIPMENT RENTAL & MANAGEMENT, LLC
c/o Nevada Corporate Planners, Inc.
7477 W Lake Mead Blvd, Suite 170
Las Vegas, NV 89128

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )
GOTTEX FUND MANAGEMENT LTD., a Delaware corporation

**DEFENDANTS** ( Check box if you are representing yourself ☐ )
(see attached addendum page)

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Stuart M. Richter (SBN 126231)
Yonaton Rosenzweig (SBN 248137); Meegan Maczek (SBN 260609)
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012; (310) 788-4400

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☐ 3. Federal Question (U.S. Government Not a Party)

☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No  (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☒ **MONEY DEMANDED IN COMPLAINT: $** 63,230,725

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. sec. 1332. Complaint for breach of contract, fraudulent conveyance, conversion, aiding and abetting conversion, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and civil conspiracy.

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☒ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

FOR OFFICE USE ONLY:   Case Number: _SACV13-922_

AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL COVER SHEET**

**VIII(a).  IDENTICAL CASES**: Has this action been previously filed in this court and dismissed, remanded or closed?  ☐ NO   ☒ YES

If yes, list case number(s):   SACV12-1172-AG (RNBx)

**VIII(b).  RELATED CASES**: Have any cases been previously filed in this court that are related to the present case?  ☐ NO   ☒ YES

If yes, list case number(s):   SACV-12-1172-AG (RNBx); SACV-12-1853-AG (ANx); SACV-12-2236-AG (MLGx)

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☒ A.  Arise from the same or closely related transactions, happenings, or events; or

☒ B.  Call for determination of the same or substantially related or similar questions of law and fact; or

☒ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE**: (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District: * | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Massachusetts; Delaware |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District: * | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | Nevada |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District: * | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles / Orange | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):**  _Meegan Maczek_        DATE: 6/18/2013

Meegan Maczek (SBN 260609)

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

**ADDENDUM TO UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET**

**I.(a) DEFENDANTS**

MKA REAL ESTATE OPPORTUNITY FUND I, LLC, a California limited liability company; MKA CAPITAL GROUP ADVISORS, LLC, a California limited liability company; JASON SUGARMAN, an individual; MICHAEL ABRAHAM, an individual; ELIZABETH SUGARMAN, an individual; LAUSANNE, LLC, a California limited liability company; EQUIPMENT RENTAL & MANAGEMENT, LLC, a Nevada limited liability company; and DOES 1-10